Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Telephone:     (212) 450-4000
Facsimile:      (212) 701-5800

*Attorneys for the Sterling Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : |
| Plaintiff-Applicant, | : |
| - against - | : |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : Adv. Pro. No. 08-01789 (BRL) |
| Defendant. | : SIPA LIQUIDATION |
| | : |
| | : (Substantively Consolidated) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:
BERNARD L. MADOFF,
Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD,

        Plaintiff,

        - against –        : Adv. Pro. No. 10-05287 (BRL)

SAUL B. KATZ, et al.

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF THE**
**STERLING DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND .........................................................................................2

THIS MOTION...........................................................................................3

ARGUMENT..............................................................................................4

POINT I        WITHDRAWAL OF THE REFERENCE IS MANDATORY ..................4

POINT II      THE INTERPRETATION OF SIPA TO AUTHORIZE THE
AVOIDANCE OF PAYMENTS BY A REGULATED BROKER TO
DISCHARGE ITS LEGAL OBLIGATIONS TO ITS CUSTOMERS
REQUIRES WITHDRAWAL OF THE REFERENCE .............................7

      A.  Avoidance Powers Under the Bankruptcy Code Are Limited..............8

      B.  The Trustee and SIPC Interpret SIPA to Require Avoidance of
Transfers, as Fraudulent, That Discharged Antecedent Debt ...............9

            1.  Customers Are Creditors to Whom Their Broker Owes the
Amounts on Their Brokerage Statements......................................11

            2.  SIPC and the Trustee Contend That SIPA Invalidates Brokerage
Statements So That They No Longer Reflect Antecedent Debt ....14

POINT III     INTERPRETING SIPA AS INCONSISTENT WITH SECTION 546(E)
OF THE BANKRUPTCY CODE REQUIRES WITHDRAWAL OF
THE REFERENCE...................................................................................18

POINT IV     INTERPRETING SIPA TO IMPOSE A RETROACTIVE DUE
DILIGENCE OBLIGATION UPON CUSTOMERS REQUIRES
WITHDRAWAL OF THE REFERENCE.................................................21

CONCLUSION.............................................................................................24

## TABLE OF AUTHORITIES

PAGE

### Cases

*Bear, Stearns Sec. Corp. v. Gredd*, No. 01 CIV 4379, 2001 WL 840187 (S.D.N.Y. July 25, 2001)................................................................................. 6, 7, 11

*Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) ........................ 9

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) ...................................... 5

*Coder v. Arts*, 213 U.S. 223 (1909) ................................................................................ 8

*Cunningham v. Brown*, 265 U.S. 1 (1924)...................................................................... 10

*Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*, No. 04 Civ. 8177, 2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) ............................................................................. 5

*Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004) ........................................................ 13

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ................................................ 9

*In re Bayou Group, LLC*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010).................................................................... 22

*In re Bernard L. Madoff Inv. Secs. LLC*, No. 10-2378 (2d Cir.) ..................................... 16

*In re Cablevision S.A.*, 315 B.R. 818 (S.D.N.Y. 2004) ..................................................... 6

*In re Chase & Sanborn Corp.*, 813 F.2d 1177 (11th Cir. 1987)........................................ 9

*In re Chateaugay Corp.*, 86 B.R. 33 (S.D.N.Y. 1987) ....................................................... 5

*In re Contemporary Lithographers, Inc.*, 127 B.R. 122 (M.D.N.C. 1991)....................... 11

*In re Enron Corp.*, 388 B.R. 131 (S.D.N.Y. 2008)............................................................ 6

*In re J.P. Jeanneret Assoc., Inc.*, 09 Civ. 3907, 2011 WL 335594 (S.D.N.Y. Jan. 31, 2011)........................................................................................ 20

*In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004)................................... 14, 22

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) .................................................... 9, 22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) ..................... 13

*Nathel v. Siegal*, 592 F. Supp. 2d 452 (S.D.N.Y. 2008) ................................................... 13

*Newman v. Family Mgmt.*, 748 F. Supp. 2d 299 (S.D.N.Y. 2010) ................................... 20

*Picard v. HSBC Bank PLC*, 11 Civ. 763 (JSR), 2011 U.S. Dist. LEXIS 44126
    (S.D.N.Y. Apr. 25, 2011).............................................................................. 5, 6, 20

*Picard v. JP Morgan Chase & Co.*, 11 Civ. 0913 (CM), (S.D.N.Y. May 23, 2011) ..... 5, 6

*Picard v. Merkin*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010) ................................................ 20

*SEC v. Zandford*, 535 U.S. 813 (2002) .......................................................................... 13

*Shugrue v. Air Line Pilots Ass'n Int'l*, 922 F.2d 984 (2d Cir. 1990) ................................. 5

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 599
    N.Y.S.2d 816 (1st Dep't 1993) ................................................................................ 9

*Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575 (1913) ..................................................... 8

## Statutes and Rules

11 U.S.C. § 544 ................................................................................................................... 8

11 U.S.C. § 546(e) ....................................................................................................... 18, 19

11 U.S.C. § 547 ................................................................................................................... 8

11 U.S.C. § 548 ................................................................................................................... 8

11 U.S.C. § 548(a)(1)(A) ................................................................................................... 19

11 U.S.C. § 550(a)(1) .......................................................................................................... 6

15 U.S.C. § 78ccc(a)(2)(A) ............................................................................................... 19

15 U.S.C. § 78fff-1(a) ................................................................................................... 10, 17

15 U.S.C. § 78fff-2(c)(3) .................................................................................... 8, 14, 17, 20

15 U.S.C. § 78*lll*(2) .......................................................................................................... 17

17 C.F.R. § 240.10b-10 (2010) ......................................................................................... 11

28 U.S.C. § 157(d) .................................................................................................. 1, 4, 5, 6

NASD Rule 2340 ............................................................................................................... 12

NYSE Rule 409 .................................................................................................. 12

NYUCC Art. 8 Historical and Statutory Notes ("Legislative Intent and
    Declaration") (McKinney 2002) .................................................................... 12

NYUCC § 8 ............................................................................................... 12, 15

NYUCC § 8-102(a)(9)(i) ................................................................................ 12

NYUCC § 8-102(a)(14)(ii) ............................................................................. 12

NYUCC § 8-102(a)(17) .................................................................................. 12

NYUCC § 8-501 ............................................................................................. 12

NYUCC § 8-501 cmt. 2 .................................................................................. 13

NYUCC § 8-501 cmt. 3 .................................................................................. 13

NYUCC § 8-501(b) ........................................................................................ 12

NYUCC § 8-501(c) ........................................................................................ 13

NYUCC § 8-503 cmt. 2 .................................................................................. 12

SEC Rule 15c3-3 ............................................................................................ 14

## Other Authorities

Confirmation of Transactions, 59 Fed. Reg. 59,612 (Nov. 17, 1994) ........................ 11, 12

*Important Message on Creditor Claims* ......................................................... 16

SEC, Avoiding Fraud, http://investor.gov/investing-basics/avoiding-fraud (last
    visited May 25, 2011) ................................................................................. 21

SEC Office of Investigations, Report No. OIG-509, *Investigation of Failure of the
    SEC to Uncover Bernard Madoff's Ponzi Scheme – Public Version* (2009),
    *available at* http://www.sec.gov/news/studies/2009/oig-509.pdf (last visited
    May 25, 2011) .............................................................................................. 22

SIPC, SIFMA, and NASAA, *Understanding Your Brokerage Account Statements* ........ 14

Trustee's Fifth Interim Report, *In re Madoff*, No. 09-01789, doc. no. 4072 (Bankr.
    S.D.N.Y. May 16, 2011) .............................................................................. 15

Defendants ("Sterling Defendants") respectfully submit this memorandum of law

in support of their motion, pursuant to 28 U.S.C. § 157(d), to withdraw from the

Bankruptcy Court the reference of this adversary proceeding brought by the trustee

("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS").  Significant and novel questions of non-bankruptcy federal law permeate this

case and mandate withdrawal of the reference.

## PRELIMINARY STATEMENT

The Trustee has sued the Sterling Defendants for one billion dollars.  His

complaint seeks to avoid, as fraudulent transfers, all withdrawals, over a twenty-five year

period, by the Sterling Defendants from their brokerage accounts with BLMIS, a

registered broker, in accordance with their legal rights as reflected on statements

regularly issued by BLMIS.

The complaint, filed in the Bankruptcy Court for this District, is rife with false

allegations that are directly contradicted by the Trustee's unilateral pre-complaint

discovery.

More importantly for this motion to withdraw the reference, the Trustee's

avoidance claims raise significant questions regarding the interpretation of the Securities

Investor Protection Act ("SIPA") and its interaction with the other federal securities laws

and the Bankruptcy Code.  The Trustee contends that SIPA requires that he avoid

transfers to customers that are protected payments under the securities laws and that

would not otherwise be avoidable under the Bankruptcy Code.  Neither this

unprecedented interpretation, nor the resulting contention that the Trustee is given

extraordinary avoidance powers, is supported by the words of SIPA.

The Securities Investor Protection Corporation ("SIPC"), an entity operating under the oversight of the Securities and Exchange Commission ("SEC"), agrees with the Trustee that, under SIPA, the Trustee may avoid transfers by brokers to customers that were protected by the securities laws if the broker is ultimately liquidated as a result of a particular type of fraud—a Ponzi scheme.

SIPC and the Trustee consequently raise several issues of first impression that require withdrawal of the reference.

## BACKGROUND

As set forth in detail in the underlying motion papers, the Sterling Defendants include the ten partners of Sterling Equities, their families, family trusts, charitable foundations, and certain entities that they own, including the New York Mets.

For twenty-five years the Sterling Defendants were customers of BLMIS, a registered securities broker. They, like most BLMIS customers, signed brokerage agreements that gave Bernard L. Madoff ("Madoff") discretionary trading authority over their brokerage accounts. The Sterling Defendants regularly deposited funds from their successful businesses into BLMIS accounts for the purchase of blue chip securities, such as Walmart and ExxonMobil. BLMIS was *not* a hedge fund and, unlike the Ponzi schemes in cases relied upon by SIPC and the Trustee, the Sterling Defendants did not acquire equity *in* BLMIS; they purchased securities *through* BLMIS. They were creditors of BLMIS. The monthly statements that BLMIS was legally required to send them reflected BLMIS' obligations to them for their securities.

On December 11, 2008, Madoff confessed. The Sterling Defendants lost over a half billion dollars that day. Shortly thereafter, the SEC filed a complaint accusing

Madoff and BLMIS of engaging in securities fraud.  SIPC and the SEC placed BLMIS in a SIPA liquidation and requested appointment of the Trustee.  Two years later, the Trustee commenced more than one thousand adversary proceedings against customers of BLMIS, including the Sterling Defendants.

## THIS MOTION

The Trustee filed an initial complaint against the Sterling Defendants on December 7, 2010 and an amended complaint ("Complaint") on March 18, 2011. (Declaration of Karen E. Wagner ("Wagner Decl."), Ex. A.)  The Complaint seeks recovery of "fictitious profits" alleged to have been paid over the course of the Sterling Defendants' investment relationship with BLMIS.  The Complaint also seeks recovery of "principal," alleging that the Sterling Defendants were willfully blind to the fact that BLMIS was operating a Ponzi scheme.

On March 20, 2011, the Sterling Defendants moved to dismiss, or, in the alternative, for summary judgment dismissing, the Complaint ("Sterling Motion"). (Wagner Decl., Ex. B.)  The Sterling Motion asserts that the factual allegations relied on by the Trustee to support his claim of constructive notice are false and directly contradicted by the Trustee's own extensive, and unilateral, pre-complaint discovery record.  As set forth in their Motion, the Sterling Defendants also challenge as a matter of law the Trustee's avoidance claims, for which there is no basis—under SIPA, the Bankruptcy Code, or any other body of law.

On May 19, 2011, the Trustee filed his opposition to the Sterling Motion ("Trustee Opp.").  (Wagner Decl., Ex. C.)  SIPC also filed a brief in support of the Trustee ("SIPC Opp.").  (Wagner Decl., Ex. D.)  The Sterling Defendants' reply is due by

June 20, 2011, and argument in the Bankruptcy Court, currently scheduled for June 29, 2011, will likely be adjourned.

Both the Trustee and SIPC interpret SIPA and its interaction with other federal laws to alter retroactively the federal and state laws applicable to nearly three decades of transactions between a regulated broker and its customers.  Indeed, SIPC devotes almost half of its argument to a startling statutory interpretation analysis of SIPA in support of the Trustee's deployment of SIPA to attack, rather than to protect, brokerage customers. (*See* SIPC Opp. at 8-16.)  The Sterling Motion had contemplated the possibility that the Trustee's arguments would give rise to legal claims that would require withdrawal.  (*See* Sterling Motion at 68 n.29.)  The Trustee's opposition, as well as SIPC's, have now done so.

## ARGUMENT

## POINT I

## <u>WITHDRAWAL OF THE REFERENCE IS MANDATORY</u>

In response to the Sterling Motion, SIPC and the Trustee have raised fundamental issues with regard to the interpretation of SIPA and other federal securities laws and their interaction with the Bankruptcy Code.  Resolution of these issues will directly affect the resolution of this case and likely will affect all of the cases brought by the Trustee against BLMIS customers.

Section 157(d) of Title 28 of the United States Code provides:

> "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.  The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and

4

other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. § 157(d).

Pursuant to 28 U.S.C. § 157(d), this Court may *sua sponte* withdraw the reference for "a wide variety of reasons."  *Picard v. HSBC Bank PLC*, 11 Civ. 763 (JSR), 2011 U.S. Dist. LEXIS 44126, at *6 (S.D.N.Y. Apr. 25, 2011).  The nature of the questions raised by SIPC and the Trustee, and their application to the BLMIS case generally, constitute such a reason.  *See, e.g.*, *In re Chateaugay Corp.*, 86 B.R. 33, 36-39 (S.D.N.Y. 1987) (finding mandatory and permissive withdrawal of core bankruptcy claims appropriate because claims involved significant issues of first impression of bankruptcy and ERISA law that could impact many present and future retirees and their employers).

In addition, "a litigant can *mandate* withdrawal of the bankruptcy reference where the movant shows that, absent the withdrawal, the bankruptcy judge would be obliged 'to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statute.'"  *HSBC*, 2011 U.S. Dist. LEXIS 44126, at *6-7 (citing *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991)); *see also Picard v. JP Morgan Chase & Co.*, 11 Civ. 0913, slip op. at 6 (S.D.N.Y. May 23, 2011) (same); *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*, No. 04 Civ. 8177, 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (providing that the reference of any proceeding that involves "substantial and material consideration" of non-bankruptcy federal law must also be withdrawn) (quoting *Shugrue v. Air Line Pilots Ass'n Int'l*, 922 F.2d 984, 995 (2d Cir. 1990)).

Because SIPA is codified under Title 15 as a securities law, a "substantial issue under SIPA is therefore, almost by definition, an issue 'the resolution of [which] requires consideration of both title 11 and other laws of the United States.'"  *HSBC*, 2011 U.S.

5

Dist. LEXIS 44126, at *9 (quoting 28 U.S.C. § 157(d)); *see also JP Morgan Chase*, 11 Civ. 0913, slip op. at 14 ("[A]n issue that requires significant interpretation of SIPA undoubtedly requires consideration of laws other than Title 11.  Regardless of a bankruptcy court's familiarity with a statute outside of Title 11, the requirements for mandatory withdrawal are satisfied if the proceeding requires consideration of a law outside of Title 11.").

Where significant interpretation of the securities laws has been required, withdrawal has been found mandatory.  *See, e.g.*, *Bear, Stearns Sec. Corp. v. Gredd*, No. 01 CIV 4379, 2001 WL 840187, at *4 (S.D.N.Y. July 25, 2001) (withdrawal mandatory where SEC rule potentially precluded application of the Bankruptcy Code avoidance provisions because debtor would not have an interest in the subject property); *In re Cablevision S.A.*, 315 B.R. 818, 821 (S.D.N.Y. 2004) (withdrawal mandatory where the interplay between the federal securities laws and the ancillary proceeding section of the Bankruptcy Code was required); *In re Enron Corp.*, 388 B.R. 131, 140 (S.D.N.Y. 2008) (withdrawal mandatory where trustee's theory of secondary liability under Section 550(a)(1) of the Bankruptcy Code, if it were reached, involved substantial and material consideration of the Securities Act).

Further, where there appears to be a conflict between the Bankruptcy Code and other federal laws, mandatory withdrawal also is required.  *See HSBC*, 2011 U.S. Dist. LEXIS 44126, at *17 (deeming a conflict between SIPA and bankruptcy law as "something that itself warrants withdrawal of the bankruptcy reference"); *see also In re Cablevision*, 315 B.R. at 821 ("The very existence of a dispute as to whether the rights of [investors] under the [Trust Indenture Act] and Williams Act supersede Section 304 [of

6

the Bankruptcy Code] or whether the Bankruptcy Code overrides the TIA, regardless of the ultimate resolution of such dispute, mandates withdrawal."); *Gredd*, 2001 WL 840187, at *2-4 (withdrawing reference where federal securities laws "arguably conflict[ed]" with the Bankruptcy Code).

Because the opposition papers filed by SIPC and the Trustee raise very consequential issues regarding the interpretation of SIPA and its effect on other federal and state laws, as well as the Bankruptcy Code, withdrawal of the reference is mandated and appropriate.

**POINT II**

**THE INTERPRETATION OF SIPA TO AUTHORIZE THE
AVOIDANCE OF PAYMENTS BY A REGULATED BROKER TO
DISCHARGE ITS LEGAL OBLIGATIONS TO ITS CUSTOMERS
<u>REQUIRES WITHDRAWAL OF THE REFERENCE</u>**

The Trustee's Complaint seeks to avoid transfers that do not fit within the parameters of either the preference or the fraudulent conveyance avoidance powers under the Bankruptcy Code.  The Trustee and SIPC contend that SIPA must be interpreted to transform those powers to permit the Trustee to avoid transfers that discharged a broker's obligation to its customers—transfers that are not otherwise avoidable and that were, and still are, protected by the securities laws.

SIPC and the Trustee attempt to downplay the significance of this novel interpretation, repeatedly stating that a SIPA trustee is entitled to use the avoidance powers of the Bankruptcy Code.  (*See, e.g.*, Trustee Opp. at 57; SIPC Opp. at 14-15.) But the Complaint is not based on the avoidance powers of the Bankruptcy Code—it is based on vastly enlarged powers that SIPC and the Trustee contend are created by SIPA.

The words of SIPA do not support the employment of expanded avoidance powers.  SIPA provides that a SIPA trustee may employ the avoidance provisions only "if and to the extent that [a] transfer is voidable or void under the provisions of title 11." 15 U.S.C. § 78fff-2(c)(3).  The contrary claim of the Trustee and SIPC requires an unprecedented reading of SIPA that would conflict with the Bankruptcy Code and with non-SIPA securities laws.  That interpretation alone mandates withdrawal of the reference.

**A.      Avoidance Powers Under the Bankruptcy Code Are Limited**

Under the Bankruptcy Code, certain transfers occurring prior to a bankruptcy filing may be avoided, either as fraudulent or as preferential.  The objectives of the two bases for avoidance are very different.  "An attempt to prefer is not to be confounded with an attempt to defraud, nor a preferential transfer with a fraudulent one."  *Coder v. Arts*, 213 U.S. 223, 241 (1909) (citation omitted).

Avoidance of a transfer as preferential, which is permitted only for transfers within a ninety-day window of an insolvency filing, seeks to prevent a debtor from unevenly distributing its assets *among its creditors* just before it files an insolvency proceeding.  *See* 11 U.S.C. § 547.  Avoidance of a transfer as fraudulent, which is permitted for transfers occurring within periods ranging from two to six years or possibly more, allows a debtor to reclaim an asset transferred to an entity *other than a creditor*. *See* 11 U.S.C. §§ 544, 548.

A transfer is intentionally fraudulent when the debtor "intends to hinder and delay [its creditors] *as a class*."  *Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 582 (1913) (emphasis added).  A transfer that has the same result, even if not intentional, is avoidable

as constructively fraudulent.  "Fraudulent transfers are avoidable because they diminish the assets of the debtor to the detriment of *all creditors*."  *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1181 (11th Cir. 1987) (emphasis added).

By definition, a transfer to a creditor that discharges a valid debt—such as BLMIS' transfers to customers—cannot be avoided as fraudulent.  "[T]he preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because 'the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them.'"  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (quoting *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987)); *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) ("'[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.'" (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D. 2d 86, 90-91, 599 N.Y.S. 2d 816 (1st Dep't 1993))).

**B.      The Trustee and SIPC Interpret SIPA to Require Avoidance of Transfers, as Fraudulent, That Discharged Antecedent Debt**

The great majority of the claims asserted by the Trustee against the Sterling Defendants seek to avoid transfers occurring as far back as twenty-five years before the SIPA filing.  SIPC and the Trustee contend that they have launched this and over a thousand other avoidance actions because SIPA requires them to cause all BLMIS customers to "stand shoulder to shoulder in terms of their principal losses from BLMIS." (Trustee Opp. at 92; *see also* SIPC Opp. at 6, 16.)  Because equality is their objective, they are necessarily invoking the Bankruptcy Code's preference power, which is directed

9

toward equality of treatment *among* creditors, and not the fraudulent transfer powers, which are directed toward recovering assets transferred to persons *other* than creditors. Indeed, the Trustee relies upon the Supreme Court's decision in *Cunningham v. Brown*, 265 U.S. 1, 13 (1924), a *preference* case, as support for the notion that "equality is equity" in a Ponzi scheme case. (Trustee Opp. at 93.)

Given that most of the targeted transfers occurred well outside the ninety-day preference period, they cannot be avoided as preferential. And given that the targeted transfers discharged obligations to the Sterling Defendants as creditors of BLMIS for the amounts owed to them based on their brokerage statements, they were transfers on account of antecedent debt that cannot be avoided as fraudulent. Consequently, SIPC and the Trustee are forced to argue that SIPA either expands the temporal limitation of the preference provision or that SIPA expands the fraudulent conveyance provisions to capture transfers that do not otherwise fall within the Bankruptcy Code parameters.

Thus, SIPC and the Trustee claim that SIPA Section 78fff-1(a), which vests a SIPC trustee with "the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11," merges and enlarges the separate avoidance provisions to permit avoidance of preferences for a twenty-five year period or to permit avoidance of payments of legally valid debt as fraudulent. SIPC contends that "fraudulent [transfer actions] are pivotal to ensure equal treatment of creditors, including customers, in a SIPA case" (SIPC Opp. at 6), while the Trustee argues that "[t]he Bankruptcy Code works in tandem with SIPA to permit the Trustee to recover fraudulent transfers . . . to ensure that customers have recovered their net losses" (Trustee Opp. at 92).

These interpretations of SIPA are novel, without precedent, and cause SIPA to conflict with other securities laws and with the Bankruptcy Code.

### 1. Customers Are Creditors to Whom Their Broker Owes the Amounts on Their Brokerage Statements

Most investment securities today are held in electronic form. Customers rarely receive paper certificates. The only evidence of ownership a customer is likely to receive is the acknowledgement by the broker, in a confirmation or periodic statement, that it owes securities to the customer. It is therefore a bedrock principle of federal broker-dealer regulation that brokers must issue statements, upon which customers may rely, to evidence customer transactions and holdings. Rule 10b-10 under the Securities Exchange Act of 1934 requires brokers to provide customers with confirmations of securities transactions. *See* Rule 10b-10, 17 C.F.R. § 240.10b-10 (2010) (Confirmation of Transactions).[1] The SEC releases adopting this rule reflect that these confirmations are to serve as legally enforceable evidence of a broker's obligation to the customer.[2]

---

[1] SEC regulations have the force of law, and cases that involve substantial consideration of such regulations also require withdrawal of the reference to the Bankruptcy Court. *See, e.g.*, *Gredd*, 2001 WL 840187, at *4 (withdrawing reference because the Trustee's fraudulent transfer theory required "substantial and material consideration" of federal securities regulations); *In re Contemporary Lithographers, Inc.*, 127 B.R. 122, 123 (M.D.N.C. 1991) (granting motion to withdraw the reference because case required interpretation of SEC regulations).

[2] *See* Confirmation of Transactions, 59 Fed. Reg. 59,612, 59,613 (Nov. 17, 1994) (to be codified at 17 C.F.R. pt. 240) ("For over 50 years, the customer confirmation has served basic investor protection functions by conveying information allowing investors to verify the terms of their transactions; alerting investors to potential conflicts of interest with their broker-dealers; acting as a safeguard against fraud; and providing investors the means to evaluate the costs of their transactions and the quality of their broker-dealer's execution.").

The rules of FINRA and the NYSE similarly mandate issuance of periodic account statements.  *See* NASD Rule 2340 (Customer Account Statements); NYSE Rule 409 (Statements of Accounts to Customers).  Because statements are so critical, where customers have given their broker trading authority, the SEC prohibits waiver of the right to receive such statements.  *See* Confirmation of Transactions, 59 Fed. Reg. 59,612, 59,614 ("The customer may not waive this periodic report.").

These federal laws enforce state law ownership rights.  In New York, Article 8 of the New York Uniform Commercial Code ("NYUCC") determines the customer's rights against his broker.  *See* NYUCC § 8-501 *et seq.*[3]  Under Article 8, the broker's obligation to the customer is created by the issuance of a statement.  The NYUCC provides that "a person acquires a security entitlement[4] if a securities intermediary[5] . . . (1) indicates by book entry that a financial asset has been credited to the person's securities account . . . [or] (3) becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account."  NYUCC § 8-501(b).  It is therefore "a basic operating assumption of the indirect holding system that once a [broker] has acknowledged that it is carrying a position in a financial asset for its customer . . . the

---

[3]  Article 8 addresses the modern securities holding system, in which customers do not hold physical certificates, but rather hold securities entitlements in an indirect holding system.  *See* NYUCC Art. 8 Historical and Statutory Notes ("Legislative Intent and Declaration") (McKinney 2002).

[4]  A "security entitlement" means "the rights and property interest of an entitlement holder with respect to a financial asset [including a security, *see* NYUCC § 8-102(a)(9)(i)] specified in Part 5 [of Article 8]."  NYUCC § 8-102(a)(17).  It is "a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary."  NYUCC § 8-503 cmt. 2.

[5]  A "securities intermediary" includes a broker.  *See* NYUCC § 8-102(a)(14)(ii).

[broker] is obligated to treat the customer . . . as entitled to the financial asset."  NYUCC

§ 8-501 cmt. 2.

Once ownership is acknowledged, Section 8-501(c) provides that "a person has a

security entitlement even though the securities intermediary does not itself hold the

financial asset"—i.e., the broker owes the customer the securities reflected on the

customer's statement regardless of whether the broker actually purchased the securities.

As the Official Comment to this Section explains:

> "In the indirect holding system, the significant fact is that the securities
> intermediary has undertaken to treat the customer as entitled to the
> financial asset.  It is up to the securities intermediary to take the necessary
> steps to ensure that it will be able to perform its undertaking.
>
> * * *
>
> The entitlement holder's rights against the securities intermediary do not
> depend on whether or when the securities intermediary acquired its
> interests."  NYUCC § 8-501 cmt. 3.

Similarly, the federal laws enforce the customer's rights whether or not a broker

actually purchased securities, given that the customer has no means to confirm the

transaction.  The customer is protected when the broker accepts the customer's payment

and issues a statement that acknowledges its debt to the customer.  "[A] broker who

accepts payment for securities that he never intends to deliver . . . violates § 10(b) and

Rule 10b-5."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10

(2006); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (same); *see also Grippo v. Perazzo*,

357 F.3d 1218, 1223-24 (11th Cir. 2004) (finding "in connection with" the purchase or

sale of a security element of securities fraud claim adequately pled where broker accepted

and deposited customer's money as payment for securities); *Nathel v. Siegal*, 592 F.

Supp. 2d 452, 464 (S.D.N.Y. 2008) (deeming allegations that broker falsely promised to

13

purchase securities, but never intended to do so sufficient to allege fraud "in connection with" a purchase of securities).[6]  Were the law otherwise, the protective legal framework that promotes investment through registered brokers would be rendered entirely illusory.

> **2.      SIPC and the Trustee Contend That SIPA Invalidates Brokerage Statements So That They No Longer Reflect Antecedent Debt**

When a customer deposits funds with his broker, the broker becomes obligated to the customer for the securities on the statements the broker issues.  SIPA, passed to protect customers after their broker has failed, has not previously been interpreted to change these rules.  Indeed, SIPC expressly advises customers that "[i]n the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you.  This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement."  SIPC, SIFMA, and NASAA, *Understanding Your Brokerage Account Statements*, at 5 (Wagner Decl., Ex. E); *see also In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 86 (2d Cir. 2004) (customers in a SIPA case are entitled to rely "on what the customer has been told by the debtor in written confirmations").

The Trustee and SIPC do not disagree that customers are creditors.  Nor could they.  SIPA itself so states, *see* 15 U.S.C. § 78fff-2(c)(3), and SIPC agrees (SIPC Opp. at 15 n.7).  The Trustee, too, has acknowledged that "[a]ll BLMIS customers who filed

---

[6]  SIPC disputes the idea that when a customer deposits funds with the broker, the customer exchanges the funds for the broker's obligation to the customer.  (*See* SIPC Opp. at 24 n.10.)  Basing its argument on SEC Rule 15c3-3, SIPC appears to contend that the customer's funds are to be maintained for the customer, and if the broker uses the funds to pay another customer, that customer is in receipt of stolen funds.  This interpretation of SEC Rule 15c3-3 is entirely novel and constitutes another basis for withdrawal of the reference.

claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate."  Trustee's Fifth Interim Report ¶ 76, *In re Madoff*, No. 08-01789, doc. no. 4072 (Bankr. S.D.N.Y. May 16, 2011).  Therefore, payments to BLMIS customers that discharged what BLMIS owed them as creditors cannot be subject to fraudulent transfer claims.

In this case, however, the Trustee and SIPC seek to alter that rule.  They argue that BLMIS did *not* owe its customers the securities on their statements because BLMIS was engaged in a Ponzi scheme.  As a result, they contend, SIPA retroactively preempts NYUCC Article 8 and overrides the federal laws protecting brokerage customers, so that, in this case, what customers were owed in the past is only the amount of a customer's "net equity" as defined by and calculated under SIPA.  (*See, e.g.*, SIPC Opp. at 20 (rejecting argument that antecedent debt is based on statements because "[w]hat customers are owed in a SIPA proceeding is their net equity," "the difference between the amounts deposited by them with the brokerage and the amounts withdrawn"); Trustee Opp. at 61-62 (contending that the Bankruptcy Court has rejected the legal significance of statements in context of "net equity" claims and therefore statements do not reflect valid antecedent debt).)  This argument is made not only as to the last statements received by the defrauded customers, but as to all statements they ever received over time.

The proffered reason for this interpretation of SIPA is that it is necessary to further SIPA's requirement that the Trustee equalize customer status by suing one set of customers to benefit another.  (*See* SIPA Opp. at 13 ("A SIPA trustee's ability to recover fraudulent transfers is necessary for the equitable treatment of customers and other creditors alike."); Trustee Opp. at 69 ("But whether an investor is a customer under SIPA

has no bearing upon whether he received avoidable transfers from the broker-dealer.").)
No provision of SIPA by its terms gives that direction.  Instead, SIPC and the Trustee
interpret SIPA's "customer" and "net equity" definitions to mandate that customers be
divided into two categories, "net winners" and "net losers," contending that only "net
losers" have "net equity" claims and that "net winners" may be sued so that the losses of
the two groups may be made commensurate.[7]

But SIPA's definition of "net equity," which addresses a customer's claim against
the SIPC fund and the bankrupt estate, has never before been held to be the measure of
what the broker owed the customer *before* the SIPA filing, such that payments based
upon brokerage statements may be invalidated as fraudulent.[8]  And neither SIPA's

---

[7] As the Trustee has explained on his website:

"When the Ponzi scheme collapsed, there were two large classes of
investors.  Both invested principal in the scheme, and both received
fraudulent statements showing that those funds were invested.  One class,
however – the 'net winners' – has not only already recovered all of their
principal through withdrawals, but also received some amount of the
fictitious profits shown on their statements.  Because there were no profits,
this money came from other investors.  The second class deposited
principal but had not received all or even some of it back as of the day of
the collapse.  This class – the 'net losers' – is the one that funded
payments to the first class.  This class has valid net equity claims.

*As defined by SIPA*, BLMIS customers with valid net equity claims – 'net
losers' – have a preferred status and will be paid from the Customer Fund
first.  If the Trustee is able to satisfy all claims of the preferred customer
class, that will represent the first time that all customers of BLMIS will
stand equal in terms of their losses from BLMIS and their status as
creditors of the General Estate."  *Important Message on Creditor Claims*
(emphasis added) (Wagner Decl., Ex. F).

[8] SIPC and the Trustee also interpret SIPC to require calculation of "net equity"
in a novel manner.  The validity of that interpretation is pending before the Second
Circuit.  *See In re Bernard L. Madoff Inv. Secs. LLC*, No. 10-2378 (2d Cir.)

definitions of "customer" or "net equity," nor any other SIPA provision, contains the words "net winner" or "net loser"—terms that deflect attention from the fact that every BLMIS customer, including the Sterling Defendants, suffered horrendous losses.[9]  These terms are litigation constructs created to attempt to justify the unprecedented use of SIPA to override the customer protections of the securities laws and the creditor protections of the Bankruptcy Code.

Finally, the words of SIPA itself are contrary to the interpretation advocated by SIPC and the Trustee as the basis for transformation of the avoidance powers.  SIPA expressly subjects the use of the avoidance provisions to the limits imposed by the Bankruptcy Code, stating that a SIPA trustee may employ the avoidance provisions only "*if and to the extent* that [a] transfer is voidable or void *under the provisions of title 11*." 15 U.S.C. § 78fff-2(c)(3) (emphasis added).  Therefore, pursuant to the terms of SIPA itself the Trustee may avoid transfers to customers only as preferences.  Indeed, when describing the Trustee's powers, the statute gives the Trustee "the same rights to avoid *preferences*, as a trustee in a case under title 11."  15 U.S.C. § 78fff-1(a) (emphasis added).[10]

---

[9]  "Customer," under SIPA, is defined in several ways—including "any person who has deposited cash with the debtor for the purpose of purchasing securities"—that reflect the customer's perspective and not that of the fraudulent broker.  *See* 15 U.S.C. § 78*lll*(2).

[10]  The Trustee's Complaint asserts preference claims against the Sterling Defendants.  With respect to those claims, the Trustee alleges that each Sterling Defendant was a "creditor" and that all preferential transfers were made on account of antecedent debt.  (Compl. ¶¶ 1377, 1380.)  He offers no justification or explanation as to why every other targeted transfer, made to these same creditors and on account of antecedent debt, is otherwise avoidable as fraudulent.

17

SIPC forthrightly admits that "absent authority to sue under section 548 or other avoidance provisions, recovery for the benefit of customers and other creditors would be extremely limited and possibly nil if a preference could not be shown."  (SIPC Opp. at 16; *see also* Trustee Opp. at 92-93 (describing the avoidance of fraudulent transfers as "necessary" to effectuate SIPA's goals of equalizing customers).)  But, precisely because customers are owed what is reflected on their statements, that is exactly what SIPA contemplates—that avoidance of transfers to customers as fraudulent is not authorized, consistent with the limitations on avoidance powers prescribed by the Bankruptcy Code. The contrary position of SIPC and the Trustee, which nullifies statements issued over a twenty-five year period representing valid obligations which were discharged by transfers, is a stunning and unprecedented interpretation of SIPA that mandates withdrawal of the reference.

## POINT III

### INTERPRETING SIPA AS INCONSISTENT WITH SECTION 546(E) OF THE BANKRUPTCY CODE REQUIRES WITHDRAWAL OF THE REFERENCE

As discussed, transfers to customers that discharge antecedent debt cannot be avoided as fraudulent.  But even if the Trustee were able to prove that a particular BLMIS obligation to a customer was invalid—perhaps because the customer was complicit in the fraud, such that payments upon those obligations were not made on account of valid debt—the Bankruptcy Code provides a safe harbor that prevents avoidance of such transfers unless they occur within two years of the SIPA filing.  *See* 11 U.S.C. § 546(e).  If this safe harbor applies in this case, the Trustee cannot proceed with many of his claims against customers.  SIPC and the Trustee consequently contend

18

that this Bankruptcy Code provision is overridden by SIPA, raising another fundamental dispute as to the interpretation of SIPA and its relationship with the Bankruptcy Code.

Section 546(e) of the Code provides that a "trustee may not avoid a transfer . . . that is a transfer made by or to . . . [a] stockbroker [or] financial institution . . . in connection with a securities contract . . . ." *Id.*  Section 546(e) is one of several Bankruptcy Code provisions that provide a wide range of safe harbors that balance the avoidance powers with the need to protect the securities and financial markets from disruption.  Under Section 546(e), as relevant here, a transfer by a broker to a customer may be avoided only within two years of a SIPA filing, if proof of the intent requirements of Section 548(a)(1)(A) can be shown.  Plainly, if Section 546(e) applies, no transfer by BLMIS that occurred prior to December 11, 2006, may be avoided.

SIPC and the Trustee therefore argue vigorously that Section 546(e) is "altogether" inapplicable to this case on many grounds, including that BLMIS was not a "broker" for purposes of Section 546(e) and that the application of Section 546(e) is "incompatible with SIPA."  (Trustee Opp. at 90-91; SIPC Opp. at 19-20.)  In so doing, they again interpret SIPA in a novel manner that significantly conflicts with the Bankruptcy Code.

First, BLMIS was, and must have been, a broker because it is the subject of a SIPA proceeding.  Only a registered broker qualifies as a candidate for a SIPA proceeding.  *See* 15 U.S.C. § 78ccc(a)(2)(A) (defining SIPC members as registered brokers or dealers under the federal securities laws).  If BLMIS was a broker under applicable law when it engaged in the targeted transfers and was a broker for purposes of a SIPA liquidation, to conclude that BLMIS is not considered a broker for purposes of the

19

Bankruptcy Code safe harbor in a SIPA case creates a mystifying conflict among SIPA, the securities laws, and the Bankruptcy Code.

Second, to interpret SIPA as precluding the application of Section 546(e) because it is "incompatible" with SIPA is also novel.[11]  (Trustee Opp. at 90; SIPC Opp. at 19-20.) SIPA on its face permits use of the avoidance powers only "if and to the extent that [a] transfer is voidable or void under the provisions of title 11."  15 U.S.C. § 78fff-2(c)(3). Section 546(e) plainly limits the voidability of transfers under Title 11, and, therefore, on its face applies in a SIPA proceeding.[12]  The Trustee's contrary interpretation of SIPA, on the grounds that Section 546(e) is an impediment to his avoidance of preferences and transfers that fall outside of the two-year window and that SIPA, therefore, must be interpreted to override Section 546(e), raises a conflict between the two statutes and a substantial statutory interpretation issue, each of which mandates withdrawal.

---

[11]  The Bankruptcy Court previously has held that application of Section 546(e) to a BLMIS adversary proceeding was "incompatible with SIPA" and, therefore, SIPA controls and Section 546(e) cannot apply.  *Picard v. Merkin*, 440 B.R. 243, 267-68 (Bankr. S.D.N.Y. 2010)  This conflict between the Bankruptcy Code and SIPA, itself, gives rise to a withdrawable issue.  *See HSBC*, 2011 U.S. Dist. LEXIS 44126, at *17.

[12]  Much of the Trustee's and SIPC's argument concerning the purported inapplicability of Section 546(e) to BLMIS transfers focuses on BLMIS' lack of actual trading.  (*See* Trustee Opp. at 90-91; SIPC Opp. at 19.)  In other contexts, the Courts of this District have found that BLMIS' failure to purchase securities does not affect the securities law protection of its customers.  *See, e.g.*, *In re J.P. Jeanneret Assoc., Inc.*, 09 Civ. 3907, 2011 WL 335594, at *13, 18 (S.D.N.Y. Jan. 31, 2011) (finding "in connection with" requirement of securities fraud claim satisfied even though Madoff failed to purchase or sell securities and citing numerous Second Circuit courts holding the same); *see also, e.g.*, *Newman v. Family Mgmt.*, 748 F. Supp. 2d 299, 311-13 (S.D.N.Y. 2010) (stating that there is "no question that Madoff's Ponzi scheme was 'in connection with' the purchase and sale of securities" when considering SLUSA preemption) (citation omitted).

## POINT IV

### INTERPRETING SIPA TO IMPOSE A RETROACTIVE
### DUE DILIGENCE OBLIGATION UPON CUSTOMERS
### <u>REQUIRES WITHDRAWAL OF THE REFERENCE</u>

Finally, in order to avoid transfers of "principal," the Trustee interprets SIPA to retroactively impose a diligence obligation on brokerage customers—an obligation that, in this case, the Trustee employs to penalize customers who failed to discover what BLMIS' regulators did not.  Reading SIPA to cause a retroactive change in the law governing the relationship between a registered broker and its customers again requires mandatory withdrawal of the reference.

The Trustee's Complaint alleges that random comments and widely disseminated magazine articles should have tipped off the Sterling Partners to BLMIS' fraud (even though BLMIS' regulators, who had a great deal more information and expertise than any Sterling Defendant had, remained in the dark).  The Trustee contends that a diligence obligation was imposed upon the Sterling Defendants to determine whether BLMIS was actually trading securities or engaging in a Ponzi scheme—although the Complaint does not suggest how such an investigation could be accomplished.[13]  Because no forensic

---

[13]  The most likely course of action for a retail customer to take, in the event the customer thought his broker was engaged in improper conduct, would be to go to the SEC with his concerns, not to investigate the broker himself.  Indeed, the SEC's website says:

> "**Where can I go for help?**  If you have a question or concern about an investment, or you think you have encountered one of these frauds, please contact the SEC, FINRA, or your state securities regulator to report the fraud and to get assistance."  *See* SEC, Avoiding Fraud, http://investor.gov/investing-basics/avoiding-fraud (last visited May 25, 2011) (emphasis in original).

examination was undertaken, the Trustee charges the Sterling Defendants with "willful blindness"—actual or imputed—to Madoff's fraud, and seeks the return of all withdrawals from their brokerage accounts over a twenty-five year period.

The key allegations as to "notice" are demonstrably false.  (*See* Sterling Motion at 6-53.)

And the Trustee's legal conclusions are unprecedented.  The Sterling Defendants were customers of a registered broker.  No federal securities law, including SIPA, imposes upon a brokerage customer a duty to investigate his broker to ensure that the broker is not engaging in fraud.[14]  As to SIPA in particular, the Court of Appeals for the Second Circuit has rejected the argument that SIPA imposes any diligence obligation. *See In re New Times*, 371 F.3d at 86-87 ("[A] goal of greater investor vigilance, however, is not emphasized in the legislative history of SIPA.  Instead . . . the drafters' emphasis was on promoting investor confidence in the securities market and protecting broker-dealer customers.").

Here, the Trustee seeks to recover a billion dollars from the Sterling Defendants on the theory that they were sophisticated business people who were obligated, but failed,

---

In the case of BLMIS, if any BLMIS customer had had concerns about BLMIS (which the Sterling Defendants did not), going to the SEC would have been futile.  SEC Office of Investigations, Report No. OIG-509, *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme – Public Version* 25 (2009), *available at* http://www.sec.gov/news/studies/2009/oig-509.pdf (last visited May 25, 2011).

[14] Nor is there any state law duty to discover, or reveal, fraud that is incorporated into SIPA or any other securities statute.  *See, e.g.*, *In re Sharp*, 403 F.3d at 52-53 (finding "no affirmative duty under New York law" to reveal a debtor's fraud to other creditors); *In re Bayou Group, LLC*, 396 B.R. 810, 848 (Bankr. S.D.N.Y. 2008) ("[T]he investor has no obligation to any third party to make any inquiry."), *rev'd on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010).

to discover the BLMIS fraud.  The Trustee's novel interpretation of SIPA to impose a retroactive due diligence obligation on brokerage customers is inconsistent with the entire foundation of securities regulation, which is premised upon customer protection by regulators and regulation, not by other customers.  Consequently, withdrawal of the reference is mandated.

## CONCLUSION

The Trustee and SIPC have raised numerous issues that require significant interpretation of SIPA, other securities laws, and their relationship with the Bankruptcy Code.  These issues are of great consequence for the thousands of BLMIS customers sued by the Trustee, and, indeed, for the securities markets generally.  The reference of this adversary proceeding, therefore, is subject to mandatory withdrawal to the District Court.

Dated:  New York, New York
        May 26, 2011

DAVIS POLK & WARDWELL LLP

By:   /s/ Karen E. Wagner
      Karen E. Wagner
      Dana M. Seshens

      450 Lexington Avenue
      New York, New York 10017
      Telephone:     (212) 450-4000
      Facsimile:     (212) 701-5800

      *Attorneys for the Sterling Defendants*

24