Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Telephone:    (212) 450-4000
Facsimile:    (212) 701-5800

*Attorneys for the Sterling Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : <br> : <br> : <br> : |
| Plaintiff-Applicant, | : <br> Adv. Pro. No. 08-01789 (BRL) |
| - against - | : <br> SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : <br> (Substantively Consolidated) <br> : <br> : |
| Defendant. | : <br> : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re: | : <br> : |
| BERNARD L. MADOFF, | : <br> : |
| Debtor. | : <br> : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| IRVING H. PICARD, | : <br> : |
| Plaintiff, | : <br> : |
| - against - | : <br> Adv. Pro. No. 10-05287 (BRL) |
| SAUL B. KATZ, et al. | : <br> : |
| Defendants. | : <br> : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF**
**STERLING DEFENDANTS' MOTION TO DISMISS THE AMENDED**
**COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 2

THE COMPLAINT'S FALSE OR MISLEADING ALLEGATIONS .......................... 6

    False Allegation #1:  Sterling Stamos Told the Sterling Partners That
    Madoff Was a "Scam" or a Fraud ......................................................................... 6

    False Allegation #2:  Sterling Stamos Advised the Sterling Partners Not to
    Invest with Madoff .............................................................................................. 8

    False Allegation #3:  The Sterling Partners Were Sophisticated Stock
    Market Experts Who Should Have Detected Madoff's Fraud ............................ 11

    False Allegation #4:  The Sterling Partners Should Have Recognized
    Madoff's Fraud Because Saul and David Katz Became Expert in the
    Brokerage Business ........................................................................................... 12

    False Allegation #5:  All Sterling Partners Were Familiar with Sterling
    Stamos' Due Diligence Process ........................................................................ 17

    False Allegation #6:  BLMIS' Failure to Pass Sterling Stamos' and Merrill
    Lynch's Due Diligence Processes Was an Indication of Fraud ......................... 20

    False Allegation #7:  BLMIS' Proprietary "Black Box" Strategy Was a
    Red Flag ............................................................................................................ 24

    False Allegation #8:  Sterling Stamos Was Restructured to Evade SEC
    Scrutiny of Madoff ............................................................................................ 26

    False Allegation #9:  Sterling Stamos and the Sterling Partners Should
    Have Been Concerned That Madoff Was Front Running ................................... 28

    False Allegation #10:  The Sterling Partners Knew That Madoff's Custody
    of Securities Was a Red Flag ............................................................................. 30

    False Allegation #11:  The Sterling Partners Knew About the Bayou Fraud
    and Therefore Should Have Recognized Madoff's Fraud .................................. 32

    False Allegation #12:  The Sterling Defendants Never Conducted Any
    Diligence on Madoff .......................................................................................... 34

False Allegation #13:  The Sterling Defendants Received "Staggering" Profits ............................................................................................. 39

False Allegation #14:  Together the Allegations Prove That the Sterling Defendants Were Complicit ................................................................. 40

THE FACTS ............................................................................................................. 48

The Sterling Defendants Trusted Madoff, Had No Idea He Was Engaged in Any Fraud, and Were Grievously Injured by That Fraud ......................................... 48

The Founding of Sterling Equities and Its Great Success .................................. 48

Madoff Was a Luminary in the Investment World When the Sterling Partners Began to Use Him as Their Broker ....................................... 48

The Partners' Individual BLMIS Investments Increased Over Time ................ 50

The Partners Shared the Madoff Opportunity with Friends and Family ........... 52

The Sterling Defendants Trusted Madoff with Their Money Until the End ....... 53

PROCEDURAL HISTORY ...................................................................................... 53

The Trustee's Pre-Complaint Discovery ........................................................... 53

The Sealed Complaint and This Complaint ....................................................... 55

The Sterling Defendants Will Continue the Mediation .................................... 55

ARGUMENT ........................................................................................................... 56

I.      THE COMPLAINT SHOULD BE DISMISSED AND SUMMARY JUDGMENT ENTERED FOR THE STERLING DEFENDANTS ................... 56

II.     THE COMPLAINT STATES NO CAUSE OF ACTION FOR AVOIDANCE OF TRANSFERS BY BLMIS AS FRAUDULENT CONVEYANCES ........................................................................................... 58

        A.      None of the Transfers from BLMIS Was a Fraudulent Conveyance ...... 58

        B.      Each Transfer to a Customer Was on Account of Antecedent Debt and Therefore Cannot Be Avoided as Fraudulent .................................... 60

        C.      Intent Is Irrelevant Where a Transfer Discharges Antecedent Debt ....... 64

        D.      The Ponzi Scheme Presumption Is Inapplicable .................................... 67

E.      The Trustee Cannot Prove That the Antecedent Debt Incurred by
        BLMIS Was Invalid ................................................................................ 68

        1.      The Trustee Must Prove That the Sterling Defendants Were
                Knowing Participants in Madoff's Fraud ................................... 68

        2.      The Common "Red Flags" Are Not Red ................................... 70

        3.      The Undisputed Facts Regarding Sterling-Specific "Red
                Flags" Do Not Demonstrate Willful Blindness or
                Conscious Disregard .................................................................. 74

F.      Even under a "Good Faith" Standard No Fraudulent Conveyance
        Claim May Be Stated ............................................................................... 75

        1.      The Sterling Defendants Are Retail Investors
                Who Were Not on Inquiry Notice of Fraud .............................. 76

        2.      No Reasonable Investigation Would Have Uncovered the
                Ponzi Scheme ............................................................................ 78

III.    THE BANKRUPTCY CODE PROTECTS MANY TYPES OF
        SECURITIES TRANSACTIONS FROM AVOIDANCE, INCLUDING
        PAYMENTS TO BROKERAGE CUSTOMERS ............................................. 80

IV.     THE COMMENCEMENT OF A SIPA CASE PROTECTS, RATHER
        THAN DESTROYS, CUSTOMER RIGHTS .................................................... 84

V.      THE TRUSTEE'S IMPUTATION AND VEIL PIERCING CLAIMS
        ARE UNSUPPORTED AND UNSUPPORTABLE ......................................... 87

VI.     THE TRUSTEE'S DISALLOWANCE AND SUBORDINATION
        CLAIMS MUST BE DISMISSED AS UNSUPPORTED ................................ 91

        CONCLUSION ................................................................................................ 94

# TABLE OF AUTHORITIES

### CASES

PAGE

*In re Agape Litig.*, 681 F.Supp.2d 352, 364 (E.D.N.Y. 2010)...........................................70

*In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740 (E.D.N.Y. 1984).................90

*Alaska Trowel Trades Pension Fund v. Lopshire*,
    855 F. Supp. 1077 (D. Alaska 1994), *rev'd on other grounds*, 103 F.3d 881 ............89

*Am. Cash Card Corp. v. AT&T Corp.*,
    No. 99-7894, 2000 U.S. App. LEXIS 6318 (2d Cir. Apr. 6, 2000)............................91

*Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791 (6th Cir. 1995)...................................84

*Barron v. Igolnikov*,
    2010 U.S. Dist. LEXIS 22267, 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010)............84

*In re Bayou Group, LLC*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008),
    *rev'd on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010).............................................77

*In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010) ........................................ *passim*

*In re Beacon Assocs. Litig.*,
    No. 09 Civ. 777, 2010 U.S. Dist. LEXIS 106355 (S.D.N.Y. Oct. 5, 2010) ..........41, 84

*In re Bernard L. Madoff Inv. Sec. LLC*,
    No. 08-10789, doc. no. 720 (Bankr. S.D.N.Y. Nov. 12, 2009) ..................................50

*In re Bernard L. Madoff Inv. Sec. LLC*, No. 10-2378 (2d Cir. Mar. 3, 2011) ............. 86-87

*Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) .............59, 65, 68

*Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416 (1972).......................77

*In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002)......................................65

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................56

*Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782 (1985)...............................................88

*In re Champion Enters.*,
    No. 09-14014, 2010 Bankr. LEXIS 2720 (Bankr. D. Del. Sept. 1, 2010)..................66

*In re Chase & Sanborn Corp.*, 813 F.2d 1177 (11th Cir. 1987)........................................59

*Coder v. Arts*, 213 U.S. 223 (1909) ................................................................59

*Contemporary Indus. Corp. v. Frost*, 564 F.3d 981 (8th Cir. 2009)................................81

*Cunningham v. Brown*, 265 U.S. 1 (1924)........................................................86

*D'Amico v. Christie*, 71 N.Y.2d 76 (1987) ......................................................77

*In re Derivium Capital, LLC*, 437 B.R. 798 (Bankr. D.S.C. 2010) ...................................82

*Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595 (2d Cir. 1991) ...............................61

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007)........................................................70

*Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004) ...........................................63

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ......................................59

*H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135 (S.D.N.Y. 2001)...........89

*Hare & Chase, Inc. v. Nat'l Surety Co.*, 49 F.2d 447 (S.D.N.Y. 1931) ...........................90

*Horan v. Mason*, 141 A.D. 89 (2d Dep't 1910)................................................89

*In re Indep. Clearing House Co.*, 77 B.R. 843 (D. Utah 1987)........................................67

*In re J.P. Jeanneret Assocs., Inc.*,
    No. 09 Civ. 3907, 2011 U.S. Dist. LEXIS 9630
    (S.D.N.Y. Jan. 31, 2011)....................................................................82, 83

*J.P. Morgan Chase v. Winnick*, 406 F. Supp. 2d 247 (S.D.N.Y. 2005)...........................70

*Kirschner v. Bennett*, 648 F. Supp. 2d 525 (S.D.N.Y. 2009)........................................70

*Kirschner v. Bennett*,
    No.  07 Civ. 8165, 2010 U.S. Dist. LEXIS 132344 (S.D.N.Y. June 3, 2010).......69, 70

*In re Lehman Bros. Holdings Inc.*,
    No. 09-01045, 2011 WL 722601 (Bankr. S.D.N.Y. Feb. 22, 2011)...........................56

*Levinson v. PSCC Servs.*,
    2009 U.S. Dist. LEXIS 119957, 2009 WL 5184363 (D. Conn. Dec. 23, 2009)..........84

*In re M. Fabrikant & Sons, Inc.*,
    Case No. 06-12737, 2011 Bankr. LEXIS 316 (Bankr. S.D.N.Y. Jan. 25, 2011).........75

*In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y. 2007)...................75, 77, 79, 80, 82

*Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245 (S.D.N.Y. 2008) ...................70

*In re McGee*,
    No. 97-50234, 2000 Bankr. LEXIS 1865 (Bankr. E.D. Ky. Nov. 22, 2000),..............80

*McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044 (2d Cir. 1995)...................63

*Meisel v. Grunberg*, 651 F. Supp. 2d 98 (S.D.N.Y. 2009) .................................89

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) ......................63

*Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) ...........................................69

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
    No. 09 Civ. 4049, 2010 U.S. Dist. LEXIS 85466 (S.D.N.Y. July 14, 2010)......... 72-73

*In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977).........................................92

*Nathel v. Siegal*, 592 F. Supp. 2d 452 (S.D.N.Y. 2008) .........................................63

*In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004)...................................78, 84

*Newman v. Family Mgmt. Corp.*,
    No. 08 Civ. 11215, 2010 U.S. Dist. LEXIS 111589
    (S.D.N.Y. Oct. 20, 2010) ....................................................................71, 72

*Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273 (2d Cir. 1998) .....................................88

*One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*,
    386 F. Supp. 2d 394 (S.D.N.Y. 2005).........................................................90

*Osofsky v. Zipf*, 645 F.2d 107 (2d Cir. 1981).....................................................63

*Panos v. Island Gem Enters.*, 880 F. Supp. 169 (S.D.N.Y. 1995).....................................63

*People v. Ivy Asset Mgmt. LLC*,
    No. 450489/2010 (N.Y. Sup. Ct. May 11, 2010)........................................41

*Perrin & Nissen Ltd. v. SAS Group, Inc.*,
    No. 06 Civ. 13089, 2009 WL 855693 (S.D.N.Y. Mar. 27, 2009) ..............................56

*Pettigrew v. Citizens Trust Bank*, 229 B.R. 39 (N.D. Ga. 1998) ......................................80

*Picard v. Chais*,
No. 08-01789, 2011 Bankr. LEXIS 606 (Bankr. S.D.N.Y. Feb. 24, 2011)...........73, 88

*Picard v. Merkin*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010)............................................82, 83

*Picard v. Picower*, No. 09-1197 (Bankr. S.D.N.Y. May 12, 2009) .................................73

*Press v. Chem. Inv. Servs. Corp.*,
988 F. Supp. 375 (S.D.N.Y. 1997), *aff'd*, 166 F. App'x 529 (2d Cir. 1999).............61

*In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009).....................................................81

*In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999).......................................................81

*Saboundjian v. Bank Audi*, 157 A.D.2d 278, 556 N.Y.S.2d 258 (1st Dep't 1990)...........62

*Saltz v. First Frontier, LP*,
No. 10 Civ. 964, 2010 U.S. Dist. LEXIS 136140
(S.D.N.Y. Dec. 22, 2010)........................................................................................71, 72

*SEC v. Cohmad Sec. Corp.*,
No. 09 Civ 5680 (LLS), 2010 U.S. Dist. LEXIS 8597
(S.D.N.Y. Feb. 1, 2010) ...........................................................................................71, 72

*SEC v. Madison Real Estate Group*, 647 F. Supp. 2d 1271 (D. Utah 2009) ....................77

*SEC v. Zandford*, 535 U.S. 813 (2002) ..............................................................................63

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) .................................................. *passim*

*SIPC v. Barbour*, 421 U.S. 412 (1975) ..............................................................................84

*SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir. 1976)......................................84

*Steed Fin. LDC v. LASER Advisers, Inc.*, 258 F. Supp. 2d 272 (S.D.N.Y. 2003) ............70

*Stellar X Prods. v. Int'l Bus. Machs. Corp.*,
No. 03 Civ 5739 (JSR), 2003 U.S. Dist. LEXIS 22233
(S.D.N.Y. Dec. 9, 2003)................................................................................................89

*Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599 (S.D.N.Y. 2010) ..............71, 72, 73

*TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335 (1998) ........................................90

*Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320 (5th Cir. 1993) ...............................90

*Thomas v. Whalen*, 962 F.2d 358 (4th Cir. 1992)..............................................................87

*Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) .......................................................69

*In re TOUSA, Inc.*,
   No. 10-60017-CIV, 2011 U.S. Dist. LEXIS 14019 (S.D. Fla. Feb. 11, 2011) ......77, 91

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
   703 F. Supp. 2d 362 (S.D.N.Y. 2010)........................................................................72

*Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*,
   191 A.D.2d 86, 599 N.Y.S.2d 816 (1st Dep't 1993) ............................................ 59-60

*In re Unified Commercial Capital, Inc.*,
   No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002)......................66

*Union Bank v. Wolas*, 502 U.S. 151 (1991)...............................................................86, 87

*United States v. Noland*, 517 U.S. 535 (1996)..........................................................87, 92

*Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575 (1913) .....................................................59

*Van Ostrand v. Nat'l Life Assurance Co. of Canada*,
   371 N.Y.S.2d 51 (Sup. Ct. 1975).................................................................................88

*Visconsi v. Lehman Bros.*, 244 F. App'x 708 (6th Cir. 2007) ..........................................61

*Wheatland v. Pryor*, 133 N.Y. 97 (1892)........................................................................90

*In re World Vision Entm't, Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002) .........................67

## STATUTES & RULES

11 U.S.C. § 101(22) .........................................................................................................82

11 U.S.C. § 101(53A) .......................................................................................................81

11 U.S.C. § 502(d) ...........................................................................................................92

11 U.S.C. § 510(c) ...........................................................................................................92

11 U.S.C. § 544...................................................................................................56, 59, 81

11 U.S.C. § 545.................................................................................................................81

11 U.S.C. § 546.................................................................................................................81

11 U.S.C. § 546(e) ...................................................................................... *passim*

11 U.S.C. § 547 .......................................................................................... *passim*

11 U.S.C. § 548 ...............................................................................................56, 59

11 U.S.C. § 548(a)(1)(A) ..............................................................................57, 81

11 U.S.C. § 548(a)(1)(B) ......................................................................................81

11 U.S.C. § 548(b) ................................................................................................81

11 U.S.C. § 550 ....................................................................................................56

11 U.S.C. § 551 ....................................................................................................56

11 U.S.C. § 550(b) ...............................................................................................91

11 U.S.C. § 555 ....................................................................................................81

11 U.S.C. § 556 ....................................................................................................81

11 U.S.C. § 559 ....................................................................................................81

11 U.S.C. § 560 ....................................................................................................81

11 U.S.C. § 561 ....................................................................................................81

11 U.S.C. § 562 ....................................................................................................81

11 U.S.C. § 741(7) ...............................................................................................81

11 U.S.C. § 741(7)(A)(i) ......................................................................................82

11 U.S.C. § 741(7)(A)(i)-(vi) ..............................................................................82

11 U.S.C. § 741(7)(A)(vii) ..................................................................................82

15 U.S.C. § 78bbb ...............................................................................................84

15 U.S.C. § 78fff-1(a) ...................................................................................66, 85

15 U.S.C. § 78fff-2(c)(3) .......................................................................66, 84, 85

15 U.S.C. § 78*lll*(2) .............................................................................................69

28 U.S.C. § 157(d) ...............................................................................................68

Bankr. R. 2004 ...................................................................................................53

Bankr. R. 7012(b)(6)...................................................................................1, 56, 94

Bankr. R. 7012(d) .......................................................................................1, 56, 94

Bankr. R. 7056 ............................................................................................1, 56, 94

Bankr. R. 7056-1(A) .........................................................................................57

Fed. R. Civ. P. 9(b) ...........................................................................................88

Fed. R. Civ. P. 56(a) .........................................................................................56

NASD Rule 2340 ...............................................................................................62

N.Y. C.P.L.R. § 213(8) .....................................................................................59

N.Y. D.C.L. § 273 .............................................................................................56

N.Y. D.C.L. § 276 .............................................................................................56

N.Y. D.C.L. § 278 .............................................................................................56

N.Y. D.C.L. § 279 .............................................................................................56

NYPL § 23 ....................................................................................................88, 89

NYSE Rule 409...................................................................................................62

NYUCC § 8-102(a)(9)(i) ...................................................................................61

NYUCC § 8-102(a)(14) .....................................................................................61

NYUCC § 8-102(a)(17) .....................................................................................61

NYUCC § 8-112(c)..............................................................................................61

NYUCC § 8-501 *et seq.* ..................................................................................60

NYUCC § 8-501(b)..............................................................................................61

NYUCC § 8-501(c)........................................................................................61, 82

NYUCC § 8-501 cmt. 2 .....................................................................................61

NYUCC § 8-501 cmt. 3 .....................................................................................62

NYUCC § 8-503 cmt. 1 .....................................................................................................61

NYUCC § 8-503 cmt. 2 .....................................................................................................61

NYUCC Art. 8 Historical and Statutory Notes ("Legislative Intent and Declaration")
(McKinney 2002) .............................................................................................................60

SEC Rule 10b-5 .........................................................................................................63, 70

SEC Rule 10b-10 ..............................................................................................................62

Sec. Exch. Act § 10(b) .....................................................................................................63

<small>OTHER AUTHORITIES</small>

5 *Collier on Bankruptcy* § 547.01 (Alan N. Resnick & Henry J. Sommer eds.,
15th ed. rev. 2010) ..........................................................................................................58

Adam Rubin, *Picard Wants $1 Billion from Wilpon/Katz*, ESPN N.Y., Feb. 5, 2011 ........5

Alison Leigh Cowan and Richard Sandomir, *Madoff Fueled Mets' Empire,
Lawsuit Says*, N.Y. Times, Feb. 5. 2011.....................................................................46

Berkshire Hathaway Inc., Annual Report 2 (2009), *available at*
http://www.berkshirehathaway.com/2009ar/2009ar.pdf ............................................40

Concept Release on Equity Market Structure,
Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594 (Jan. 21, 2010)..................24

Confirmation of Transactions, 59 Fed. Reg. 59,612 (Nov. 17, 1994) ......................... 62-63

Harry Markopolos, The World's Largest Hedge Fund Is a Fraud (Nov. 7, 2005) ............79

H.R. Rep. No. 91-1613 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254, 5257 .................84

H.R. Rep. No. 95-595 (1977).............................................................................................86

Jacob Wolinsky, *Warren Buffett and Berkshire Hathaway have a Great Decade*,
GuruFocus.com, Jan. 1, 2010, *available at*
http://www.gurufocus.com/news.php?id=80400 .......................................................40

Matt Ackermann, *Fidelity Unit Seeks Growth Via Self-Clearing Market*,
American Banker, Apr. 9, 2008, *available at*
http://www.americanbanker.com/issues/173_69/-349756-1.html ..............................31

Peter Chapman, *Before the Fall: Bernard L. Madoff*, Traders Mag., Mar. 2009 .............49

Randall Smith, *Wall Street Mystery Features a Big Board Rival*,
      Wall St. J., Dec. 16 1992 ............................................................................38

*Restatement (Second) of Agency* § 277 (1958) ................................................90

S. Rep. No. 95-989, at 90 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5876.........................91

SEC Office of Investigations, Report No. OIG-509, *Investigation of Failure of the
      SEC to Uncover Bernard Madoff's Ponzi Scheme – Public Version* (2009)..............38

Short Selling in Connection with a Public Offering, Exchange Act Release
      No. 34-56206, 72 Fed. Reg. 45,094 (Aug. 10, 2007) .................................................24

SIPC, SIFMA, and NASAA, *Understanding Your Brokerage Account Statements* .........62

Defendants ("Sterling Defendants") respectfully submit this memorandum in support of their motion to dismiss the amended complaint ("Complaint") under Bankruptcy Rule 7012(b)(6) for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment under Bankruptcy Rules 7012(d) and 7056 on the ground that there is no genuine dispute as to any material fact and the Sterling Defendants are entitled to judgment as a matter of law.

### PRELIMINARY STATEMENT

The Complaint seeks avoidance, under federal and state law, of payments from a registered broker to its customers over a period of twenty-five years. As a matter of law, these payments are not avoidable as fraudulent transfers because they discharged the broker's legal obligation to its customers, as acknowledged on the customers' brokerage statements.

Customers of a registered broker receive special protection under federal and state securities laws. To avoid a broker's payments to such customers, the Trustee must prove that the customer has forfeited customer status because he essentially knew that, instead of depositing cash with his broker for the purpose of buying securities, he was investing in a fraud and therefore the antecedent debt discharged by the broker's payments was invalid.

The undisputed facts demonstrate that the Trustee can prove no such guilty knowledge, nor any bad faith.

In addition, any payment occurring before December 11, 2006 is protected from avoidance as a fraudulent transfer because each was made in connection with a securities contract.  For the same reason, no payment may be avoided as a preference.

Finally, the undisputed facts demonstrate no basis for disallowance or equitable subordination of the claims of the Sterling Defendants.

## BACKGROUND

The Sterling Defendants were customers of Bernard L. Madoff Investment Securities LLC ("BLMIS"), a registered broker run by Bernard L. Madoff ("Madoff"). For many years, the Sterling Defendants deposited proceeds from their successful businesses with BLMIS and withdrew funds to which they were legally entitled as they were needed.  As the world now knows, Madoff, the former chairman of NASDAQ and renowned in the investment community, was engaged in an extraordinary fraud, deceiving numerous investors, financial institutions, and regulators, including the Securities and Exchange Commission ("SEC").  According to the Complaint, BLMIS never traded any securities.  But the Sterling Defendants never knew that.  For nearly twenty-five years, their brokerage transactions appeared to be entirely routine.

Then, on December 11, 2008, Madoff revealed his fraud.  The Sterling Defendants were betrayed by a friend and realized an aggregate loss of over half a billion dollars that day.  As Fred Wilpon put it, Madoff's confession was "like a dagger in the heart."  Then came a second shock.  The BLMIS trustee ("Trustee"), appointed under the Securities Investor Protection Act ("SIPA"), not only refused to make legally mandated payments to many of Madoff's defrauded customers, including the Sterling Defendants,

2

but he also commenced over 1,000 lawsuits to "claw back" funds to which the customers'
legal entitlement under state and federal securities laws was not in question.

The Sterling Defendants are among his targets.  The crux of the Trustee's
Complaint is that the Sterling Defendants were repeatedly warned by Sterling Stamos
Partners ("Sterling Stamos") of Madoff's fraud.  The Trustee alleges that Sterling Stamos
had "fingered Madoff as a fraud for years" (Compl. ¶ 872); had "openly questioned [his]
legitimacy for years" (*id.* ¶ 871); and had repeatedly told the Sterling Partners that
Madoff was "too good to be true" (*id.* ¶ 869).  The Sterling Partners, he charges, "made
so much easy money from Madoff for so long," that they "look[ed] the other way" when
they "knew or should have known that with *every withdrawal* from their BLMIS
accounts they reaped the benefits of a fraud."  (*Id.* ¶¶ 2, 11 (emphasis added).)

But the Complaint is a fiction.

There were no warnings.  The Complaint attributes the key warnings to Peter
Stamos.  But, before the Complaint was filed, Peter Stamos had testified to just the
opposite—up until the day Madoff's fraud was disclosed, he stood in awe of Madoff and
thought he was "among the most honest and honorable men":

> "I'm embarrassed to say that I said to Mr. Katz on a number of occasions
> that my assumption is that Mr. Madoff is the most honest and honorable
> man, among the most honest and honorable men that we will ever meet.
> Number one.  And, number two, that he is perhaps one of the—my
> assumption is he's perhaps one of the best hedge fund managers in modern
> times. . . .
>
> [The first assumption was b]ased on his reputation, based upon his long
> track record, based upon having seen him receive these awards and the
> positions that he held as chairman of the NASDAQ, having built this great
> company.  He was, quite frankly, legendary, to all of us.  And I stood in

3

awe of that with Mr. Katz, and I assumed that."  (Deposition Transcript of
Peter Stamos ("Stamos Tr."), Aug. 19, 2010, 211:03-212:4.)[1]

In direct contradiction to allegations in the Complaint, there is no evidence that:

- Anyone at Sterling Stamos ever told any Sterling Partner that Madoff might be running a Ponzi scheme or engaging in any fraud.

- Anyone at Sterling Stamos ever told the Sterling Partners that Madoff was a "scam" or "too good to be true."

- Anyone at Sterling Stamos ever advised the Sterling Partners not to invest with Madoff.

- Anyone at Sterling Stamos warned any Sterling Partner that Madoff was front running.

- Anyone at Sterling Stamos or Merrill Lynch ever told any Sterling Partner that Madoff's "black box" strategy or practice of self-custodying securities were indicia of fraud.

- Any Sterling Partner, including Saul Katz and David Katz, became experienced market investors or learned in the ways of institutional due diligence through Sterling Stamos or otherwise.

- Any Sterling Partner ever suspected that Madoff was engaged in any fraudulent activity, which is why the Sterling Defendants continued to deposit significant amounts of money with Madoff until the day his fraud was disclosed—and why they lost so much money when Madoff confessed.

The Trustee took a huge amount of discovery before he filed this Complaint.  He

has for months refused—and continues to refuse—to disclose his pre-complaint

discovery, insisting that "every allegation in the one thousand three hundred and sixty

five paragraphs of the [original] Complaint was made in good faith."  (Opp'n to Sterling

Defs.' Mot. to Compel Turnover of Discovery, doc. no. 24, Feb. 18, 2011, at 3.)  But the

---

[1]  Peter Stamos' deposition transcript is attached as Exhibit A to the March 20, 2011 Declaration of Dana M. Seshens in Support of the Sterling Defendants' Motion to Dismiss the Amended Complaint, or, in the Alternative, for Summary Judgment ("Seshens Decl.").

evidence he himself compiled shows that most of its key allegations are indisputably false.

Moreover, the Trustee's claims are fatally flawed as a matter of law. The Sterling Defendants were customers to whom BLMIS owed the securities on their brokerage statements. Federal and state securities laws grant customers of registered brokers certain key protections, even when their broker fails to buy securities. They are legally entitled to rely on their brokerage statements. Payments discharging an obligation reflected on a Sterling customer's statement cannot be avoided unless the Trustee can prove that the obligation was invalid and unenforceable because the customer knew he was investing in a Ponzi scheme rather than buying blue chip securities. This the Trustee has not alleged and cannot prove.

The Sterling Defendants were given a choice: make a huge settlement payment or face an unfounded and damaging complaint.

> "'What the Trustee is looking for here is a payment in cash,' attorney David Sheehan, who leads trustee Irving Picard's team, told the newspaper. 'So whether they utilize the Mets, SNY, Sterling properties or any other resource is of no moment to us. What we're looking for is a billion dollars, and unless we settle for an amount less than that, which we're not inclined to do, where they get the money is of no moment to us.'" Adam Rubin, *Picard Wants $1 Billion from Wilpon/Katz*, ESPN.com, Feb. 5, 2011 (Seshens Decl., Ex. B).

But the Sterling Defendants should never have been targeted by the Trustee, nor put in such a position. They are victims. They were defrauded by Madoff. They are now being victimized again and harmed—both personally and as a business matter—by successive complaints, even though there is no factual or legal basis for the Trustee's claims.

5

## THE COMPLAINT'S FALSE OR MISLEADING ALLEGATIONS

**False Allegation #1:  Sterling Stamos Told the Sterling Partners
That Madoff Was a "Scam" or a Fraud**

Critical to the theory of the Complaint is that Sterling Stamos personnel

repeatedly "warned" the Sterling Partners that Madoff was a "scam" and "too good to be

true" (Compl. ¶ 869); that they "openly questioned [his] legitimacy for years" (*id.* ¶ 871);

and that they had "fingered Madoff as a fraud for years" (*id.* ¶ 872).

But before the Complaint was filed Peter Stamos had testified under oath to

exactly the opposite:

> "I'm embarrassed to say that I said to Mr. Katz on a number of occasions
> that my assumption is that Mr. Madoff is the most honest and honorable
> man, among the most honest and honorable men that we will ever meet.
> Number one.  And, number two, that he is perhaps one of the—my
> assumption is he's perhaps one of the best hedge fund managers in modern
> times. . . .
>
> [The first assumption was b]ased on his reputation, based upon his long
> track record, based upon having seen him receive these awards and the
> positions that he held as chairman of the NASDAQ, having built this great
> company.  He was, quite frankly, legendary, to all of us.  And I stood in
> awe of that with Mr. Katz, and I assumed that."  (Stamos Tr. 211:13-212:4
> (Seshens Decl., Ex. A).)
>
>                               * * *
>
> "All the way to the time when the fraud was discovered, I had the same
> conclusion.  Other than not putting more than 10 percent into a manager,
> and that as a fiduciary I could not put my capital, my fund's capital there, I
> agreed with [Saul Katz].  Legend in the industry and all of the things that
> he said." (*Id.* 162:1-162:7.)

To imply that Sterling Stamos' "CIO" had "fingered Madoff as a fraud for years,"

the Trustee employs an email written by an unidentified person on December 12, 2008,

the day *after* Madoff's fraud was disclosed, that refers to Madoff as a "scam" and "too

good to be true." (Compl. ¶ 872).  When asked about the email, which does not indicate

that any such message was communicated to the Sterling Partners, Sterling Stamos' CIO,

Peter Stamos, testified, "I can't recall ever using those words to describe Mr. Madoff."

(Stamos Tr. 237:6-11 (Seshens Decl., Ex. A).)  Nor, prior to December 11, 2008, did he

recall anybody at Sterling Stamos ever saying that Madoff was a "scam" or "too good to

be true."  (*Id.* 241:4-15.)

Ashok Chachra, to whom the Complaint attributes the statement in the December

12, 2008 email, was not asked about it at his deposition.  But he testified that Sterling

Stamos had "no reason to think there was anything wrong [at BLMIS]."  (Deposition

Transcript of Ashok Chachra ("Chachra Tr."), Oct. 8, 2010, 206:6-12 (Seshens Decl.,

Ex. C).)  He viewed Madoff as "very talented" and a "pioneer" and the "grandfather" of

electronic trading and regarded the split-strike conversion strategy as "amazing."  (*Id.*

168:8-16; 200:7-20; 209:1-210:2.)  He never thought, or said, that Madoff was not

trading and running a Ponzi scheme and never told the Sterling Partners not to invest with

Madoff or BLMIS.  (Declaration of Ashok Chachra ("Chachra Decl."), dated Mar. 16,

2011, ¶¶ 4, 7.)

The Complaint also contends that, after Merrill Lynch became interested in

acquiring an interest in Sterling Stamos in 2007, "various Merrill Lynch officers,

including one senior executive in particular, communicated concerns about Madoff and

BLMIS to members of the Sterling partnership."  (Compl. ¶ 720.)  Later the Complaint

alleges that an unidentified "Merrill Executive" spoke to Saul Katz and "echoed and

reinforced [Peter] Stamos' criticisms of Madoff."  (*Id.* ¶¶ 902-903.)  No detail about any

"concern" is pleaded, and Peter Stamos *had* no criticisms of Madoff, so there cannot have

been any "echoes."

7

**False Allegation #2:  Sterling Stamos Advised the Sterling
Partners Not to Invest with Madoff**

Equally critical to the Trustee's theory is the claim that Peter Stamos and others at Sterling Stamos "openly questioned Madoff's legitimacy for years and recommended to the Sterling Partners that they should redeem their BLMIS investments" (Compl. ¶ 871); "warned Saul Katz and Fred Wilpon not to invest" (*id.* ¶ 874); "alerted the Sterling Partners to [Sterling Stamos'] concerns about Madoff for years" (*id.* ¶ 875); and "defied" recommendations to withdraw their BLMIS investments (*id.* ¶ 874).

These allegations also are directly contrary to the evidence the Trustee had when he filed the Complaint.  Peter Stamos never questioned Madoff's legitimacy.  To the contrary, he thought Madoff was honest and honorable, and he testified repeatedly that he never warned Mr. Katz about Madoff or suggested that Mr. Katz redeem his Madoff investments.  He warned only that investing so much with *any* single manager, not just Madoff, created concentration risk:

> "Q. . . . Did anyone at Sterling Stamos ever recommend to anyone at Sterling that they should, that Sterling should withdraw its assets from Madoff?
>
> A.  I don't know if anyone, in the way I use the word 'recommend,' formal, professional advice, did that.  I believe that on a regular basis Mr. Chachra, who was assigned to Mr. Katz's account, encouraged him to diversify from Madoff and put more capital with us.  But I say that in the context of competition.  We wanted more of his capital, and we believed that whether it was Bernard Madoff or D.E. Shaw or Paul Singer or any other great hedge fund manager, you shouldn't put more than 10 percent with that manager, whoever he or she was."  (Stamos Tr. 165:3-17 (Seshens Decl., Ex. A).)

> * * *

> "Q. . . . [B]efore you became a registered investment advisor, the question is did you recommend to Saul Katz not to invest in Madoff?

A.  To not invest in Madoff?

Q.  Yes.

A.  No, I never told him not to invest in Madoff, to my recollection.  What I recall telling him was don't put more than 10 percent of your assets in any one manager.  Put the other 90 percent with us."  (*Id.* 213:11-20.)

\* \* \*

"Q.  In the next sentence [in the email alleged at paragraph 870] you go on to write:  'Unfortunately, our partners, Saul and Fred, against our recommendations, invested as individuals and through their real estate firm.'  And there you use the word 'recommendations.'  Now, what did you mean by that statement?

A.  I was stretching it, because I know what my recommendation was to them.  My recommendation was to not put more than ten percent of their personal assets there, period.

Q.  And is that the only recommendation that you're referring to in that email?

A.  As I said, I think I was trying to separate myself from Madoff, so I was probably stretching it by marketing more.  I didn't—I don't recall ever recommending to Saul and Fred that they have no capital with Madoff, that they just not put more than 10 percent of their assets with Madoff." (*Id.* 227:19-228:12.)

And Mr. Stamos freely admitted that he was competing with Madoff for the

Sterling Defendants' money:

"A.  May have come up in the context of diversification, it may have come up in the context of the competition that I felt with Madoff, of wanting to get more, have Mr. Katz invest more money with me as opposed to invest money with somebody else.

Q.  So, in the context of further diversifying away from Madoff to Sterling Stamos?

A.  Not necessarily away from Madoff.  When they sold the building, I'd like to get that money invested in 25 managers, not in one manager.

Q.  But one of the purposes of Sterling Stamos was to diversify the Katz and Wilpon family's investments in Madoff, right?

A.  Purpose was initially diversification.  And then later for me it became competition."  (*Id.* 154:6-155:1.)

(*See also* Stamos Tr. 163:2-11 (Stamos "viewed Bernard Madoff as [his] competition for the Sterling Equities' capital and . . . wanted 90 percent of their liquid assets with [him] and 10 percent . . . with Mr. Madoff"); Chachra Tr. 83:15-24 (Stamos would discuss "[t]hat if the Katz and Wilpon families would, you know, speed up their diversification process for Madoff, then we could, you know, we could—we could grow our asset—our business") (Seshens Decl., Ex. C).)

Saul Katz's testimony was the same:

"Q.  Did [Stamos] advise you to [move all of your money out of Madoff]?

A.  No, never really advised me to do that.  Always sort of hustling for me to move some more money over.

Q.  You viewed that as a kind of a business hustle?

A.  Yes.  A pleasant one, not a . . .

Q.  I understand.  They were competitors.

A.  For my money.

Q.  For your money.

A.  They were friends and competitors for my money."  (Deposition Transcript of Saul Katz ("S. Katz Tr."), Aug. 4, 2010, 158:3-159:1 (Seshens Decl., Ex. D).)

The single manager risk was not specific to Madoff.  And it has *nothing to do with fraud*.  As Peter Stamos said:

"[T]here seems to be no reason to be worried about this capital [with BLMIS] being at risk.  However, it's still concentration risk and there's still the possibility that [Madoff] could retire, there's still the possibility that he could be hit by a truck, there's still the possibility that he could have a regulatory review in which your assets are held up for a period of time.  And for, again, those reasons I wouldn't put more than 10 percent of my assets in any one manager.  But I put it in the same category as an

10

investment with any other investment manager like Mr. Madoff, such as D.E. Shaw or any other similarly situated manager." (Stamos Tr. 147:6-148:2 (Seshens Decl., Ex. A).)

**False Allegation #3:  The Sterling Partners Were Sophisticated Stock Market Experts Who Should Have Detected Madoff's Fraud**

Critical to the argument that the Sterling Partners "knew or should have known" about the Madoff Ponzi scheme is the conclusion that "the partners at Sterling Equities" and "Fred Wilpon and Saul Katz" are "sophisticated investors." (Compl. ¶ 1.)  Yet the testimony taken by the Trustee before he filed his Complaint demonstrates that, as to investing in the securities markets, the Sterling Defendants are not sophisticated:

"Q.  Do you understand—do you consider yourself a sophisticated investor? . . . I'm talking about in the stock market, not in real estate or anything else.

[S. Katz].  In the sophisticated, in today's world of derivatives that are going on, the answer is no. . . . I don't do well in the markets, the stock market.  I'm not good at it, it's not my business.  I don't have an active trading account anywhere." (S. Katz Tr. 45:7-46:6 (Seshens Decl., Ex. D).)

* * *

"Q.  Did you understand how Madoff was making money off of his investment business?

[F. Wilpon].  Not in any kind of depth.

Q.  Well, what do you mean by not in any kind of depth?  Did you have any understanding?

A.  I'm not an investment person, I'm not an investment, stock investment advisor, so I wouldn't have that kind of expertise." (Deposition Transcript of Fred Wilpon ("Wilpon Tr."), July 20, 2010, 191:6-13 (Seshens Decl., Ex. E).)

* * *

"Q.  And does Sterling hold itself out to be in the business of investing securities?

11

[A. Friedman].  No.

Q.  Do you personally view yourself as a professional securities investor?

A.  No.

Q.  Does Sterling Equities hold itself out to be a securities investment advisor?

A.  No.

Q.  Do you view yourself as a securities investment advisor?

A.  No."  (Rule 27 Deposition of Arthur Friedman ("Friedman Rule 27 Tr."), June 29, 2010, 6:12-23 (Seshens Decl., Ex. F).)

* * *

"Q. . . . [W]hy did you decide not to become a Sterling Stamos employee?

[D. Katz].  I just said I spend 90 percent of my time on not-for-profits.  I'm not a numbers guy.  I don't know if you picked that up yet."  (Deposition Transcript of David Katz ("D. Katz Tr."), Aug. 31, 2010, 304:3-7 (Seshens Decl., Ex. G).)[2]

**False Allegation #4:  The Sterling Partners Should Have Recognized Madoff's Fraud Because Saul and David Katz Became Expert in the Brokerage Business**

Another foundation of the Complaint is the false claim that Saul Katz and David Katz were central to the Sterling Stamos investment process and therefore became experienced in the stock market and the brokerage industry.  The Complaint alleges, "[u]pon information and belief, over the period from June 2002 to December 2008, the Sterling Partners became familiar with the business and investment operations and management of a hedge fund, including due diligence requirements and the various

---

[2]  Peter Stamos did not view the Sterling Partners as particularly experienced in the investment industry.  When asked about an early piece of Sterling Stamos marketing literature from its pre-registration days that described Sterling Equities as having "a deep expertise in hedge funds, private equity, and real estate," Mr. Stamos called the claim that Sterling had hedge fund expertise "marketing puffery."  (Stamos Tr. 167:18-25 (Seshens Decl., Ex. A).)

investment industry red flags typically associated with potentially fraudulent investment funds or managers."  (Compl. ¶ 705.)

Further, and again "[u]pon information and belief," the Complaint alleges that "between approximately June 2002 and June 2005, Saul Katz and David Katz were involved in the operational and business management, as well as certain investment decisions of Sterling Stamos, including, but not limited to, the selection of certain funds and fund managers" (*id.* ¶ 722); and that, "[u]pon information and belief, Saul Katz and David Katz were familiar with Sterling Stamos' due diligence processes for vetting potential investment managers" (*id.* ¶ 728).  This supposed investment fund experience made their "lack of diligence on Madoff . . . even more indefensible."  (*Id.* ¶ 1077.)

The undisputed evidence is that *no* Sterling Partner, including Saul Katz and David Katz, had any material involvement with Sterling Stamos' investment strategies or decisions.[3]  Rather, they were involved in matters such as where the business should lease space:

> "Q.  Do you know what role, if any, Fred Wilpon had in any of the Sterling Stamos'[sic] investments?
>
> [Chachra].  I don't believe Fred Wilpon or Saul Katz or David Katz had anything to do with the investments of Sterling Stamos."  (Chachra Tr. 124:5-10 (Seshens Decl., Ex. C).)
>
> * * *
>
> "Q.  To your understanding [Saul Katz] was not actively involved in the investment decisions [of Sterling Stamos]?

---

[3]  In Sterling Stamos' early days, Sterling Stamos did not have a formal investment committee, but its four or five employees would meet regularly to discuss investment decisions.  (Stamos Tr. 60:11-61:23 (Seshens Decl., Ex. A).)  Periodically, Peter Stamos would involve Saul Katz in discussions where investment decisions had to be made.  (*Id.* 61:24-62:12.)  Since the money that Sterling Stamos was investing at that time came principally from Mr. Katz and the other Sterling Partners, this is not surprising. (*Id.* 137:8-138:13; 141:25-142:11; S. Katz Decl. ¶ 5.)

A.  My understanding [was that] he was not involved at all in the investment decision-making.  As it relates to introducing clients and/or the revenue and profits of the business, my understanding [was that] he was involved."  (*Id.* 133:22-134:3.)[4]

\* \* \*

"Q. . . . At this time in 2004, how would you characterize Mr. [Saul] Katz's involvement in the investment aspect of Sterling Stamos?

[Stamos]  Minimally, relatively minimal."  (Stamos Tr. 136:18-21 (Seshens Decl., Ex. A).)

\* \* \*

"Q.  And what was Saul Katz's involvement in the investment process when you first launched the firm?

A.  He was, I would say highly involved for the first three months.

Q.  And can you describe his involvement in the first three months?

A.  Yes.  He, and his partners, provided the primary[,] vast majority of the initial capital, and in some of those investments, some of the capital that he provided with us were in-kind investments, in the names of managers that he prior held. . . . So, in that context he introduced us to those managers.

Q.  What other involvement did he have, did Mr. Saul Katz have during those first three months?

A.  He was highly involved in the decision-making about the setting up of the business.

Q.  What do you mean by that, by the setting up of the business?

A.  What office space we would use, for example, what our cost structure would be, how much we should pay for employees, how many employees we should have.

Q.  Anything else?

---

[4]  (*See also* Chachra Tr. 132:6-134:22 (testifying that the statement alleged in paragraph 724 of the Complaint—that a pre-2005 hedge fund questionnaire identified Saul Katz and David Katz as "two of the four primary portfolio decision makers" at SSP—was "inaccurate," as were numerous other statements in the questionnaire concerning Saul Katz's and David Katz's roles with Sterling Stamos) (Seshens Decl, Ex. C).)

A.  Just general advice like that.  That's all I can recall."  (Stamos Tr. 137:8-138:13 (Seshens Decl., Ex. A).)

* * *

"Q. . . . In addition to introducing Peter Stamos to potential investors and limited partners, did Mr. [Saul] Katz play any role in selecting fund managers do you recall?

[Chachra].  No.

Q.  Not to your recollection or you know that he did not?

A.  I don't believe he played a role.

Q.  Okay.  So, to your recollection, he didn't play any role in deciding which funds to invest in?

A.  No.  He didn't actually know many of the fund managers.

Q.  Okay.  With respect to David Katz, he's listed here as a senior investment team member.  What was his role at that time prior to registration?

A.  Saul's son.  There was no role.  He attended one . . . he attended one fund manager interview with me. . . .  He happened to be in the city that day and I was going to a meeting, and he said can I come along and I said sure."  (Chachra Tr. 121:4-122:2 (Seshens Decl., Ex. C).)

* * *

"Q.  Who were the decision-makers as far as what types of investments would be made by Sterling Stamos?

[S. Katz].  Peter was the chief investment officer.

Q.  Were there any other persons that were decision-makers that would—

A.  Peter made the decisions.

Q.  Okay.  What role did you have?

A.  In?

Q.  Sterling Stamos.

A.  Only in where the business rented the space and how many employees and budget, only on a management of the business level.  Zero

15

involvement in any investments." (S. Katz Tr. 138:11-25 (Seshens Decl., Ex. D).)

* * *

"Q.  What role did David play?  David, your son?

A.  Same as me.

Q.  Same as you?

A.  Yeah.

Q.  No decision-making with respect to investments, particular investments of the Sterling Stamos fund?

A.  The only decision we made is putting our own money into any particular fund as it was offered to the limited partners.  But not putting the fund together, not picking managers, not reviewing the managers, no review process.  Nothing to do with the investment strategy of the company at all."  (*Id.* 139:9-23.)

* * *

"Q.  Is there a time when you were [involved in the investment strategy of Sterling Stamos]?

A.  Never.

Q.  Never been involved in any investment strategies at Sterling Stamos?

A.  No.

Q.  Is the same true for your son David?

A.  Yes."  (*Id.* 128:12-18.)

* * *

"Q.  Would you say that prior to Sterling Stamos registering as an investment advisor that you were involved in the investment decisions of Sterling Stamos?

[D. Katz].  Not even close.

Q.  Would you say that you were on the senior investment team at Sterling Stamos prior to registering?

16

A.  That would defeat the whole purpose of having Sterling Stamos.

Q.  What do you mean?

A.  If we were going to do it, we'd do it ourselves, we'd do it.  Right?  We wanted Peter's brain."  (D. Katz Tr. 173:24-174:12 (Seshens Decl., Ex. G).)

* * *

"Q.  Prior to Sterling Stamos registering as an investment advisor, did your father, Saul Katz, have any involvement in the investment decisions at Sterling Stamos?

A.  About the same I did.  Nothing.  Except he went to less meetings, I'm sure.

Q.  So he had no involvement in deciding which investment mangers the funds would invest in?

A.  Not that I know, not that I know of."  (*Id.* 174:21-175:4.)[5]

### False Allegation #5:  All Sterling Partners Were Familiar with Sterling Stamos' Due Diligence Process

The Complaint suggests that the Sterling Partners should have recognized

Madoff's fraud because they not only became experienced with the investment industry,

but also, "[u]pon information and belief," "*all* the Sterling Partners also became familiar

with Sterling Stamos' due diligence process."  (Compl. ¶ 729 (emphasis added).)[6]  In

---

[5]  Although the Complaint alleges that David Katz "managed" a fund at Sterling Stamos called "SP Trading" (Compl. ¶ 726), this so-called "fund" was nothing more than a brokerage account for David Katz in which he traded a particular credit card stock up and down.  (*See* D. Katz Tr. 157:11-16 ("Q.  You managed a fund at one point at Sterling Stamos, right?  A.  No.  Q.  You don't recall managing a fund called SP Trading?  A.  SP Trading?  No."); 159:6-9 ("Q. . . . Can you explain that sentence [referencing an "Opportunistic Fund, SP Trading, which is managed by David Katz" in a 2002 email] to me?  A.  I think this has to do with the KRB [stock] I was trading up and down.")  (Seshens Decl., Ex. G).)

[6]  This allegation is, according to the Trustee, based on the Sterling Partners' roles as "both general partners and limited partners of Sterling Stamos . . . ."  (Compl. ¶ 729; *see also id.* ¶ 1030.)  These allegations are contrary to the evidence.  None of the Sterling Partners would have had access to Sterling Stamos' due diligence process as either general or limited partners.  (Chachra Tr. 118:20-119:6 (testifying that SSP "actually made a rule by which [the due diligence process] would not be shared" with any Sterling Stamos general or limited partners); *cf. id.* 128:24-129:10 ("Q.  Prior to that time frame . . . June of '07, where were the investment memos maintained?  A.  To be clear, we had like a file on a shared drive and

particular, it alleges that "Saul Katz and David Katz were familiar with Sterling Stamos'
due diligence processes for vetting potential investment managers" (*id.* ¶ 728); that the
Sterling Partners' supposed exposure to Sterling Stamos' due diligence process "should
have prompted their own due diligence on Madoff" (*id.* ¶ 1077); and that, after Merrill
Lynch in 2007 acquired part of Sterling Stamos and imposed a particular new
requirement, "Saul Katz was aware of this new due diligence requirement" (*id.* ¶ 907).

These allegations are both false and irrelevant.  The fact that a manager was
excluded from eligibility for investment because of the nature of his trading strategy was
not an indication of fraud.  The allegations also are directly contrary to evidence
generated by the Trustee before the Complaint was filed.  No Sterling Partner was
familiar with Sterling Stamos' due diligence requirements, either before or after the
Merrill Lynch investment:

> "Q.  Were you aware or are you aware of the type of diligence that Mr.
> Stamos or people working under his direction would perform before
> deciding to invest with a particular manager in a particular fund?
>
> [S. Katz].  I don't know the details of it, but I do know that as part of the
> management decisions that were made in running the company, we had
> more employees per money under management than any one of our size
> doing due diligence. . . .
>
> Q.  What—
>
> A.  What they did, I don't know. . . .
>
> Q.  Did you understand them to evaluate both—first of all, do you
> understand one of the due diligence aspects is to evaluate the risk of a
> particular fund's or manager's investment strategy?
>
> A.  No.  I don't know what they did and how they did it.

---

they would be in that file.  Q.  Okay.  And did the limited partners or the general partners have access to the
investment memos at that time?  A.  No.  Q.  Okay.  So if a limited partner or a general partner wanted to
review a particular investment memo, how would they—  A.  They wouldn't.")  (Seshens Decl., Ex. C).)

Q.  Do you understand that one of the diligence aspects is to investigate the type and evaluate the type of operational controls that a particular fund brings to bear?

A.  I don't know the details of how they did and what they did.

Q.  Did you ever participate in any meetings or discussions where—in your role at Sterling Stamos—where results of particular diligence were discussed?

A.  No, because that would be an investment thing and we didn't participate in that. . . .

Q.  Did you receive reports—

A.  On due diligence?

Q.  Well, stop there, on due diligence?

A.  No."  (S. Katz Tr. 141:17-143:7 (Seshens Decl., Ex. D).)

* * *

"Q.  In 2002 when Sterling Stamos was first created, in its beginning stages, what's your understanding of the diligence process that Sterling Stamos used to consider investments?

[D. Katz].  I don't recall.

Q.  Do you recall anything about the diligence process at Sterling Stamos at that time?

A.  Nothing.  I know they did something.  I don't remember what they actively did.

Q.  At any point in time did you gain an understanding of Sterling Stamos' diligence process?

A.  No.  No."  (D. Katz Tr. 195:3-14 (Seshens Decl., Ex. G).)

* * *

"Q.  Did you think they had a good diligence process at Sterling Stamos?

A.  I don't know.  That would be a guess.

Q.  So you would know nothing about Sterling Stamos' diligence process?

19

A.  No.  Not that I remember, anyway."  (*Id.* 195:25-196:6 (objection omitted).)

* * *

"Q.  Did you ever discuss Sterling Stamos' diligence process with your father, Saul Katz?

A.  No.  Not that I remember."  (*Id.* 197:13-15.)[7]

**False Allegation #6:  BLMIS' Failure to Pass Sterling Stamos' and Merrill Lynch's Due Diligence Processes Was an Indication of Fraud**

Continuing the due diligence theme, the Complaint implies (though entirely "upon information and belief") that BLMIS had failed Sterling Stamos' and Merrill Lynch's due diligence processes for reasons indicative of fraud, and the Sterling Partners knew it.  It alleges, "[u]pon information and belief," that "Sterling Stamos personnel repeatedly warned the Sterling Partners that Madoff was 'too good to be true' based on a number of factors including, but not limited to[] Sterling Stamos' rejection of Madoff on due diligence grounds" (Compl. ¶ 869); that "Sterling Stamos persistently told the Katz and Wilpon families that Sterling Stamos had concerns about Madoff and that BLMIS had failed Sterling Stamos' due diligence process" (*id.* ¶ 873); and that "BLMIS would

---

[7] Peppered throughout the Complaint are allegations that anything that purportedly was told to Saul or David Katz, including anything about the specifics of Sterling Stamos' due diligence process, was discussed, "upon information and belief," at the meetings of the Sterling Partners that typically occur every two weeks.  (*See, e.g.*, Compl. ¶¶ 870, 878, 888, 896, 904, 911, 1037, 1070.)  But these allegations too are baseless and improperly pleaded upon information and belief.  During the course of the Trustee's expansive Rule 2004 investigation, Sterling produced agendas and minutes from every Sterling Partners' meeting for which they were taken and maintained (Seshens Decl. ¶ 13), and there is no record of any discussion of any warning about the legitimacy of Madoff's operations (*id.* ¶ 14), of the specifics of Sterling Stamos' due diligence process (*id.*), or of Sterling Stamos' investment decision-making process (*id.*).  No Sterling witness testified to any of these topics being discussed at Partner meetings either.

Given that only the Sterling Partners, Sterling's General Counsel, and Sterling's Chief Financial Officer generally attend Partner meetings, there is no other evidence the Trustee could obtain to establish that these topics were discussed, and allegations made "upon information and belief" are completely improper.

not pass Sterling Stamos' due diligence requirements and that [Peter Stamos] had warned Saul Katz and Fred Wilpon not to invest" (*id.* ¶ 874).

But the testimony the Trustee had before he filed the Complaint made clear that, although BLMIS did not fit within Sterling Stamos' criteria for investment of third-party money,[8] Sterling Stamos never suggested to any Sterling Partner that BLMIS was engaging in fraudulent activity.  On the contrary, Peter Stamos held Madoff in high esteem *even though* BLMIS did not fit Sterling Stamos' investment profile.  (*See supra* at 3-4, 6.)

Indeed, the implication that Sterling Stamos' due diligence turned up fraud is particularly misleading because Sterling Stamos never conducted any diligence on BLMIS.  Sterling Stamos knew BLMIS was simply ineligible for investment by Sterling Stamos due to its proprietary trading strategy.

> "Q.  And with respect to Madoff, did you begin to monitor the broker-dealer issue?
>
> [Stamos].  No.  Never did due diligence on Mr. Madoff."  (Stamos Tr. 149:11-14 (Seshens Decl., Ex. A).)
>
> * * *
>
> "Q.  [Did you ever express to Sterling] that they should engage in any— that Sterling should engage in any due diligence with Madoff?
>
> A.  I didn't think that was my—no.  I never did due diligence on Madoff and I never asked them to do diligence on Madoff."  (*Id.* 162:18-23.)
>
> * * *

---

[8] As Sterling Stamos grew, its due diligence process evolved, and, over time, Sterling Stamos elected not to invest in non-transparent managers.  (*See* Stamos Tr. 201:19-202:3; 209:19-210:13; 225:1-10 (Seshens Decl., Ex. A); Chachra Tr. 172:12-173:17 (Seshens Decl., Ex. C).)

"Q.  And what kind of questions did these Madoff investors that Saul Katz had brought to Sterling Stamos, what did they ask?

[Chachra].  Did I—did we—you know, if we're doing due diligence, did we ever do due diligence on Madoff.

Q.  And what was your response to that question?

A.  No."  (Chachra Tr. 139:10-18 (Seshens Decl., Ex. C).)

The Complaint refers to a statement in a December 13, 2008 email from Mr. Chachra suggesting that Sterling Stamos "turned down the Madoff Funds more [than] 6 years ago" (¶ 873) to reinforce the false implication that Sterling Stamos had discovered something amiss at BLMIS through its due diligence.[9]  But Mr. Stamos testified that this statement was inaccurate:

"Q.  Did Sterling Stamos turn down an investment opportunity with Madoff?

A.  I believe that is an inaccurate statement.  I don't believe that we turned down Mr. Madoff more than six years ago, which would have been, from that date, 2002.  In fact, I think quite the opposite.  We asked to invest with Mr. Madoff as part of our original diversified portfolio and Mr. Katz said [Madoff] would not allow it."  (Stamos Tr. 192:4-13 (objection omitted) (Seshens Decl., Ex. A).)

In fact, Peter Stamos had invested with BLMIS and developed a positive view of Madoff. (*Id.* 146:6-21.)  He withdrew his funds in 2003 and 2004 for personal reasons and to invest in Sterling Stamos—not because he had any suspicion of Madoff.  (*Id.* 117:5-25.)

---

[9]  In fact, in its early stages Sterling Stamos *wanted* to invest with Madoff, and, contrary to what is alleged in the Complaint (¶ 1016), Peter Stamos asked Mr. Katz if Sterling Stamos could do that.  (Stamos Tr. 191:24-192:22 (testifying that it was "inaccurate" to say that Sterling Stamos turned down the opportunity to invest with Madoff because Sterling Stamos wanted to invest with Madoff early on); 194:16-195:2 (testifying that Stamos asked Saul Katz if Madoff could be one of ten managers as part of a diversified portfolio) (Seshens Decl., Ex. A).)  However, as Peter Stamos explained, he was told by Saul Katz that Madoff did not take capital from funds of funds.  (*Id.*)  When Peter Stamos later learned that Madoff did permit investments by funds of funds, he testified, not that he felt this was a potential badge of fraud, but that he "felt that . . . Sterling was being treated less favorably than other managers."  (*Id.* 198:6-12.).)

Once again, Mr. Chachra, the author of the December 13, 2008 email, was not asked about it at his deposition. Had he been asked, he would have said that Sterling Stamos was never offered an opportunity to invest with Madoff. (Chachra Decl. ¶ 5.)

Also misleading is the suggestion that BLMIS would not pass Merrill Lynch's due diligence process for reasons suggesting fraud. The Complaint implies that Merrill Lynch had a specific reason for "rejecting" BLMIS when it turned down Saul Katz's proposal in 2008 that Sterling Stamos create a fund of "black box" managers that would include BLMIS. (Compl. ¶¶ 908-910.) In fact, the Complaint itself demonstrates that Merrill Lynch mandated several changes to Sterling Stamos' due diligence process, including requiring all investment managers to complete a transparency report disclosing details about their investment strategy.[10] This directive was not aimed at BLMIS, and no inference of wrongdoing is properly drawn from the change, which prevented Sterling Stamos from investing with *any* investment manager who, like Madoff, refused to disclose their black box strategies.[11] (Compl. ¶ 906.)

After Sterling Stamos, over time, instituted more stringent investment requirements, Madoff became an ineligible manager for its investment purposes. But Peter Stamos continued to regard Madoff as "honest" and "honorable," and as a "legend"

---

[10] The Complaint alleges that Merrill Lynch, "[u]pon information and belief," "had concerns regarding Madoff as early as 1998," did not invest its own money with Madoff, and did not include "Madoff or any Madoff feeder fund on its 'approved' list for investment recommendations." (Compl. ¶ 898). These unidentified concerns are not alleged to have played any role in the Sterling Stamos acquisition process, and there is no allegation that any "concerns" were ever communicated to any Sterling Defendant.

[11] As Peter Stamos testified, it was not uncommon for a fund manager to either refuse or not be able to complete a transparency report. Among others, he recalled that both D.E. Shaw and Renaissance Capital were unable or unwilling to meet Sterling Stamos' transparency report requirement once it was implemented. (Stamos Tr. 310:9-311:2 (Seshens Decl., Ex. A).)

in the hedge fund industry.  The two issues are not related.  The fact that BLMIS was not an eligible investment was not an indication of fraud.

**False Allegation #7:  BLMIS' Proprietary "Black Box" Strategy Was a Red Flag**

Another significant focus of the Trustee's Complaint is the claim that Saul Katz and the Sterling Defendants were repeatedly warned about the dangers of Madoff's "mysterious" black box trading strategy:  "Stamos expressed concern to Saul Katz about Madoff's overall lack of transparency, especially as it related to his mysterious black box strategy" (Compl. ¶ 882); "Stamos informed Saul Katz that black box funds were inherently risky" (*id.* ¶ 883); Merrill Lynch and Sterling Stamos rejected a proposal to invest in a fund of black box strategies, including Madoff, because they would not pass applicable due diligence requirements (*id.* ¶¶ 908-910).

The allegations are again off the mark.  Black box quantitative strategies are common, unremarkable, and entirely legal.[12]  Employing such a strategy is no indicator of fraud, and nothing in Peter Stamos' testimony supports the Trustee's suggestion to the contrary.  Indeed, numerous courts have rejected Madoff's lack of transparency as a "red flag" on which to base a claim of scienter, as discussed *infra* at 70-73.

No "industry professional," and in particular no Sterling Stamos employee, ever warned the Sterling Partners that Madoff's "black box" strategy was an indication of

---

[12]  "High Frequency" trading is the new term for rapid black box trading strategies.  Such trading strategies are pervasive and legitimate.  *See, e.g.*, Concept Release on Equity Market Structure, Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594, 3606 (Jan. 21, 2010) ("One of the most significant market structure developments in recent years is high frequency trading ('HFT').  The term is relatively new and is not yet clearly defined.  It typically is used to refer to professional traders acting in a proprietary capacity that engage in strategies that generate a large number of trades on a daily basis.").  Other regulations too address "black box strategies."  *See, e.g.*, Short Selling in Connection with a Public Offering, Exchange Act Release No. 34-56206, 72 Fed. Reg. 45,094, 45,099 (Aug. 10, 2007) (addressing exemption for an "adviser that operates a black box using a trading algorithm, if the black box is separate from another black box or another trading unit").

fraud.  On the contrary, "black box" strategies were common and could perform well in

stressed markets:

> "Q.  And what was your reaction to Mr. Madoff's response that his market
> timing component of a split strike strategy was a black box?
>
> A.  At that time, which I believe was early on in the development of our
> firm, that was a common answer to a number of managers that we either
> invested with or considered investing with.  For example, D.E. Shaw had a
> quantitative black box that people invested in." (Stamos Tr. 116:4-13
> (Seshens Decl., Ex. A).)

* * *

> "Q. . . . [W]as part of your defense that it was unusual that[,] despite the
> drop in the market[,] that Madoff's returns were remaining so consistent?
>
> A.  I don't recall that as being part of my defense.  I actually recall the
> opposite, that we found in past periods of crisis that black boxes were in
> fact those kinds of managers that had a higher probability of performing
> well when markets collapsed." (*Id.* 204:7-18.)

The Sterling Partners understood that part of Madoff's strategy was intentionally

proprietary and that did not cause them concern.  (S. Katz Tr. 108:1-20 (describing his

comfort with the non-transparent part of Madoff's strategy—when and why he went into

and out of the market—because he knew it was proprietary—the part investors were not

supposed to know) (Seshens Decl., Ex. D); D. Katz Tr. 146:10-23 (defining "black box"

as a "proprietary trading method" and explaining that he was not concerned about

Madoff's so-called "black box" strategy because Madoff was "an outstanding citizen"

who "helped computerize NASDAQ" and with whom the SEC wrote rules) (Seshens

Decl., Ex. G); Deposition Transcript of Arthur Friedman ("Friedman Tr."), June 22-24,

2010, 272:21-273:10 (explaining his comfort with Madoff's strategy because the non-

transparent portions of it were grounded in Madoff's "great technology") (Seshens Decl.,

Ex. H).)

25

The Sterling Partners were free to invest as they chose, including with a manager who employed a "black box" strategy.  Sterling Stamos and Merrill Lynch, who provided investment advice for others, had different considerations.  (*See* Stamos Tr. 161:18-162:7 (describing his positive pre-December 11, 2008 views of Madoff, but explaining that he did not feel that, as a fiduciary, he should invest in non-transparent funds) (Seshens Decl., Ex. A); Chachra Tr. 172:12-173:17 (explaining that Chachra did not invest in "black box" strategies because he can't explain to a customer "how that fund works," but, "look, if it were just my money, I would have less of an issue") (Seshens Decl., Ex. C).)  But no one suggested that a "black box" strategy was indicative of fraud.

**False Allegation #8:  Sterling Stamos Was Restructured to Evade SEC Scrutiny of Madoff**

The Complaint alleges that the Sterling Partners helped Madoff conceal his activities from the SEC.  "Sometime before October 2003, Saul Katz also informed individuals at Sterling Stamos that its registration would interfere with his close relationship with Madoff and cause all of Sterling's related BLMIS investments to be disclosed against Madoff's wishes" and that, "[a]ccordingly, to appease Madoff's concerns and avoid certain Madoff-related disclosure requirements, Sterling, together with Sterling Stamos, undertook substantial steps to restructure Sterling Stamos and attempted to institute a formal separation between Sterling and Sterling Stamos that would obviate the requirement to disclose details about Sterling's and Madoff's business dealings, including the amount of Sterling's investments with Madoff."  (Compl. ¶¶ 954-955.)

Again, the evidence is to the contrary.

The Sterling Partners and Peter Stamos started Sterling Stamos as an alternative investment opportunity for the Sterling Partners and their families.  (S. Katz Tr. 151:17-

26

24 (Seshens Decl., Ex. D); D. Katz Tr. 347:20-25 (Seshens Decl., Ex. G).)  Over time, the

non-Sterling assets invested through Sterling Stamos grew, and Peter Stamos' vision for

Sterling Stamos changed.  (S. Katz Tr. 151:17-152:14 (Seshens Decl., Ex. D); D. Katz Tr.

103:7-19; 329:21-330:3 (Seshens Decl., Ex. G).)  Consistent with its growing group of

investors and with recent changes in the laws applicable to funds such as Sterling Stamos,

in 2005 Sterling Stamos decided to register as an investment advisor.  (D. Katz Tr.

165:16-20 (Seshens Decl., Ex. G); Stamos Tr. 46:8-47:3 (Seshens Decl., Ex. A); Chachra

Tr. 49:2-23 (Seshens Decl., Ex. C).)

     The Sterling Partners were concerned that, as a consequence of Sterling Stamos'

registration and their ownership in the company, disclosure of otherwise private family

investments and business relationships might be required.  (Declaration of Saul B. Katz

in Support of Sterling Defendants' Motion to Dismiss or, in the Alternative, for Summary

Judgment ("S. Katz Decl."), dated Mar. 19, 2011, ¶¶ 17-18.)  In addition, the Sterling

Partners were concerned about increased legal exposure to these third-party investors,

given that they were neither expert nor involved in the investment side of Sterling

Stamos' business.  (*Id.* ¶ 17.)

     Consequently, the relationship was restructured—to provide privacy and

protection to the Sterling Partners, not to Madoff.

> "Q.  What did Mr. [Saul] Katz tell you that Mr. Madoff's concerns were
> with Sterling Stamos registering as an investment advisor?
>
> A.  What I recall is Mr. Katz expressing the concern that our registration,
> that is Sterling Stamos, would require that Mr. Katz disclose *all* of his
> investment holdings, including all business relationships with Mr.
> Madoff."  (Stamos Tr. 51:5-12 (emphasis added) (Seshens Decl., Ex. A).)

(*See also* S. Katz Decl. ¶¶ 17-20; Stamos Tr. 274:15-275:10 (explaining that Saul Katz

had "raised the concern about disclosure of information from Mr. Madoff as well as

privacy issues regarding investments and business transactions; that they, as wealthy

individuals, did not want to have to disclose," but that Saul Katz was "generally

supportive" and not "unhappy" about Sterling Stamos' decision to register) (Seshens

Decl., Ex. A).)[13]

**False Allegation #9:  Sterling Stamos and the Sterling Partners Should**
**                    Have Been Concerned That Madoff Was Front Running**

        The Complaint contends that the Sterling Partners should have known that

Madoff was front running.  "On multiple occasions, Stamos discussed with Saul Katz the

frequent rumor that Madoff engaged in illegal front-running" (Compl. ¶ 887) and that

"the Merrill Executive raised with both Stamos and Saul Katz . . . the possibility that

Madoff was front-running" (*id.* ¶ 902).

        Of course, Madoff's fraud was the *failure* to purchase securities, while front

running *requires* the purchase of securities.  The Sterling Partners could not have known

Madoff was front running because he was not.  And neither they nor anyone at Sterling

Stamos thought Madoff was front running.  Testimony given before the Complaint was

filed demonstrates how deceptively misleading these allegations are:

        "Q.  What did you tell Mr. Saul Katz about the possibility that Madoff
        may be front-running?

        [Stamos].  *My view was that I didn't believe that that was true.  I just*
        *didn't believe it was true.*

---

        [13]   The notion that the Sterling Partners should have known that Madoff was evading SEC
registration requirements by February 2006 is nonsensical.  (*See* Compl. ¶¶ 968-973.)  First, virtually every
allegation in this section of the Complaint is made "upon information and belief" while none has any basis
in the factual record.  Second, the Complaint itself alleges that Madoff registered in August 2006.  (*Id.*
¶ 972.)

Q.  So you told Saul Katz that you did not think that the rumor [that Madoff was front-running] was true; is that what you're saying?

A.  Yes."  (Stamos Tr. 152:11-20 (objection omitted) (emphasis added) (Seshens Decl., Ex. A).)

* * *

"Q.  What I'm struggling to understand is where does front running come into that conversation [with Sterling]?

[Chachra].  I did not bring up front running, that wasn't part of our conversation.

Q.  So the front running wasn't discussed?

A.  I didn't say to them that he's front running or anything.  I had no facts to that effect.

Q.  Not whether you said it, but did you ever hear that topic discussed?

A.  No.  What I definitely—no, that was not part of my discussions with them."  (Chachra Tr. 210:3-17 (objection omitted) (Seshens Decl., Ex. C).)

* * *

"Q.  And what was your response to [non-Sterling individual's] concern that Madoff might be front-running?

[Stamos].  I remember my response.  It was, first, I am not, have not done due diligence on Mr. Madoff, he's not in our investment portfolio, and I cannot give you counsel as to how to invest in managers outside my own portfolio.  I said, there are issues that have been raised but my assumption is, having been an investor myself, that Mr. Madoff is incredibly honest, incredibly reputable and perhaps one of the best hedge fund managers in modern history.  With all that said, I still believe it is prudent to not put more than 10 percent of your assets in any one manager."  (Stamos Tr. 146:6-21 (Seshens Decl., Ex. A).)

* * *

"Q. . . . [T]his sequencing of execution, was that in any way tied to or related in any way to the possibility or concern that Madoff might be front running?

[Chachra].  I mean, I had no—first of all, as I said, we had no reason to think there was anything wrong there.  Peter and I may have had a conversation saying that's [a] potential risk, that you can sequence trades

29

differently if it's for your business versus your clients."  (Chachra Tr. 206:6-15 (Seshens Decl., Ex. C).)

* * *

"Q.  Did you ever have any suspicion that Madoff might be involved— whether you discussed it with anybody or not—might be involved in front-running or inside trading?

[S. Katz].  No.  Because he did it in—front-running would be a particular stock, again."  (S. Katz Tr. 88:15-20 (Seshens Decl., Ex. D).)

* * *

"Q.  And what did you discuss about the implications [if Madoff was front-running]?

[Stamos].  I remember Mr. Katz explaining to me that he didn't believe that that were true, that Mr. Madoff had been reviewed regularly by the SEC, that he was one of the most reputable investors, that he'd known him for 25 years, that he was highly honest, highly honorable.  And for those reasons he didn't believe it were true and he asked me what I [thought]."  (Stamos Tr. 153:3-12 (Seshens Decl., Ex. A).)

**False Allegation #10:   The Sterling Partners Knew That Madoff's Custody of Securities Was a Red Flag**

The Complaint charges that the Sterling Partners were warned that Madoff suffered from the "operational deficiency" that he was both an investment manager and a broker-dealer who cleared and custodied his own trades.  The Complaint contends that, "[b]ecause Madoff cleared and maintained custody of the securities he purportedly traded, there was no independent safeguard in place to verify that Madoff was actually making the trades he reported" (Compl. ¶ 884); that, "[a]lthough Saul Katz was well aware of the risks associated with BLMIS' operational deficiencies, he never once attempted to confirm through any third party that Madoff actually traded the securities indentified on his or other Sterling-related monthly BLMIS account statements" (*id.* ¶ 885); and that Saul Katz and Sterling Stamos were told that Merrill Lynch "would

30

reject such a manager because independent checks on the manager's truthfulness were lacking" (*id.* ¶ 902).

First, as noted above, Saul Katz was not familiar with any due diligence processes and understood that investors of third-party funds had obligations to their investors. But the Sterling Partners had no such obligations—they invested only their own funds.

Second, self-custody arrangements are not remarkable. "[A] 'staggering' 83% of financial services companies are self-clearing." Matt Ackermann, *Fidelity Unit Seeks Growth Via Self-Clearing Market*, Am. Banker, Apr. 9, 2008 (Seshens Decl., Ex. I). (*See also* Chachra Tr. 174:18-175:5 (it was a "common practice" in the early days of the hedge fund industry to have one's own broker dealer—"D.E. Shaw had their own broker-dealer[,] I believe Steinhard [sic] had his own broker-dealer") (Seshens Decl., Ex. C).) In fact, as with many of the alleged "red flags" in the Complaint, Madoff's practice of self-clearing and self-custodying also has been rejected as a red flag sufficient to establish scienter. (*See infra* at 70-73.)

Third, one of the risks identified with self-clearing arrangements is the risk of front running. (Chachra Tr. 205:16-206:15 (describing the "conflict of interest" that arises when an investment manager has its own broker-dealer as the "sequencing of transactions") (Seshens Decl., Ex. C); Stamos Tr. 83:22-84:15 (explaining the Merrill Executive's concerns about Madoff clearing his own trades was in the context of a "rumor" that "Madoff was using information from his broker-dealer to help him as an investment manager") (Seshens Decl., Ex. A).) Neither any Sterling Defendant nor any Sterling Stamos employee thought Madoff was front running.

**False Allegation #11:   The Sterling Partners Knew About the Bayou Fraud
and Therefore Should Have Recognized Madoff's Fraud**

The Complaint is also wrong when it claims that, because a hedge fund
investment by Sterling Stamos turned out to be a Ponzi scheme, the Sterling Defendants
should have concluded that Madoff also was engaged in a Ponzi scheme.

The Complaint asserts that Sterling Stamos explained to Saul Katz the reasons for
its redemption of equity investments in Bayou Superfund LLC ("Bayou"), including
"Bayou's style drift, plan to drastically increase the amount of assets under management,
and deficiencies in its back office infrastructure." (Compl. ¶ 1036.)  Then, it alleges
"[u]pon information and belief, prior to making [a 'special'] investment [offered by
Madoff], the Sterling Partners knew that one reason Sterling Stamos had redeemed its
Bayou investments was due to a style drift." (*Id.* ¶ 1043; *see also id.* ¶¶ 1036-1041.).

The Complaint then charges that the Sterling Partners "failed to conduct any
diligence" when Madoff also underwent a "style drift," offering a "special" investment
opportunity that "involved a dramatic change in strategy that should have stood out to the
Sterling Partners not only after approximately 20 years of investing with Madoff, but
especially in light of the similar red flag that was raised by Bayou." (*Id.* ¶ 1045.)

The premise of these allegations is wrong.  There was no Madoff "style drift."
The so-called "style drift" at Bayou involved the fund manager completely shifting
strategies, from trading short-term and small cap equities to trading currencies and
commodities.  (Stamos Tr. 175:17-176:20 (Seshens Decl., Ex. A); Chachra Tr. 176:11-24
(Seshens Decl., Ex. C).)  The Bayou fund manager also told Sterling Stamos that he was
going to implement this new strategy and substantially increase his assets under

management in three months time, which Sterling Stamos did not think was feasible. (Chachra Tr. 176:11-24 (Seshens Decl., Ex. C).)

By contrast, the November 2005 "special" investment was a one-time, "short-term" investment opportunity.[14] "[N]othing was different [about the strategy] other than the dash 4, which was the options" (Friedman Tr. 449:19-24 (Seshens Decl., Ex. H); *see also id.* 447:15-449:18), as the Complaint itself alleges (Compl. ¶ 1041). Madoff's "split-strike conversion" strategy remained the same. And directly contrary to the Complaint (¶ 1042), no Sterling Partner ever "questioned the legality" of the one-time investment. (Friedman Rule 27 Tr. 11:14-12:16 (Seshens Decl., Ex. F).)

There is no allegation that the other specific reasons for the Bayou redemption—Bayou's "plan to drastically increase the amount of assets under management, and deficiencies in its back office infrastructure"—were raised or identified with regard to Madoff. In fact, Peter Stamos understood that Madoff had a "substantial infrastructure in his broker-dealer." (Stamos Tr. 230:22-231:8 (Seshens Decl., Ex. A).)

The Complaint further alleges "upon information and belief" that, because the Sterling Partners were familiar with Sterling Stamos' due diligence protocol after Bayou, they knew or should have known that Friehling & Horowitz was not a legitimate auditor for an enterprise such as BLMIS. (Compl. ¶¶ 891-892.) The Sterling Defendants were not familiar with Sterling Stamos' due diligence process. Further, Mr. Stamos testified that while he did discuss lessons learned from the Bayou situation with Saul Katz, he did

---

[14] (*See e.g.*, A. Friedman Mem., dated Nov. 28, 2005, regarding "Special Investment in Madoff" (describing opportunity as "Short-term Special Madoff Investment" and reflecting note that "special" account closed as of June 25, 2007) (Seshens Decl., Ex. J); Friedman Tr. 434:16-435:4 (understanding of investment was that it would be "relatively short-term") (Seshens Decl., Ex. H).)

not recall ever knowing who Madoff's auditor was or ever discussing Madoff's auditor with Saul Katz.  (Stamos Tr. 229:23-230:21 (Seshens Decl., Ex. A).)  Nothing about the Bayou experience caused Mr. Stamos to change his view of Madoff or of the Sterling Partners' investments with Madoff.

**False Allegation #12:   The Sterling Defendants Never
                         Conducted Any Diligence on Madoff**

The Complaint alleges repeatedly that "the Sterling Partners conducted no diligence on Madoff or BLMIS, instead choosing to blindly accept their good fortune without conducting any investigation whatsoever."  (Compl. ¶ 12.)  No fewer than twenty-two paragraphs of the Complaint allege that the Sterling Defendants conducted no diligence on Madoff and BLMIS.  (*See id.* ¶¶ 12, 731, 753, 764, 797, 838, 890, 895, 905, 912, 914, 932, 975, 1024, 1045, 1046, 1057, 1061, 1064, 1074, 1075, 1080.)  Ten additional paragraphs claim that the Sterling Partners "buried their heads in the sand," "ignor[ed] the gathering clouds," or otherwise ignored indicia of fraud.  (*See id.* ¶¶ 2, 9, 10, 865, 866, 897, 973, 1073, 1076, 1079.)  The Complaint concludes that the Sterling Defendants' association with Sterling Stamos made their "lack of diligence on Madoff . . . even more indefensible."  (*Id.* ¶ 1077.)

The Sterling Defendants had no diligence obligation.  They were not investing other people's money, were not paid to invest other people's money, and were entitled to make judgments as to how to invest their own funds in any manner they chose.  Even so, the contention that they conducted no diligence is false.

At the start of the BLMIS relationship, Mr. Friedman undertook many due diligence exercises to try to understand BLMIS' "split-strike conversion" strategy.  (Friedman Tr. 123:13-125:10 (Seshens Decl., Ex. H); Friedman Rule 27 Tr. 9:7-11:2

(Seshens Decl., Ex. F); *see also* Compl. ¶¶ 754-765.)  For a few years he tracked

transaction prices by comparing them against publicly available information in the

newspapers to see if they were within the reported price ranges—which they were—and

to see if that value was at the high, low, or middle of the range.  (Friedman Tr. 123:13-

125:10 (Seshens Decl., Ex. H); *see also id.* 139:25-142:1; Friedman Rule 27 Tr. 20:21-

22:13 (Seshens Decl., Ex. F).)  He also prepared projections of maximum gains and losses

for the Sterling Partners' BLMIS accounts, given the securities they held, and giving effect

to the puts and the calls, which established a ceiling and a floor for the BLMIS returns.

(Friedman Tr. 123:13-125:10 (Seshens Decl., Ex. H).)  Through this exercise, Mr.

Friedman tried to project the maximum the accounts could gain and lose one month in

advance.  The values and returns always fell within his anticipated ranges.  (*Id.*)

     In the early days, Mr. Friedman even tried to replicate the "split-strike

conversion" strategy on paper to see if he could generate a profit.  (*Id.* 144:14-145:17; *see

also id.* 140:7-141:5.)  He identified specific transactions, and then mimicked those

transactions using different transaction dates and different quantities of the subject

securities.  (*Id.* 144:14-145:17.)  Contrary to the Complaint's allegation that Mr.

Friedman's efforts were "unsuccessful" and should have caused the Sterling Partners to

engage in further diligence (Compl. ¶ 764), Mr. Friedman "determined in [his] own mind

that the strategy was good, it worked, but not to the extent that it worked for [Madoff]."

(Friedman Tr. 144:14-145:9 (Seshens Decl., Ex. H).)  Mr. Friedman attributed his

inability to do exactly what Madoff did to timing and the absence of commission costs.

(*Id.* 145:18-146:8; 163:14-20.)  He viewed the exercise as an unequivocal success.

After the first few years, Mr. Friedman ceased his diligence exercises.  The

number of Sterling accounts had begun to grow, making the effort burdensome, and he

had not observed any inconsistencies between market information and what Madoff was

reporting.  (*Id.* 139:25-142:1; Friedman Rule 27 Tr. 21:5-22:13 (Seshens Decl., Ex. F).)

However, other forms of diligence continued to confirm the Partners' faith in Madoff.

First, over many years the Sterling Defendants and other customers continued to

make deposits and withdrawals in an unremarkable manner and to receive statements and

confirmations that reflected the purchase and sale of equity securities.  (Friedman Tr.

150:22-153:10; 600:16-601:2; 602:16-603:12; 610:5-23 (Seshens Decl., Ex. H).)

Although the Trustee has noted that Madoff created trades in hindsight, that very process

allowed them to confirm the regularity of his trades according to the market—as Mr.

Friedman did for several years.  The notion that he might not be trading never crossed

their minds.

Second, major financial institutions regularly reviewed the Sterling Defendants'

BLMIS holdings for the purposes of determining their value as collateral and as a source

of liquidity, in some cases making loans to certain of the Sterling Defendants to be used

as leverage, like margin loans, to increase returns on their securities investments.  (*Id.*

256:12-257:23; 475:25-476:20; S. Katz Tr. 165:4-13 (Seshens Decl., Ex. D); Deposition

Transcript of Mark Peskin ("Peskin Tr."), July 29, 2010, 179:21-181:5 (Seshens Decl.,

Ex. K).)  In every instance, the BLMIS holdings were accepted as valuable collateral.

"Q. . . . Did Citibank ever raise any questions about the—

A.  No.  To the contrary, I think they were very secure knowing that the
money was in a—a liquid asset.  If you also look at the right-hand—
excuse me, the left-hand column, 'Fleet margin, Fleet margin, Fleet
margin,' I mean, all of these Fleet, which is now B of A, was exceedingly

secure.  They gave us loans supported, collateralized by Madoff.  That's how I understand first—understood Madoff or got comfortable with Madoff, because these double-up loans you talk about, it took me, like, three seconds—exaggeration—ten minutes to negotiate them because B of A was so comfortable using Madoff.  It wasn't a matter of marking to market.  It wasn't a matter of understanding the collateral.  Oh, Madoff.  Okay, fine, yeah, put it in Madoff.  It's going to be liquid.

Q.  And why was BOA so comfortable with Madoff?

A.  B of A, I have to—you have to ask them.  I mean, they had other clients with Madoff.  They had other—I believe other loans, tri-party agreement type loans with Madoff.  If it was good enough for them, it was sort of good enough for me."  (Peskin Tr. 186:6-187:8 (Seshens Decl., Ex. K).)

Other institutions were similarly satisfied.  For example, in 1990 the Mets were seeking financing from Travelers Insurance Company, which sought information about the BLMIS investments of certain Sterling Partners and the Mets.  (S. Katz Tr. 53:11-54:6 (Seshens Decl., Ex. D).)  Not only did Madoff permit such due diligence, Travelers' documents reflect that he spoke personally with a Travelers representative.  (B. Gonder Mem., dated Aug. 24, 1990 (Seshens Decl., Ex. L).)  Travelers' due diligence memorandum confirmed the Sterling Partners' understanding about Madoff's strategy and provided them with additional comfort concerning their BLMIS investments.  (S. Katz Tr. 53:19-24; 56:23-57:6 (Seshens Decl., Ex. D).)

In addition, it was obvious that Madoff continued to be a star in the brokerage community.  For example, it was widely publicized in 2003 that Madoff had entered into a joint venture with several Wall Street firms, including Goldman Sachs and Merrill Lynch.  (S. Katz Decl. ¶ 9.)  Thus, although questions occasionally arose about Madoff, on each occasion the questions were answered in a manner that confirmed Madoff's honesty and standing.  (Friedman Tr. 163:21-165:14 (Seshens Decl., Ex. H); Wilpon Tr.

37

190:9-23; 199:15-201:24 (Seshens Decl., Ex. E).)  In particular, the Sterling Partners knew of a widely publicized SEC investigation in 1992, in which Madoff had been completely cleared of any wrongdoing.[15]  (S. Katz Tr. 52:3-53:6 (Seshens Decl., Ex. D); Wilpon Tr. 198:5-199:7 (Seshens Decl., Ex. E).)  *See also* Randall Smith, *Wall Street Mystery Features a Big Board Rival*, Wall St. J., Dec. 16 1992, at C1 (Seshens Decl., Ex. M).

The comfort the Sterling Partners took from the SEC's clearance of Madoff was widespread among Madoff customers, as noted in a report issued by the Office of Investigations of the SEC.  "We also found that investors who may have been uncertain about whether to invest with Madoff were reassured by the fact that the SEC had investigated and/or examined Madoff, or entities that did business with Madoff, and found no evidence of fraud. . . . Thus, the fact that the SEC had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him."  SEC Office of Investigations, Report No. OIG-509, *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme – Public Version* 25 (2009), *available at* http://www.sec.gov/news/studies/2009/oig-509.pdf (last visited Mar. 18, 2011) ("OIG Report").

---

[15]  Prior to December 11, 2008, Saul Katz relayed to Mr. Stamos the comfort he took in the SEC's oversight of BLMIS.  (Stamos Tr. 153:3-12 (Seshens Decl., Ex. A).)  Other Sterling Partners felt similarly, as they shared with Mr. Chachra before BLMIS collapsed.  Mr. Chachra recalled a general discussion with someone from Sterling in which "someone had mentioned a *Barron's* article . . . regarding Bernie, and I don't know who at Sterling, but someone made the comment, you know, we take a lot of comfort that they are an SEC broker—they are an SEC registered broker-dealer and have government oversight."  (Chachra Tr. 206:21-207:14 (Seshens Decl., Ex. C).)

**False Allegation #13:    The Sterling Defendants Received "Staggering" Profits**

The Trustee alleges that, over the twenty-five years during which the Sterling

Partners invested the profits of their businesses with BLMIS, they reaped a massive profit

of $300 million from "other people's money."

First, the Sterling Defendants were entitled to the securities on their statements.

No "profit" or principal concept is applicable.

Second, the Trustee's total is generated by aggregating all of the accounts of the

various Sterling entities and Partners and cherry-picking only the accounts without net

losses.  The information known to the Sterling Defendants does not reflect any $300

million "profit" if all accounts are aggregated without such cherry-picking.  When

accounts with net losses are set off against the so-called "profit," the Sterling Defendants

believe the Trustee's claim is less than half of what he contends—again, over twenty-five

years.[16]  But there is no legal basis for any aggregation anyhow.  These accounts were

managed by individuals making their own investment decisions.  (*See infra* at 51.)

Notably, the Trustee makes no allegation, as he has against others, that the

Sterling Defendants received "fantastical" or extraordinary returns.  The Complaint

alleges only that the Sterling Defendants' returns were "consistent."  (*See, e.g.*, Compl.

¶¶ 3, 5, 797, 837, 1056.)  But consistency is a good thing in a manager.  (Stamos Tr.

205:6-11 (Seshens Decl., Ex. A).)  Contrary to the extreme and damaging allegations in

this Complaint, the overall return on the Sterling Defendants' investments was hardly

"staggering," particularly over a twenty-five year period.  Had the Defendants invested

---

[16]  The Sterling Defendants have numerous objections to the Trustee's calculations, to which they reserve the right to object on any and all grounds should it become necessary.

their funds with Berkshire Hathaway, for example, their return on income would have been vastly greater.[17]

**False Allegation #14:   Together the Allegations Prove That the Sterling Defendants Were Complicit**

The remaining allegations are either entirely lacking in specificity, immaterial, or irrelevant.  None of them, alone or in the aggregate, supports the Trustee's conclusion that the Sterling Defendants were "willfully blind" or "consciously avoided" knowing that Madoff was engaged in a Ponzi scheme.

*"Red Flags" Known to All.*  As discussed in greater detail *infra* at 70-73, the Complaint includes allegations that appear in many of the Trustee's complaints regarding magazine articles and other widely known features of BLMIS' business that the Trustee contends should have made a large number of customers, including the Sterling Defendants, aware of Madoff's Ponzi scheme.  Many courts to consider these same allegations have found them inadequate as a matter of law to establish scienter against industry professionals and auditors.  They cannot demonstrate as a matter of law that the Sterling Defendants were knowing participants in Madoff's fraud.  (*See infra* at 70-73.)

*Ivy Asset Management.*  The Complaint alleges that Ivy Asset Management ("Ivy"), communicated "concerns" about Madoff to Saul Katz, David Katz, and Arthur

---

[17]  Over the past 44 years (1965-2009), Berkshire Hathaway achieved an annual growth rate of 20.3% with only two instances of a negative return.  *See* Berkshire Hathaway Inc., Annual Report 2 (2009), *available at* http://www.berkshirehathaway.com/2009ar/2009ar.pdf (last visited Mar. 18, 2011).  Indeed, Berkshire Hathaway's stock has been able to produce positive returns in down markets, as it produced a return of 76% from 2000-2010, compared to the S&P 500's negative 24.1% return.  Jacob Wolinsky, *Warren Buffett and Berkshire Hathaway have a Great Decade,* GuruFocus.com, Jan. 1, 2010, *available at* http://www.gurufocus.com/news.php?id=80400 (last visited Mar. 18, 2011).

Friedman, but does not allege what these "concerns" were.[18]   (Compl. ¶¶ 917-919.)   Ivy

has been sued by its investors and the New York State Attorney General for concealing

its Madoff "concerns."   *See, e.g.*, *In re Beacon Assocs. Litig.*, 09 Civ. 777, 2010 U.S.

Dist. LEXIS 106355 (S.D.N.Y. Oct. 5, 2010); Complaint, *People v. Ivy Asset Mgmt. LLC*,

No. 450489/2010 (N.Y. Sup. Ct. May 11, 2010).   It is rather unlikely, therefore, that Ivy

would have communicated specific fraud warnings to the Sterling Partners during their

one encounter.   And the only Sterling witness to be asked about Ivy did not even know

that Ivy was a Madoff investor.   (D. Katz Tr. 155:19-22 (Seshens Decl., Ex. G); *see also*

S. Katz Decl. ¶ 14 ("I have no recollection of anyone from [Ivy] ever advising me of any

concerns Ivy had about Madoff or that Ivy had withdrawn its proprietary investment with

BLMIS.").)

   ***"Sterling Consultant."***   The Complaint cryptically claims that some unknown

consultant told *Stamos* in an undated email that he had "warned Saul Katz about

Madoff's inexplicable returns" and "couldn't make Bernie's math work and something

wasn't right."   (Compl. ¶¶ 920-921.)   But there is no factual amplification as to who this

was or any basis or context for any such communication, of which Saul Katz has no

recollection.   (S. Katz Decl. ¶ 15.)   Moreover, as discussed previously, Arthur Friedman

was able to make Madoff's math work by confirming that Madoff's strategy yielded a

profit.

---

[18]   The Complaint similarly tries to create the appearance that the chair of the Brooklyn College
Foundation's investment committee communicated certain concerns about Madoff to Saul Katz and
Richard Wilpon.  (Compl. ¶¶ 922-924).  However, the only facts alleged are that Saul Katz is an Honorary
Governor of the Brooklyn College Foundation and Richard Wilpon is a Trustee and that the Foundation's
investment committee chair purportedly had concerns about Madoff.  No connection between the two is
alleged.

***Chuck Klein.***  The Complaint's allegation that the supposed warning from Chuck Klein that "Madoff was the sole manager at BLMIS" is irrelevant.  (Compl. ¶ 942.)  As discussed previously, "single manager" risk has nothing to do with fraud.  (*See supra* at 10-11.)  Furthermore, the allegations that Chuck Klein recommended that the Sterling Defendants obtain fraud insurance for their BLMIS investments also are irrelevant.  (*Id.* ¶¶ 943-947.)  The Sterling Partners determined that fraud insurance was an unnecessary expense given their comfort level with Madoff.[19]  (*Id.* ¶ 948; S. Katz Tr. 102:7-19 (Seshens Decl., Ex. D); Friedman Tr. 434:1-4 (Seshens Decl., Ex. H).)

***Madoff's Strategy.***  The Complaint contends that the Sterling Partners should have understood that Madoff's consistent returns were "too good to be true" because the Partners were "not your average investors" and had "unique direct access" to Madoff.  (*See, e.g.*, Compl. ¶¶ 837, 869, 1047, 1075, 1076.)  But Peter Stamos told Saul Katz that he looked for consistency of returns when evaluating fund managers.

> "Q. . . . Did you ever raise that issue with Saul Katz, the fact that Madoff's returns were very—were consistent over time?
>
> A.  I don't recall expressing that concern.  I recall expressing that as an objective of one of the criteria we looked for in managers."  (Stamos Tr. 205:6-11 (Seshens Decl., Ex. A).)[20]

---

[19]  The evidence directly contradicts any implication that the Sterling Partners sought fraud insurance because they suspected Madoff was engaged in a Ponzi scheme.  (Compl. ¶ 947; *see* Friedman Tr. 430:18-431:22 ("Q.  Do you understand the beginning of your notes to be describing the scope of coverage?  A.  Yes.  Q.  And this was based on the discussion that took place in June of 2001?  A.  Yes.  Q.  And the first line says, "Fraud or fidelity"?  A.  Correct.  Q.  And then in parens it says "Ponzi"?  A.  Yes.  Q.  What was the conversation that surrounded those notes?  A.  This, to some extent I'm guessing, but that, he mentioned, I have some recollection of him giving examples of what types of fraud, and Ponzi was one of them.  You can see I wasn't even quite sure how to spell Ponzi.  Q.  I see.  A.  I'm not sure how I wound up ultimately, either.  It's hard to read.  Q.  Looks like you've got an E on the end.  A.  I think so, too.  Q.  Did you know what a Ponzi scheme was at that time?  A.  I don't think I did.  Q.  Was there any discussion of Madoff in particular during the course of this meeting?  A.  No.") (Seshens Decl., Ex. H).)

[20]  The related allegation that Madoff's returns were "impossible statistically" based upon information contained in a 2004 bank presentation (Compl. ¶ 1066) is unfounded.  The presentation states

The Complaint also suggests that the Sterling Partners should have questioned (i) Madoff's practice of selling all equity positions shortly before the end of each quarter (Compl. ¶ 1058); (ii) his explanation that his returns were tied to the Treasury rate (*id.* ¶¶ 1062-1065) (which the Sterling Partners analyzed and confirmed (Seshens Decl., Ex. O)); (iii) his compensation methodology (*id.* ¶¶ 929-930) ; and (iv) BLMIS' "archaic technology" (*id.* ¶¶ 933-936).  But the Complaint does not explain why or how questioning any of these items would have led to the conclusion that Madoff was not buying securities.  Moreover, nearly all of these supposed "red flags" have been rejected as red flags by many courts that have considered them in the context of analyzing scienter.  (*See infra* at 70-73.)

**SSP's Inability to Match Madoff's Returns.**  The Complaint charges that the "inability of Sterling Stamos . . . to generate similarly high and consistent returns as compared to BLMIS should have caused Sterling to question the legitimacy of Madoff's enterprise."  (Compl. ¶ 880.)

Of course, that BLMIS might outperform Sterling Stamos was not surprising.  Mr. Stamos regarded Madoff as "perhaps one of the best hedge fund managers in modern times" (Stamos Tr. 211:4-212:4 (Seshens Decl., Ex. A)), while Mr. Chachra called Madoff the "pioneer in electronic trading," said he was "very talented and has faster execution" and was the "grandfather of electronic trading," and called the split-strike

---

that Madoff's average annual return had been 18% with a standard deviation of 4% over a 25-year period and that the future annual Madoff returns were predicted to be positive 99.9% of the time.  (Lenders' Meeting Presentation, dated March 9, 2004, at 27 (Seshens Decl., Ex. N).)  But the same statistical prediction was made with respect to Sterling's investments with Sterling Stamos.  (*Id.* at 28.)  Consequently, the prediction for future annual returns was no more "statistically impossible" for Madoff than it was for Sterling Stamos.

conversion strategy "amazing" (Chachra Tr. 168:8-16, 200:7-20, 209:13-210:2 (Seshens

Decl., Ex. C)).  Any of these could have explained why BLMIS might have achieved

better returns.

But before he filed the Complaint, the Trustee had other testimony that explained

the reason for any performance differential:  Sterling Stamos was a fund of funds, while

BLMIS was a single manager with a single strategy.  It was not expected that Sterling

Stamos would achieve the same results as BLMIS.  (D. Katz Tr. 240:5-15 (Seshens Decl.,

Ex. G).)  A hedge fund of funds with numerous different investment managers employing

varied strategies is far different from a SEC-registered broker employing a single "split-

strike conversion strategy."  (Chachra Tr. 161:18-162:6 (deeming benchmark comparison

between Madoff and Sterling Stamos "completely irrational" because Sterling Stamos

invested in 30 fund managers as compared to just one) (Seshens Decl., Ex. C).)[21]

*"Evading Scrutiny."*  The Complaint alleges that the Sterling Partners structured

their 401(k) Retirement Plan as participant-directed rather than trustee-directed so as to

"insulate" Madoff from scrutiny by plan participants.  (Compl. ¶ 977; *see also id.* ¶¶ 974-

982.)  On the contrary, Sterling chose that structure because it was more popular and

would reduce Sterling's fiduciary exposure.  (Friedman Tr. 561:12-24 (Seshens Decl.,

Ex. H).)  No plan structure would "insulate" Madoff:  under either structure, all Plan

---

[21]  That the Sterling Partners used Madoff as a comparative benchmark is not surprising given
their longstanding investment relationship with Madoff and the significant amount of money they had
invested with him over time.  (*See* D. Katz Tr. 107:4-13 ("Q. . . . At any time was the purpose of Sterling
Stamos to recreate Madoff-like returns?  A.  It's always—it was always a hurdle I think in our minds
because it's just a natural hurdle because you've seen it for so long.  But personally I didn't want it to be
exactly the same because that means you're doing something like that and I wanted to be diversified.  So in
a way yes and in a way, no.") (Seshens Decl., Ex. G); Chachra Tr. 143:12-144:5 (explaining Sterling's
comparisons between Madoff and Sterling Stamos in the context of their "significant investment, so that
was their effective benchmark, if you will") (Seshens Decl., Ex. C).)

participants would be aware of Madoff and any Plan participant could ask any questions about Madoff that they liked.[22]   (*Id.* 537:16-538:10.)

In the same vein, the Complaint asserts that Sterling "screened" friends and family who wanted to invest with Madoff and required communications to run through Arthur Friedman.  (Compl. ¶¶ 983-985.)  But there is no evidence that any Sterling Partner "screened" anyone with the objective of hiding something from any regulator or anyone else.

Finally, the Complaint alleges that the Wilpon and Katz Family Foundations misled the New York Attorney General's Office ("NYAG") by suggesting that the family members, rather than Madoff, made trading decisions.  (*Id.* ¶¶ 1007-1015.)  These allegations are absurd.  The NYAG asked the Foundations who makes their *investment* decisions, not who makes the *trading* decisions.  (*Id.* ¶ 1009.)  The Katzes and the Wilpons made the decision about where to invest the funds of their respective Foundations, which is what they told the NYAG.  (Friedman Tr. 662:15-663:5 (Seshens Decl., Ex. H); S. Katz Decl. ¶ 16.)  Both Foundations provided the requested information, and there is no allegation that the NYAG's office was not satisfied.

**SNY Transaction.**  Before the Complaint was filed, counsel for the Trustee mischaracterized in the press a transaction in which Madoff advanced funds to the Sterling Partners to permit them to timely exercise an option to buyout the Mets broadcast rights from Cablevision.

---

[22]  Even Madoff himself appeared not to be concerned with additional exposure via Sterling's 401(k) Plan.  Neither Madoff nor anyone at his firm voiced any concern about or resistance to the inclusion of BLMIS as an investment option for Sterling's 401(k) Plan.  (Friedman Tr. 540:3-20 (Seshens Decl., Ex. H).)

"'When Fred would have certain cash needs, what we're alleging is he'd go to Bernie and Bernie on paper would make an investment into one of the Sterling Equities [sic] properties or some other vehicle that Fred was offering and then Fred would get the use of that capital,' said David Sheehan, a lawyer who is advising Mr. Picard. 'And after Fred had no use for the money, he'd return it and the investment was rescinded.

So rather than going to conventional banking channels and disclosing he needed additional capital, what he'd do is obtain the funds from Bernie under the guise of an investment rather than as a loan,' Mr. Sheehan said, 'because if he took it as a loan he'd have to disclose it as a loan to the banks from which he already borrowed money.'" Alison Leigh Cowan and Richard Sandomir, *Madoff Fueled Mets' Empire, Lawsuit Says*, N.Y. Times, Feb. 5, 2011 (Seshens Decl., Ex. P).

As the Complaint itself says, nothing like that ever happened. On the one occasion when BLMIS advanced funds to the Sterling Partners, supported by their own investments, a request for a loan from "conventional banking channels" already had been granted, and the advance was repaid the next day. (Compl. ¶¶ 991-995; *see also* S. Katz Tr. 197:8-199:5 (Seshens Decl., Ex. D); Wilpon Tr. 212:22-216:18 (Seshens Decl., Ex. E); Friedman Tr. 223:3-224:8 (Seshens Decl., Ex. H).)

The Trustee sees the transaction the same way. His Complaint alleges that BLMIS advanced funds to the Sterling Partners, because liquidating some of their accounts, as they requested, would result in a loss, when the Partners became concerned that the bank funding would come too late. (*Id.* ¶¶ 991-992.) And he agrees that the advance was repaid one day later. (*Id.* ¶¶ 993-995.) He then criticizes the Sterling Partners for what he calls minimal and incorrect documentation. (*Id.* ¶¶ 1004, 1005.) But these allegations are of no consequence as the loan was repaid the following day. The allegations concerning the transaction, which at heart was an attempt by the Sterling Partners to access their own funds at BLMIS, cannot support an inference of fraud of any

kind, much less support the Trustee's suggestion that it put the Sterling Partners on notice

that Madoff was not actually trading, was using other people's money, or that he was

running a Ponzi scheme.  There was no fraud.  The banks were not defrauded—they

knew Sterling was borrowing.  The Sterling Partners were not defrauded—they were

borrowing based on their own accounts.  Madoff was not defrauded—the funds, which

were in any event supported by the Sterling Partners' investments, were immediately

returned.  These allegations provide no support for the Trustee's assertion that the

Sterling Partners were on notice of what Madoff was doing at BLMIS.

    ***Sterling Equities Restructuring Agreements***.  The Complaint makes new

allegations about certain of the terms of the Sterling credit agreements entered into after

BLMIS failed.  (*See* Compl. ¶¶ 853-864.)  These allegations contain inaccuracies.  For

example, the Sterling entities are not required to "pay over" to their lenders any portion

of the proceeds from dispositions of the referenced interests, and there is no evidentiary

basis for any claim that the Sterling Defendants anticipated the likelihood of any

judgment, let alone one in excess of the sum contemplated by those agreements.  The

Sterling Defendants were shocked by the Complaint.  Regardless, the terms of Sterling's

restructuring credit facilities following BLMIS' failure have no bearing on any of the

Trustee's claims against the Sterling Defendants.

## THE FACTS

### The Sterling Defendants Trusted Madoff, Had No Idea He Was Engaged in Any Fraud, and Were Grievously Injured by That Fraud

**The Founding of Sterling Equities and Its Great Success**

Nearly 40 years ago, two brothers-in-law from Brooklyn, Fred Wilpon and Saul Katz, started a small real estate company called Sterling Equities ("Sterling").  (S. Katz Decl. ¶ 2.)  Soon thereafter, their brothers, Richard Wilpon and Michael Katz, joined them, and over the years Sterling grew and prospered as a family-owned and operated enterprise.  (Wilpon Tr. 16:15-17:13 (Seshens Decl., Ex. E).)

Historically, Sterling's primary business has been real estate, although Sterling has diversified its investments through holdings in baseball, including the New York Mets baseball franchise, media, including a controlling interest in SportsNet New York ("SNY"), and private equity.  (Friedman Tr. 43:23-44:14 (Seshens Decl., Ex. H); Friedman Rule 27 Tr. 5:13-6:11 (Seshens Decl., Ex. F); S. Katz Decl. ¶¶ 2-4).)  With Peter Stamos and Merrill Lynch, the Sterling Partners also have a passive ownership interest in Sterling Stamos Partners, a hedge fund of funds.  (S. Katz Tr. 10:8-18; 36:21-37:1; 151:10-12 (Seshens Decl., Ex. D); S. Katz Decl. ¶ 5).)

The businesses of the Sterling Partners have been extremely successful over the years, including before the first Sterling-related investments were made with BLMIS in 1985.  (S. Katz Decl. ¶ 7.)

**Madoff Was a Luminary in the Investment World When the Sterling Partners Began to Use Him as Their Broker**

Fred Wilpon first met Bernie Madoff through their children.  (Wilpon Tr. 34:7-35:13 (Seshens Decl., Ex. E).)  Though not "everyday" or frequent social friends, the

48

Wilpons saw the Madoffs at charitable events, family celebrations, and, "maybe two or three times in all those years [they] went to a movie together."  (*Id.* 42:12-43:13; 48:12-49:6.)  Saul Katz had a "business social" relationship with Madoff and did not recall a single time that he went out to dinner with Madoff.  (S. Katz Tr. 75:14-76:5 (Seshens Decl., Ex. D).)

When the Sterling Partners first began using BLMIS as their broker, Madoff was a member of the Board of Governors of the National Association of Securities Dealers and also served on its executive committee, board surveillance committee and long-range planning committee and chaired its international committee.  Peter Chapman, *Before the Fall: Bernard L. Madoff*, Traders Mag., Mar. 2009 (Seshens Decl., Ex. Q).  He was a member of the Cincinnati Stock Exchange and pioneered its conversion to an all-electronic exchange.  *Id.*  Madoff continued, until the very end, to be a major fixture of the investment firmament, serving as one of two vice chairman of the Securities Industry Association and head of its Trading Committee and chairman of the NASDAQ Board of Directors, in addition to his numerous philanthropic positions.  *Id.*  Consequently, people like Arthur Levitt and Howard Squadron, who either invested with or knew Madoff, held him in great esteem.  (Wilpon Tr. 39:25-40:7; 44:15-45:7 (Seshens Decl., Ex. E).)  The Sterling Partners understood that Madoff was a "guru" who was "renowned in the field."  (*Id.*)

In late 1985, when a few of the Partners had some extra liquidity from their business ventures, they decided to open accounts at BLMIS.  (Friedman Tr. 107:24-108:15; 116:24-118:2; 188:19-189:3 (Seshens Decl., Ex. H); Wilpon Tr. 33:13-34:6, 39:1-9 (Seshens Decl., Ex. E); S. Katz Tr. 24:1-25:5 (Seshens Decl., Ex. D).)  Each

investor executed a Customer Agreement, a Trading Authorization, and an Option

Agreement with BLMIS.  (*See, e.g.*, Declaration of Arthur Friedman, *In re Bernard L.*

*Madoff Inv. Sec. LLC*, No. 08-10789, doc. no. 720, at ¶ 4 & Exs. A-C (Bankr. S.D.N.Y.

Nov. 12, 2009).)  Each of these agreements gave Madoff discretion to invest pursuant to

his "split-strike conversion" strategy in each Sterling account.  (*Id.*)

      Thereafter, each BLMIS customer received monthly customer statements,

quarterly reports, and regular trade confirmations, which showed account activity and

holdings of blue chip stocks ranging from Exxon-Mobil to Coca-Cola when Madoff was

"in the market," and U.S. Treasuries when he was not.  (*Id.* at ¶ 7 & Ex. D.)  Such

monthly statements reflecting verifiable market transactions were received until the time

that Madoff revealed his fraud.

      Over the period of their relationship, Mr. Wilpon and Mr. Katz would meet once a

year with Madoff to discuss BLMIS and the economy in general.  (Wilpon Tr. 42:12-

43:13 (Seshens Decl., Ex. E); S. Katz Tr. 77:7-19; 96:10-21 (Seshens Decl., Ex. D).)  Mr.

Wilpon did not otherwise discuss business with Madoff.  (Wilpon Tr. 42:12-43:13

(Seshens Decl., Ex. E).)  Mr. Katz occasionally spoke with Madoff on the phone.

(S. Katz Tr. 77:7-19 (Seshens Decl., Ex. D).)

**The Partners' Individual BLMIS**
**Investments Increased Over Time**

      The Sterling Defendants' BLMIS accounts proliferated as they opened different

accounts to accommodate different personal situations.  Most of the Sterling Partners

eventually had individual BLMIS accounts, and some also had joint or tenant-in-common

("TIC") accounts, typically with each other or with family members.  (Friedman Tr.

255:19-256:3; 380:8-20 (Seshens Decl., Ex. H).)

50

The decision to invest through BLMIS was an *individual* one.  As each Partner received funds from the various businesses in which he held interests, he decided what to do with them.  (Wilpon Tr. 55:3-12 (Seshens Decl., Ex. E); S. Katz Tr. 22:24-27:1 (Seshens Decl., Ex. D); Friedman Tr. 107:24-109:16 (Seshens Decl., Ex. H).)  There was no "Sterling" BLMIS account or "Sterling" way of investing, and unlike some large BLMIS investors, there was no "mastermind" making investment decisions for the Partners, their families, and the operating businesses they owned.  (*Id.*)  Rather, each Partner, or group of Partners, opened additional BLMIS accounts as needed, for family trusts, charitable foundations, and minor children.

For their businesses, the Sterling Defendants used BLMIS accounts in much the same manner as they might have used traditional bank accounts—to deposit excess cash for short-term investment before withdrawing it for use in operating their businesses.[23] For example, when season tickets for the Mets were sold in the winter, the cash generated would be deposited into a Mets BLMIS account so that returns could be maximized until the funds were needed, a few months thereafter, to meet expenses.  (Friedman Tr. 358:5-18 (Seshens Decl., Ex. H); *see also* Compl. ¶ 794.)

For administrative ease, Arthur Friedman, who became Sterling's treasurer and "administrative" partner shortly after the first BLMIS accounts were opened, was charged with day-to-day administration of all accounts.  (Friedman Tr. 39:23-40:13; 116:24-

---

[23]  The Complaint makes much about the "liquidity crisis" Sterling suffered when Madoff failed and contends that it is evidence of Sterling's "dependency" on Madoff.  (*See, e.g.*, Compl. ¶¶ 8, 854-864.) The Sterling entities used their BLMIS accounts as they might have used bank accounts.  Just as would have happened if their bank had failed, when BLMIS failed they faced liquidity problems.  But that is no evidence of any "dependency."  Moreover, the Complaint itself alleges that by the time BLMIS collapsed in 2008, Sterling had nearly the same amount of money invested with Sterling Stamos as with BLMIS.  (*Id.* ¶ 704.)

117:12; 250:12-23; 298:20-299:4; 600:21-601:8 (Seshens Decl., Ex. H); Wilpon Tr. 51:1-12; 53:2-10 (Seshens Decl., Ex. E).)

**The Partners Shared the Madoff**
**Opportunity with Friends and Family**

The Sterling Partners also helped their friends and family members who were interested in opening BLMIS accounts.  Although they now deeply regret that some of their close friends and family were victimized along with them, at the time the Partners believed they were doing something positive.  (Wilpon Tr. 87:6-16; 143:7-20 (Seshens Decl., Ex. E).)  As Saul Katz described it, the Madoff investments were "such a blessing that [he] wanted to share with [his] friends and family."  (S. Katz Tr. 90:10-17 (Seshens Decl., Ex. D).)  The same motivation led the Partners to offer BLMIS as an investment option in Sterling's self-directed 401(k) Retirement Plan.  (Friedman Tr. 538:14-539:4 (Seshens Decl., Ex. H).)

Contrary to the assertion in the Complaint, no Sterling Defendant ever "solicited" investors for BLMIS, nor did they "steer" family and friends to BLMIS.  (S. Katz Tr. 119:25-120:9 (testifying that he would "not solicit anybody" to invest with BLMIS, but that if someone asked him where he invested, he would tell them) (Seshens Decl., Ex. D); Wilpon Tr. 84:15-18 (testifying that Sterling did not "bring in accounts to Madoff") (Seshens Decl., Ex. E).)  But if people asked, and they did, the Partners offered to help.  (S. Katz Tr. 119:25-120:9 (Seshens Decl., Ex. D); Wilpon Tr. 86:5-87:5 (Seshens Decl., Ex. E).)

Once an account was opened, Arthur Friedman added it to his administrative duties.  (Friedman Tr. 360:18-361:6; 600:21-601:16 (Seshens Decl., Ex. H); Friedman Rule 27 Tr. 19:23-20:12 (Seshens Decl., Ex. F).)  No payment or benefit was ever

52

solicited or received for this service, burdensome though it became. (S. Katz Tr. 215:5-21 (Seshens Decl., Ex. D); Wilpon Tr. 87:6-16 (Seshens Decl., Ex. E); Friedman Tr. 378:17-379:6 (Seshens Decl., Ex. G).)  The Partners were helping their families and friends, not trying to make money. (Wilpon Tr. 87:6-16; 143:7-18 (Seshens Decl., Ex. E); S. Katz Tr. 216:13-217:1 (Seshens Decl., Ex. D).)

**The Sterling Defendants Trusted
Madoff with Their Money Until the End**

The Sterling Defendants' faith in Madoff continued right up until his fraud was revealed on December 11, 2008. In fact, Peter Stamos testified that Mr. Katz was about to move nearly all of his Sterling Stamos investments back to BLMIS right before the disclosure of the fraud (Stamos Tr. 199:24-201:8 (Seshens Decl., Ex. A)), and the Sterling Partners deposited millions of dollars with Madoff within weeks of its disclosure—and even, unknowingly, on the day of Madoff's arrest. (S. Katz Decl. ¶ 11.) It is testimony to the fact that the Sterling Defendants were completely in the dark about Madoff's fraud that, at the time the fraud was disclosed, BLMIS owed the Sterling Defendants over half a billion dollars in securities on the date of the SIPA filing. (*Id.* ¶ 12.) They trusted Madoff as a broker and as a friend. As Fred Wilpon stated, Madoff's confession was "like a dagger in the heart." (Wilpon Tr. 64:15-25 (Seshens Decl., Ex. E).)

## PROCEDURAL HISTORY

**The Trustee's Pre-Complaint Discovery**

The Trustee initiated discovery of the Sterling Defendants in 2009, invoking Bankruptcy Rule 2004 and issuing two subpoenas, dated October 7, 2009. (Seshens

Decl. ¶ 3.)  The subpoenas were exceedingly broad, covering 71 entities and individuals, with close to 40 different document requests.  (*Id.* ¶ 4.)

The Sterling Defendants cooperated fully with the Trustee's Rule 2004 investigation.  Nearly 700,000 pages of documents, comprised of both hard copy and electronic documents, were produced over the course of approximately one year.  (*Id.* ¶ 5.)  Roughly 70 boxes of hard copy records were copied and produced to the Trustee. (*Id.* ¶ 6.)  With respect to electronic documents, Sterling ran, at the request of the Trustee, *97 different search terms* across the email boxes and individual electronic document folders of all of the Sterling Partners, among others (*id.* ¶ 7) and produced more than 150,000 pages of electronic documents (*id.* ¶ 8).  Not one contained a warning from anyone that Madoff might be engaged in fraud.  (*Id.* ¶ 9.)

On May 11, 2010, the Trustee issued Rule 2004 subpoenas for deposition testimony from Sterling Partners Arthur Friedman, Fred Wilpon, Saul Katz, and Michael Katz, as well as Sterling's Chief Financial Officer, Mark Peskin, and Arthur Friedman's assistant.  (*Id.* ¶ 10.)  Subsequently, the Trustee requested Rule 2004 testimony from David Katz as well.  (*Id.*)  Between June and September 2010, Messrs. Friedman, Wilpon, S. Katz, D. Katz, and Peskin provided more than 10 days of deposition testimony on the record, while Mr. Friedman's assistant provided an informal interview. (*Id.* ¶ 11.)

Unknown to the Sterling Defendants at the time, the Trustee had also issued subpoenas to, and taken discovery from, numerous third parties, including Sterling's banks, Sterling Stamos Partners, Merrill Lynch, Bank of America, and possibly other financial institutions.  (*Id.* ¶ 12.)  The Trustee has refused to disclose the full scope of his

inquiries or the evidence he has gathered, but it is apparent that there was no evidence whatsoever that any Sterling Partner or Sterling Defendant had any knowledge or suspicion of Madoff's fraud.

**The Sealed Complaint and This Complaint**

The Sterling Defendants advised counsel for the Trustee that the original complaint was not consistent with the evidence.  (*Id.* ¶ 15.)  On December 7, 2010, the Trustee filed the original complaint under seal.  However, after key parts of the original complaint were leaked by "two lawyers involved in the case," and two news agencies moved to unseal it, settlement talks were terminated by the Trustee.  The original complaint was then unsealed and massively damaging press coverage resulted, including the widespread repetition of the false and misleading allegations described above. Heedless of this experience, the Trustee has now filed the amended Complaint seeking more than $1 billion despite its lack of factual or legal foundation.

**The Sterling Defendants Will Continue the Mediation**

On February 10, 2011, this Court issued an order calling for mediation and appointing former Governor Mario Cuomo as mediator.  The mediation has commenced. The filing of this motion does not, from the perspective of the Sterling Defendants, affect their willingness to continue that process.

**ARGUMENT**

**I.    THE COMPLAINT SHOULD BE DISMISSED AND SUMMARY
        JUDGMENT ENTERED FOR THE STERLING DEFENDANTS**

Bankruptcy Rule 7012(b)(6) permits dismissal of a complaint that alleges no

cause of action upon which relief may be granted.  *See, e.g.*, *Perrin & Nissen Ltd. v. SAS*

*Group Inc.*, No. 06 Civ. 13089, 2009 WL 855693, at *9 (S.D.N.Y. Mar. 27, 2009); *In re*

*Lehman Bros. Holdings Inc.*, No. 09-01045, 2011 WL 722601, at *2 (Bankr. S.D.N.Y.

Feb. 22, 2011).  Bankruptcy Rule 7012(d) permits the Court to treat such a motion as one

for summary judgment if matters outside the pleadings are presented to the Court.

Finally, summary judgment is warranted under Bankruptcy Rules 7012(d) and 7056 "if

the movant shows that there is no *genuine* dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).

Summary judgment is entered "against a party who fails to make a showing sufficient to

establish the existence of an element essential to [its] case and on which it will bear the

burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The Complaint seeks to avoid payments made to the Sterling Defendants by their

broker, BLMIS, discharging its legal obligations to them on account of securities BLMIS

was obligated to purchase for them for a period of over twenty-five years.  The

Complaint asserts claims under federal fraudulent conveyance provisions, 11 U.S.C.

§§ 544, 548, 550, and 551, alleging a right to recover under both the intentional and

constructive fraud provisions, and under Sections 273, 276, 278, and 279 of the New

York Debtor and Creditor Law, again under both intentional and constructive fraud

provisions.

The Complaint also seeks to avoid as preferences any transfers occurring within 90 days of the BLMIS SIPA filing, alleging under 11 U.S.C. § 547 that such transfers were payments on account of antecedent debt. Finally, the Complaint seeks to disallow or equitably subordinate the claims of the Sterling Defendants for amounts owed them based upon the last statement BLMIS issued to them.

The Sterling Defendants are entitled to dismissal of each of these claims as a matter of law. The Complaint alleges no basis for disputing that the Sterling Defendants were customers of BLMIS, a registered broker, who were legally entitled to the payments that discharged their broker's obligations to them as reflected on monthly statements that acknowledged those obligations. Nor does the Complaint or the undisputed facts demonstrate that any Sterling Defendant was "willfully blind" to Madoff's fraud. *See* Statement of Undisputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1(A). Therefore, the Trustee has not alleged and cannot prove that the Sterling Defendants were not customers who were entitled to the payments received from BLMIS, and, as a matter of law, those payments cannot be avoided under either intentional or constructive fraudulent conveyance law.

Similarly, each payment was made in connection with a securities contract. Therefore, pursuant to Section 546(e) of the Bankruptcy Code, no payment may be challenged as a fraudulent conveyance except under the Bankruptcy Code's intentional fraudulent conveyance provision, 11 U.S.C. § 548(a)(1)(A). That provision permits avoidance of transfers occurring only within two years of a filing and then only if the intentional fraud standards can be met. Therefore, no matter what the Trustee alleges or could prove as to intent, his avoidance powers are limited to transfers made after

57

December 11, 2006.  To the extent any claim attacks payments made before that date, they must be dismissed as a matter of law.

Section 546(e) also precludes avoidance of any transfer as preferential under 11 U.S.C. § 547 where the transfer was from a broker and was in connection with a securities contract.

Finally, neither the allegations nor the undisputed facts show any basis upon which to disallow or equitably subordinate the claims of the Sterling Customers.

## II.   THE COMPLAINT STATES NO CAUSE OF ACTION FOR AVOIDANCE OF TRANSFERS BY BLMIS AS FRAUDULENT CONVEYANCES

Each transfer by BLMIS to a Sterling Defendant over a twenty-five year period discharged a legally enforceable obligation to that customer.  No such transfer can be avoided as fraudulent because each was a transfer to a creditor on account of antecedent debt.

### A.   None of the Transfers from BLMIS Was a Fraudulent Conveyance

None of the payments to the Sterling Defendants may be avoided as a fraudulent conveyance.  Such payments at most preferred one creditor over another.

Fraudulent transfers or conveyances and preferences are entirely different concepts, as are their objectives.  "A preference merely violates the bankruptcy rule of equal distribution among all creditors.  A fraudulent transfer goes further.  By a fraudulent transfer, the debtor places its assets beyond the reach of its creditors." 5 *Collier on Bankruptcy* § 547.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2010).

Fraudulent transfers, either intentional or constructive, are transfers to entities *other than creditors* that reduce the assets available to pay creditors as a whole.  A

58

transfer is intentionally fraudulent when the debtor "intends to hinder and delay [its creditors] *as a class*." *Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 582 (1913) (emphasis added).  A transfer that has the same result, even if not intentional, is avoidable as constructively fraudulent.  "Fraudulent transfers are avoidable because they diminish the assets of the debtor to the detriment of *all creditors*."  *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1181 (11th Cir. 1987) (emphasis added).  The Bankruptcy Code permits the avoidance of fraudulent transfers occurring within two years of a filing, *see* 11 U.S.C. § 548, or as long as six years, and possibly longer, if state law is employed, *see* 11 U.S.C. § 544; N.Y. C.P.L.R. § 213(8).

Preferences are transfers that prefer one creditor over another without reducing the assets available for creditors as a whole.  "An attempt to prefer is not to be confounded with an attempt to defraud, nor a preferential transfer with a fraudulent one." *Coder v. Arts*, 213 U.S. 223, 241 (1909) (internal citation omitted).  By definition, a transfer to a creditor on a account of a valid debt cannot be avoided as fraudulent.  "[T]he preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because 'the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them.'" *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (quoting *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987)) (internal citation omitted); *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) ("'[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.'" (quoting *Ultramar*

*Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91, 599 N.Y.S.2d 816 (1st Dep't 1993))).

Transfers on account of antecedent debt sometimes may be avoided as preferential, but only if they occurred within ninety days of a bankruptcy filing. *See* 11 U.S.C. § 547.

**B.      Each Transfer to a Customer Was on Account of Antecedent Debt and Therefore Cannot Be Avoided as Fraudulent**

When a customer deposits funds for the purpose of buying securities and its broker issues a statement reflecting the purchase of the securities, the broker becomes obligated to its customer for those securities—whether or not the broker actually purchases them.  The relationship between a broker and a customer is that of debtor and creditor.  When the broker pays the customer the value of those securities, the broker discharges a valid debt to its customer.  Indeed, the Complaint actually alleges that they were transfers on account of antecedent debt—at least if they occurred within ninety days of the BLMIS filing.  (Compl. ¶¶ 1380, 1385.)

In New York, Article 8 of the New York Uniform Commercial Code ("NYUCC") governs the obligations of a broker to its customer and the rights of the customer against the broker.  *See* NYUCC § 8-501 *et seq.*[24]  Under Article 8, the broker's obligation to the customer is created by the issuance of a statement.  The NYUCC provides that "a person

_____

[24]  Article 8 addresses the modern securities holding system, in which customers do not hold physical certificates, but rather hold securities entitlements in an indirect holding system:

"The legislature finds and declares that a revised article eight of the uniform commercial code is needed to provide clarity and certainty regarding the rules that govern how interests in securities are evidenced and how they are transferred in the current securities market.  The existing law fails to clearly define such rules when an interest is held through an intermediary, rather than by holding a certificate or by registration with the issuer of securities."  NYUCC Art. 8 Historical and Statutory Notes ("Legislative Intent and Declaration") (McKinney 2002).

acquires a security entitlement[25] if a securities intermediary[26] . . . (1) indicates by book entry that a financial asset has been credited to the person's security account . . . [or] (3) becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account."  NYUCC § 8-501(b).  It is therefore "a basic operating assumption of the indirect holding system that once a [broker] has acknowledged that it is carrying a position in a financial asset for the customer . . . the [broker] is obligated to treat the customer . . . as entitled to the financial asset."  NYUCC § 8-501 cmt. 2.[27]

A customer's account statement shows, among other things, the customer's current securities positions.  Once ownership is acknowledged, Section 8-501(c) provides that "a person has a security entitlement even though the securities intermediary does not itself hold the financial asset"—i.e., the broker owes the customer the securities reflected on the customer's statement regardless of whether the broker actually purchased the securities.[28]  As the Official Comment to this Section explains:

---

[25]  A "security entitlement" means "the rights and property interest of an entitlement holder with respect to a financial asset [including a security, see NYUCC § 8-102(a)(9)(i)] specified in Part 5 [of Article 8]."  NYUCC § 8-102(a)(17).  It is "a package of rights and interests that a person has against the person's securities intermediary and the property held by the intermediary."  NYUCC § 8-503 cmt. 2.

[26]  A "securities intermediary" includes a broker.  See NYUCC § 8-102(a)(14).

[27]  A customer has an enforceable claim against its broker for the securities on its account statements.  See NYUCC § 8-112(c); Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599-600 (2d Cir. 1991) ("Brown, in sum, breached its contract with Flickinger when it failed to deliver the securities to him."); Visconsi v. Lehman Bros., 244 F.3d 708, 713-14 (6th Cir. 2007) ("[T]he fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million . . . . Plaintiffs thus . . . were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.").

The UCC determines what the broker owes the customer and therefore defines the customer's claim against the broker.  The UCC does not purport to govern distribution on, or priority of, any claim in a SIPA proceeding.  See NYUCC § 8-503 cmt. 1.

[28]  A broker given discretionary trading authority owes fiduciary duties to its customers, see Press v. Chem. Inv. Servs. Corp., 988 F. Supp. 375, 386-87 (S.D.N.Y. 1997), aff'd, 166 F.App'x 529 (2d Cir.

"In the indirect holding system, the significant fact is that the securities intermediary has undertaken to treat the customer as entitled to the financial asset.  It is up to the securities intermediary to take the necessary steps to ensure that it will be able to perform its undertaking.

The entitlement holder's rights against the securities intermediary do not depend on whether or when the securities intermediary acquired its interests."  NYUCC § 8-501 cmt. 3.

Article 8 is consistent with the bedrock principle of federal broker-dealer regulation that brokers are to issue statements, upon which customers may rely, to evidence customer transactions and holdings.  Thus, Rule 10b-10 under the Securities Exchange Act of 1934 (the "1934 Act") requires brokers to provide customers with confirmations of securities transactions.  *See* Rule 10b-10, 17 C.F.R. § 240.10b-10 (2010) (Confirmation of Transactions).  Similarly, the rules of the Financial Industry Regulatory Authority ("FINRA") and the New York Stock Exchange ("NYSE") require brokers to provide periodic account statements.  *See* NASD Rule 2340 (Customer Account Statements); NYSE Rule 409 (Statements of Accounts to Customers).

The rule that investors are entitled to rely upon their brokerage account statements as proof of the broker's obligation to them resonates throughout all aspects of the federal and state regulatory structure governing the relationship between SEC-registered brokers and their customers.  *See, e.g.*, SIPC, SIFMA, and NASAA, *Understanding Your Brokerage Account Statements*, at 5 ("In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you.  This is easily done with a copy of your most recent statement . . . .") (Seshens Decl., Ex. R); Confirmation of

---

1999), breach of which gives rise to a claim for damages, *see, e.g.*, *Saboundjian v. Bank Audi*, 157 A.D.2d 278, 284, 556 N.Y.S.2d 258 (1st Dep't 1990).

Transactions, 59 Fed. Reg. 59,612, 59,613 (Nov. 17, 1994) (customer documents "allow[] investors to verify the terms of their transactions . . . [and] act[] as a safeguard against fraud").

     The rights established under Article 8 comport with rights granted by federal securities law, which protects customers' claims for securities shown on their statements—whether or not they were purchased. "[A] broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5." *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006) (same); *see also Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004) (plaintiff "adequately pled fraud 'in connection with the purchase or sale of any security' [under Rule 10b-5], even though he failed to identify any particular security purchased, because Perazzo accepted and deposited Grippo's monies as payment for securities"); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) ("The allegation that the [defendants] falsely promised to purchase securities when they never intended to do so . . . is sufficient in pleading fraud 'in connection with' a purchase of securities.").

     If a broker does breach his obligation to buy securities for a customer, the federal securities laws give rise to a right to benefit-of-the-bargain claims. *See, e.g.*, *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1050 (2d Cir. 1995) (awarding lost profits because "plaintiffs could establish benefit-of-the-bargain damages with reasonable certainty"); *Osofsky v. Zipf*, 645 F.2d 107, 114 (2d Cir. 1981) (applying benefit-of-the-bargain damages under the 1934 Act); *Panos v. Island Gem Enters.*, 880 F. Supp. 169, 177 (S.D.N.Y. 1995) ("[W]hen benefit-of-the-bargain damages can be measured with

63

reasonable certainty and those damages are traceable to a defendant's fraud, courts are free to award them.").

Under this body of state and federal law, BLMIS was obligated to pay the Sterling Defendants in accordance with their statements.  Were the law otherwise, the protective legal framework that promotes investment would be rendered entirely illusory.  A customer has no way of knowing what his broker is actually doing.  As a matter of law, none of these transfers may be avoided as a fraudulent conveyance because each was a payment that discharged a debt to a creditor.

### C.     Intent Is Irrelevant Where a Transfer Discharges Antecedent Debt

Where a transfer is made to a creditor on account of antecedent debt, it cannot be avoided as a fraudulent conveyance, intentional or constructive.  The intent of the parties is irrelevant.

The Second Circuit has expressly held that a transfer on account of antecedent debt is not a fraudulent transfer, regardless of the mental state or intent of the parties.  *See Sharp*, 403 F.3d at 43.  There, a lender began to suspect its borrower, Sharp, of fraud and demanded repayment of a loan.  To repay the loan, Sharp fraudulently induced investments from other unsuspecting investors.  *See id.* at 47-48.  The Second Circuit ruled that Sharp's payment to State Street constituted a preference, but not a fraudulent conveyance.  A "'conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another."  *Id.* at 54 (internal citation omitted).

That Sharp defrauded new investors to raise money to pay State Street—and that State Street suspected that fraud—did not change the fact that the transfer to State Street

64

"was at most a preference between creditors and did not 'hinder, delay, or defraud either present or future creditors.'"  *Id.* at 56.  Sharp's intent to defraud was present *only* when it was obtaining new investments.  Therefore, even though the repayment of Sharp's obligation to the bank had the effect of keeping Sharp's insolvency secret, no transfer defrauding the creditor class occurred.  *See id.* at 56-57.

The analysis in *Sharp* relied, in part, upon then-Circuit Judge Breyer's decision in *Boston Trading*, 835 F.2d at 1504, which had a fact pattern similar to that in *Sharp*.  The *Boston Trading* court also carefully analyzed the difference between fraudulent conveyance and preference and held that good faith was not relevant to the latter:

> "[T]o find an actual intent to defraud creditors when, as in our example, an insolvent person prefers a less worthy creditor, would tend to deflect fraudulent conveyance law from its basic functions (to see that an insolvent debtor's funds are used to pay *some* worthy creditor) while providing it with a new function (determining *which* creditor is the more worthy)."  *Id.* at 1510.

> * * *

> "To find a lack of 'good faith' where the transferee does not participate in, but only knows that the debtor created the other debt through some form of, dishonesty is to void the transaction because it amounts to a kind of 'preference'—concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth, but a kind of preference nonetheless."  *Id*. at 1512.

While *Sharp* was decided under New York law and *Boston Trading* under Massachusetts law, their logic is plainly applicable to any fraudulent conveyance claim, and indeed courts have recognized that a payment to a creditor, even by the perpetrator of a Ponzi scheme, in satisfaction of an antecedent debt cannot be avoided as fraudulent. *See, e.g.*, *In re Carrozzella & Richardson*, 286 B.R. 480, 491 (D. Conn. 2002) (creditors had a contractual right to both principal and profits transferred to them as part of a Ponzi

65

scheme and the transfers could not be avoided as fraudulent because "the Debtor received a dollar-for-dollar forgiveness of a contractual debt" in exchange); *In re Unified Commercial Capital, Inc.*, No. 01-MBK-6004L, 2002 WL 32500567, at *8 (W.D.N.Y. June 21, 2002) (rejecting trustee's effort to claw back profits from "an innocent investor, who has received a bargained-for, contractual interest payment, at a commercially reasonable rate").

The same conclusion was recently reached in *In re Champion Enters.*, No. 09-14014, 2010 Bankr. LEXIS 2720, at *59-60 (Bankr. D. Del. Sept. 1, 2010), in which the Court applied *Sharp* to a claim that lenders caused the failing debtor to take on new debt in order to shift the risk of loss to others, and held that the "*Sharp* court noted that '[g]ood faith is an elusive concept under New York's constructive fraud statute' but that 'bad faith does not appear to be an articulable exception to the broad principle that the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property'" (internal quotation marks omitted).

SIPA, which is intended to continue customer protections in the event of a broker's insolvency, is consistent with non-bankruptcy law. SIPA contemplates no fraudulent conveyance claim against a customer. The provision that permits the use of avoidance powers in a SIPA case specifies that customers are "creditors." 15 U.S.C. § 78fff-2(c)(3). And, when describing the Trustee's powers, the statute gives the Trustee "the same rights to avoid *preferences*, as a trustee in a case under title 11." 15 U.S.C. § 78fff-1(a) (emphasis added). SIPA, a law passed to protect customers, does not permit clawback of payments to which the customer had an undisputed right.

### D.    The Ponzi Scheme Presumption Is Inapplicable

SIPA, the Bankruptcy Code, and these precedents compel the conclusion that no payment that discharges a broker's obligation to its customer may be avoided as a fraudulent transfer—a conclusion entirely consistent with the federal securities laws and UCC Article 8.  Thus, the Trustee is forced to justify this Complaint upon a so-called "Ponzi scheme presumption" that is found nowhere in SIPA or any other relevant statute.

The "Ponzi scheme presumption" is based on the theory that a Ponzi schemer must act in bad faith because he must know that the "undertakers at the end of the line [will] lose their money."  *In re Indep. Clearing House Co.*, 77 B.R. 843, 860 (D. Utah 1987).  It has been employed to recover from transferees who were not creditors, as, for example, in *In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010), in which limited partners in a fraudulent scheme redeemed equity interests ahead of creditors.  But it has no application to a transfer *to* a creditor, as in this case.  This case is legally indistinguishable from *Sharp*—the Complaint targets payments that discharged valid antecedent debt and such payments are not transformed into something else merely because of the "Ponzi scheme presumption."

> "Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance.  If so, every vendor supplying goods to the debtor would receive an avoidable fraudulent transfer when the debtor paid the vendor's invoice.  Every employee, even lower-level custodial and clerical employees, would be required to return their wages, regardless of the work they performed. . . . No one conducting business with a debtor operating a Ponzi scheme could prevent the avoidance of payments they received from the debtor, regardless of the extent of the transferee's knowledge or culpability of the actual services provided.  The law does not require this result." *In re World Vision Entm't, Inc.*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002).

67

### E.   The Trustee Cannot Prove That the
###      Antecedent Debt Incurred by BLMIS Was Invalid

A payment that discharges an antecedent debt cannot be a fraudulent transfer.

The transfers targeted by the Complaint were all on account of valid antecedent debt that

was legally enforceable by the customer.  Indeed, the protective scope of the federal and

state securities laws that govern the relationship between a customer and a regulated

broker gives special protection to the status of account statements as establishing valid

debt.[29]

Therefore, the only way that the Trustee may bring these transfers within the

scope of fraudulent conveyance law, consistent with these laws and the reasoning of

*Sharp* and *Boston Trading*, is to prove that a particular transferee was not a customer

because he knew that he was funding a Ponzi scheme.  The Trustee cannot as a matter of

fact or law make such a showing.

### 1.   The Trustee Must Prove That the Sterling Defendants
###      Were Knowing Participants in Madoff's Fraud

The Sterling Defendants engaged in securities transactions with BLMIS for many

years.  During that time, their legal rights were governed by UCC Article 8 and the

securities laws, which provide that the acknowledgement by a broker of a debt to his

customer creates the customer's securities entitlement.  The laws do not exclude from

their protection customers whose broker is engaged in a Ponzi scheme.  On the contrary,

they apply whether or not the broker buys the securities he is supposed to buy.  And they

impose no duty on a customer to question their broker's statements.

---

[29]   Depending upon the Trustee's position with regard to the securities laws that govern the customer-broker relationship, a sharp conflict may arise between the federal securities laws and SIPA. Under such circumstances, withdrawal of the reference may be required pursuant to 28 U.S.C. § 157(d).

There is no dispute that the Sterling Defendants received brokerage statements that established their securities entitlements and have therefore established customer status. A customer under SIPA is "any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2). Therefore, the Trustee must prove that the Sterling Defendants were not customers because they deposited cash with Madoff knowing that he would not use the cash to purchase securities.

To attempt to meet this burden, the Trustee has alleged that the Sterling Defendants were "willfully blind" to and "consciously disregarded" Madoff's fraud.[30] (*See, e.g.*, Compl. ¶¶ 9, 10, 12, 1076, 1079; *see also id.* Section IX.) "Willful blindness" is tantamount to knowledge. *See Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93, 110 n.15 (2d Cir. 2010) (collecting cases). "Conscious avoidance" is similar. It occurs when "'it can almost be said that the defendant actually knew' because he or she suspected a fact and then realized its probability, but refrained from confirming it in order later to be able to deny knowledge. Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence." *Kirschner v. Bennett*, 07 Civ. 8165, 2010 U.S. Dist. LEXIS 132344, at *79-80 (S.D.N.Y.

---

[30] The Complaint at times refers to inquiry notice. (*See, e.g.*, Compl. ¶¶ 11, 1080, 1085, 1089, 1091, 1092, 1093, 1097, 1098, 1099, 1100, 1105.) But that is plainly not the applicable standard by which to strip a customer of the protection of the federal and state securities laws, including SIPA and Article 8. "Inquiry notice" has recently been found by the Supreme Court to be insufficient to cause the commencement of the statute of limitations for securities fraud claims by equity investors against issuers. *See Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1797 (2010). No court would therefore conclude that the obligation of a broker to its customer could be voided upon the same "inquiry notice," especially where such a rule would not only deprive a customer of its claim against the broker, but would also retroactively impose massive liability on that customer by voiding decades of transfers that were entirely legal and enforceable by the customer.

June 3, 2010) (citing *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp.

2d 349, 368 (S.D.N.Y. 2007)).

"Willful blindness" to, or "conscious disregard" of, the fraud may establish the

knowledge element of an aiding-and-abetting cause of action. *See Kirschner v. Bennett*,

648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009); *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368.

Reckless disregard will not suffice. *See J.P. Morgan Chase Bank v. Winnick*, 406 F.

Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005); *see also In re Agape Litig.*, 681 F. Supp. 2d 352,

364 (E.D.N.Y. 2010). A failure to plead or prove scienter is a failure to plead or prove

willful blindness or conscious disregard. *See, e.g.*, *Matsumura v. Benihana Nat'l Corp.*,

542 F. Supp. 2d 245, 256 n.17 (S.D.N.Y. 2008) (finding that the conclusions regarding

the insufficiency of the allegations of defendant's scienter "apply with equal force to the

actual knowledge element of the plaintiffs' aiding and abetting claim"); *Steed Fin. LDC*

*v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 282 (S.D.N.Y. 2003) (holding that plaintiff

had failed to adequately allege scienter for the purposes of Rule 10b-5 and therefore the

claim for aiding and abetting fraud must be dismissed).

The undisputed facts demonstrate that there can be no finding of willful blindness

or conscious avoidance on the part of any Sterling Defendant. Neither the common "red

flags" dismissed as such by courts considering them in Madoff-related cases, nor the

undisputed facts as to what was known by the Sterling Defendants, are sufficient to cause

a targeted Sterling Defendant to be found complicit in Madoff's fraud.

## 2. The Common "Red Flags" Are Not Red

First, many of the Madoff "red flags" upon which the Complaint relies have been

found insufficient, as a matter of law, to provide any basis for a finding of reckless

disregard, even as to market participants far more knowledgeable and experienced in the

securities markets than the Sterling Partners. *See, e.g.*, *Saltz v. First Frontier, LP*, No. 10

Civ. 964, 2010 U.S. Dist. LEXIS 136140, at *15-17, 30 (S.D.N.Y. Dec. 22, 2010)

(rejecting publicly known red flags as "not so obvious" as to infer knowledge on behalf

of BLMIS feeder fund and feeder fund's auditor);[31] *Newman v. Family Mgmt. Corp.*, No.

08 Civ. 11215, 2010 U.S. Dist. LEXIS 111589, at *25 (S.D.N.Y. Oct. 20, 2010) (red

flags were not "so 'extremely obvious' that the [investment adviser] . . . should have

recognized them and taken steps to investigate or disclose the risks");[32] *SEC v. Cohmad

Sec. Corp.*, No. 09 Civ. 5680, 2010 U.S. Dist. LEXIS 8597, at *5-6 (S.D.N.Y. Feb. 1,

2010) (rejecting claim that broker-dealer discreetly marketing Madoff's investments from

within Madoff's office building for a fee knew of or recklessly disregarded warning signs

of fraud, notwithstanding Madoff's request for secrecy and irregular returns in one of the

principal's accounts); *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 623-24

(S.D.N.Y. 2010) (rejecting as "red flags" sufficient to give rise to scienter the consistency

of Madoff's "reported excellent results" or the fact that "Madoff was both broker and

---

[31]  Thus, neither Madoff's consistent investment returns, nor the secrecy of his strategy, his fee structure, his claimed practice of being fully invested in treasury bills at the end of each quarter, or the size and nature of BLMIS' outside auditor was sufficient to base a finding of scienter or an inference of knowledge for a BLMIS feeder fund. *See Saltz*, 2010 U.S. Dist. LEXIS 136140, at *8-9.

Similarly, neither the concentration of investments in a single manager (BLMIS), the lack of transparency of Madoff's operations, nor the high and stable positive investment results was sufficient to base a finding of scienter or an inference of knowledge for a BLMIS feeder fund's outside auditors. *Id.* at 30.

[32]  Again, the red flags rejected as sufficient to find scienter included consistent investment returns in both up and down markets, a small outside accounting firm, the lack of third-party administrators and custodians, the lack of transparency, and limited access to BLMIS' books and records. *Newman*, 2010 U.S. Dist. LEXIS 111589, at *16-17.

custodian" of the accounts and finding additional public red flags not so obvious as to infer knowledge).[33]

Important to these courts was the fact of Madoff's high standing as "a prominent and respected member of the investing community . . . [who] deceived countless investors and professionals, as well as his primary regulators, the Securities and Exchange Commission ('SEC') and the Financial Industry Regulatory Authority ('FINRA')." *Saltz*, 2010 U.S. Dist. LEXIS 136140, at *2; *see also Newman*, 2010 U.S. Dist. LEXIS 111589, at *4-5 (same); *Cohmad*, 2010 U.S. Dist. LEXIS 8597, at *5-6, 14-15 ("Madoff's established reputation as a successful and respected investment adviser" and his "use of elaborate machinery . . . fooled . . . individual investors, financial institutions and regulators."). His standing was perceived as enabling his ability to cover up his fraud. *See In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) ("Madoff's fraud went undetected for two decades [because of] his proficiency in covering up his scheme and eluding the SEC and other financial professionals.").

Finally, courts have rejected, in the Madoff context, any argument that an economic motive sufficient to establish scienter may be found absent some unusual benefit. *See, e.g.*, *Saltz*, 2010 U.S. Dist. LEXIS 136140, at *18-19 (rejecting allegations that Madoff sub-feeder fund had motive to commit fraud based on quarterly fees because there was no allegation that the fees were exorbitant or at all in excess of industry standard); *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 09 Civ. 4049, 2010 U.S. Dist.

---

[33] Additional "not so obvious" alleged red flags found insufficient to infer knowledge included, among others, operational deficiencies because Madoff was both trader and custodian, consistent success, and a small outside auditor. *Stephenson*, 700 F. Supp. 2d at 623-24.

LEXIS 85466, at *10-12 (S.D.N.Y. July 15, 2010) (rejecting as too generalized

allegations that defendant bank was earning substantial fees and had access to large cash

deposits from the BLMIS Ponzi scheme); *Stephenson*, 700 F. Supp. 2d at 620-21 (finding

that the "mere receipt of compensation and the maintenance of a profitable professional

business relationship for auditing services does not constitute a sufficient motive for

purposes of pleading scienter").  Therefore, there is no basis for any finding of scienter

based on investment returns.

As to the Sterling Defendants, there is no allegation of "fantastical" returns, such

as the 950% alleged in *Picard v. Picower*, No. 09-1197 (Bankr. S.D.N.Y. May 12, 2009),

Compl. ¶¶ 3, 63(a),[34] or "more than 35 instances of supposed annual returns of more than

100% and more than 125 in which the annual returns purportedly exceeded 50%, with an

average annual rate of return over 39%," as in *Picard v. Chais*, No. 09-1172, 2011 Bankr.

LEXIS 606, at *24-25 (Bankr. S.D.N.Y. Feb. 24, 2011).

Nor is there any other basis for a finding of scienter.  If the information discussed

in these cases was not sufficient to give rise to a finding of scienter as to financial

professionals and auditors, then, *a fortiori*, it is not sufficient for the Sterling Defendants.

Because an absence of scienter necessarily means the absence of "willful blindness" or

"conscious disregard," there can be no finding that the Sterling Defendants were not

customers.

---

[34] The Trustee ultimately failed to support this claim. The Trustee's brief in support of his
settlement with Picower says:  "Informal discovery and further research has confirmed that the 950% return
that BLMIS reported to Mr. Picower in certain BLMIS documents was inconsistent with the much lower
rate of return that Mr. Picower purportedly received based on the entirety of BLMIS records for that
account."  *See* Mem. in Support of Agreement Between the Trustee and Picower BLMIS Account Holders,
*Picard v. Picower*, No. 09-1197, doc. no. 25 at 8 (Dec. 17, 2010).

### 3. The Undisputed Facts Regarding Sterling-Specific "Red Flags" Do Not Demonstrate Willful Blindness or Conscious Disregard

The undisputed facts relating to the Sterling-specific "red flags" are equally unavailing to show willful blindness or even scienter. The facts, analyzed *supra*, show only that:

- Sterling Stamos told some Sterling Partners that they had too much money with Madoff. Even though he was a most honest and honorable man and a legendary fund manager, he could get hit by a bus. (*See supra* at 8-11.)

- Despite Madoff's good character and excellent performance, his "black box" strategy and other characteristics of his operation did not fit within the investment profile of Sterling Stamos or Merrill Lynch, but this was not a reason for the Sterling Defendants not to invest with Madoff. (*See supra* at 20-26, 30-31.)

- The Sterling Partners did a great deal of diligence when their relationship with Madoff was initiated, became very comfortable with him and his operation, and proceeded to entrust significant funds with him and to deposit and withdraw funds on a regular basis to fund their lives and their businesses. (*See supra* at 34-38.)

- They continued to invest with Madoff—and even wanted to invest more money—until the end, when they suffered crushing losses. (*See supra* at 53.)

- The few times others raised questions about Madoff, they were resolved, including when the SEC gave Madoff a clean bill of health. (*See supra* at 37-38.)

These facts are not sufficient to remove the Sterling Defendants from the protection of the securities laws, including SIPA. On the contrary, they demonstrate that the Sterling Defendants knew nothing, and had no reason to know anything, of Madoff's Ponzi scheme.

 **F.**  **Even under a "Good Faith" Standard**
    **No Fraudulent Conveyance Claim May Be Stated**

   Even under a "good faith" standard, the Trustee cannot prove that the antecedent

debt discharged by BLMIS' payments was invalid.

   A two-step test must be met for any finding of lack of good faith.  First, a court

must determine whether the transferee had information that put it on inquiry notice that

the debtor made the specific transfer at issue with a fraudulent purpose—not whether the

transferee has information indicating that the transferor's "activities in general" might be

fraudulent.  *Bayou*, 439 B.R. at 311; *see also In re M. Fabrikant & Sons, Inc.*, No. 06-

12737, 2011 Bankr. LEXIS 316, at *48-49 (Bankr. S.D.N.Y. Jan. 25, 2011).

   Second, a court must determine whether a diligent investigation by a reasonable

person would have uncovered the transferor's fraudulent purpose.  *Bayou*, 439 B.R. at

312, 317; *Fabrikant*, 2011 Bankr. LEXIS 316, at *36.

   The standard to be met is objective—the transferee's knowledge and diligence

obligation must be viewed through the lens of what a similarly situated reasonable

investor would do and must be consistent with its pre-bankruptcy obligations under

applicable law.  *Bayou*, 430 B.R. at 313 (collecting cases); *see also id.* at 314 (applying to

hedge fund defendants the standard of whether alleged "red flag" information would have

put a "reasonably prudent institutional hedge fund investor on inquiry notice"); *In re

Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 23 (S.D.N.Y. 2007) (applying to Bear Stearns the

standard of "whether the information Bear Stearns learned would have caused a

reasonable prime broker in its position 'to investigate the matter further'").  Therefore,

the actual response of "other similarly situated investors" is relevant to the question of

whether the customer, objectively, should have been on inquiry notice.  *Bayou*, 439 B.R. at 315 n.29.

### 1.   The Sterling Defendants Are Retail Investors Who Were Not on Inquiry Notice of Fraud

The Sterling Defendants are retail customers.  They are wealthy and successful. But they are not financial industry professionals—that is why they gave discretionary trading authority to Madoff, who then became their fiduciary.  They are entitled to the protection of the securities laws and Article 8—the rules are not different for successful people, despite the Complaint's suggestion to the contrary.  (Compl. ¶¶ 1074-1075; *see also* ¶¶ 731, 912, 1079.)  Therefore, even under a good faith standard, to take away their status as protected customers, the Trustee would have to show that specific Sterling Defendants, none of whom is experienced in the brokerage business, knew or should have known that Madoff was operating a Ponzi scheme, not the regulated brokerage business he appeared to be running.[35]

As discussed *supra*, even under the Trustee's "inquiry notice" standard, the undisputed facts demonstrate that the Sterling Defendants did not know—and had no reason to know—that Madoff was running a Ponzi scheme.  They are not sophisticated market investors, they knew Madoff was held in high esteem, and they were given no warnings that credibly suggested that BLMIS was engaged in any fraud, let alone a Ponzi scheme.

---

[35] Although it is the Trustee's burden to prove that the Sterling Defendants are not *bona fide* customers, even if it were the Sterling Defendants' burden to establish their own good faith, they have made the requisite showing.

Nor did they have a duty to engage in some independent investigation, as the Complaint repeatedly alleges.  Review of the federal and state laws governing the relationship between a registered broker and its customers discloses no duty on the part of one customer to another to ensure that the broker is not committing fraud.  Nor is there a general duty to others to discover, or reveal, fraud under New York law.  *See Sharp*, 403 F.3d at 52-53 and n.2 (finding "no affirmative duty under New York law" to reveal a debtor's fraud to other creditors); *In re Bayou Group, LLC*, 396 B.R. 810, 848 (Bankr. S.D.N.Y. 2008) ("[T]he investor has no obligation to any third party to make any inquiry."), *rev'd on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010); *see also In re TOUSA, Inc.*, No. 10-60017-CIV, 2011 U.S. Dist. LEXIS 14019, at *103 (S.D. Fla. Feb. 11, 2011) (New York law imposes no duty on a creditor-transferee to investigate the transferor); *D'Amico v. Christie*, 71 N.Y.2d 76, 88 (1987) ("A defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control.").  The Trustee would have no standing to assert such a claim in any event.  *See Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416 (1972).

Finally, the recipient of a transfer has no legal obligation to investigate a transferor just to protect itself, and no third party can claim breach of any such non-existent duty.  *See Manhattan Inv. Fund*, 397 B.R. at 25 ("Bear Stearns was under no legal obligation to contact the [transferor's] auditors."); *SEC v. Madison Real Estate Group*, 647 F. Supp. 2d 1271, 1281 (D. Utah 2009) ("While it may have been prudent for Midland to investigate more fully . . . , prudence is a different standard than failure to act in good faith.").

77

The Trustee cannot dispute these legal conclusions, but the Complaint appears to be premised upon the notion that after a SIPA case commences, a customer may be subjected retroactively to such an investigative duty and stripped of customer protection if he is found not to have met a duty he did not have prior to the SIPA filing.  Neither the words of the statute nor applicable case law supports any such conclusion, which would render ephemeral the customer protections of the securities laws, including SIPA.  On the contrary, the Second Circuit has found that SIPA imposes no diligence obligation.  *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 86-87 (2d Cir. 2004) ("[A] goal of greater investor vigilance, however, is not emphasized in the legislative history of SIPA.  Instead . . . the drafter's emphasis was on promoting investor confidence in the securities market and protecting broker-dealer customers.").

### 2. No Reasonable Investigation Would Have Uncovered the Ponzi Scheme

Critically, even if the Trustee could discover some such retroactive duty, which required more diligence than the considerable amount undertaken by the Sterling Defendants, in this case conclusive evidence establishes that even a very sophisticated investigation, far beyond any that the Sterling Defendants could have done, would have been futile.  The most likely course of action for a retail investor to take was not to investigate himself, but to go to the SEC, the agency with the experience and tools to investigate fraud.  Surely no one can say such a course of action would not have been reasonable.  But it would not have resulted in discovery of the fraud.

Here, there is no dispute that the SEC was provided detailed evidence, as set forth in the OIG Report, that was far different from the random observations allegedly offered to one or another of the Sterling Defendants and that specifically addressed the possibility

78

that Madoff might not be trading and might be engaged in a Ponzi scheme.  Unlike the

Sterling Defendants, the SEC is a regulatory agency, it has "vast resources" with which to

investigate, including subpoena and investigative powers not available to private parties,

and it has the expertise to understand what to look for and the significance of what it has

found.

Madoff fooled the SEC.  What can the Trustee credibly allege that the Sterling

Defendants should have done?  The Complaint does not say.  In the one thousand four-

hundred and two paragraph Complaint, the only idea is that Saul Katz should have sought

confirmation through an unidentified third-party that Madoff actually traded the securities

identified on monthly account statements.  (Compl. ¶ 885.)  No retail customer could

have accomplished that objective.  Tellingly, there is no evidence that any other

investor—even an institutional or professional investor with far greater expertise and

knowledge of the securities markets than the Sterling Defendants—tried to determine if

Madoff was actually trading.  *See Manhattan Inv. Fund*, 397 B.R. at 23 ("[T]he best

evidence of what a prudent prime broker would have done is what Bear Stearns actually

did."); *cf. Bayou*, 439 B.R. at 315 n.29 (finding the response of "similarly situated

investors" to the same alleged "red flags" relevant to the inquiry notice analysis).  Even

Harry Markopolos made no attempt to confirm through third parties whether BLMIS was

actually conducting trades.  *See* Harry Markopolos, *The World's Largest Hedge Fund Is

a Fraud* (Nov. 7, 2005), *available at*

http://static.reuters.com/resources/media/editorial/20090127/Markopolos_Memo_SEC.pdf

(last visited Mar. 18, 2011).

Finally, while the Complaint insinuates that the Sterling Defendants should have employed their "access" to Madoff in some manner (*see* Compl. ¶¶ 740-741, 890, 912, 1074, 1076), neither the law nor common sense imposes liability because a person fails to engage in the futile exercise of asking a fraudster about his misdeeds. *Cf. Manhattan Inv. Fund*, 397 B.R. at 25 (noting that, after asking the fraudster to explain inconsistencies, "Bear Stearns is entitled to the inference that [his] explanation was not only facially plausible, but also comforting"); *Pettigrew v. Citizens Trust Bank*, 229 B.R. 39, 43 (N.D. Ga. 1998) (dismissing negligence claims against bank because it was unreasonable to believe that corporate director impermissibly transferring corporate funds to his personal account would have admitted wrongdoing if bank had inquired).

On the contrary, evidence of the good faith of the Sterling Defendants is bolstered by the fact that they had known Madoff for twenty-five years, had satisfied themselves early on that he was legitimate, and had thereafter trusted him with their money—right until the end. *Cf. In re McGee*, No. 97-50234, 2000 Bankr. LEXIS 1865, at *32-33 (Bankr. E.D. Ky. Nov. 22, 2000) (granting transferee's good faith defense on a motion to dismiss because, in part, the transferee's personal relationship with the debtor served as a "counterbalanc[e]" to the alleged red flags, rendering the transferee's lack of suspicion reasonable for a person in his position).

## III.   THE BANKRUPTCY CODE PROTECTS MANY TYPES OF SECURITIES TRANSACTIONS FROM AVOIDANCE, INCLUDING PAYMENTS TO BROKERAGE CUSTOMERS

This case is governed by federal statutes—SIPA and the Bankruptcy Code. In them, Congress enacted legislation that balances the need for fast and certain financial transactions with the need to redress fraud. Consequently, where a payment is made in

connection with a securities contract, the Bankruptcy Code limits the ability of the

Trustee to avoid transfers even when they are in fact intentionally fraudulent.  Such

transfers may be avoided only if they occurred within two years of a filing.

After wire transfers, book-entry securities, and computerized transactions became

widespread in the financial and brokerage industries, the Bankruptcy Code was amended

to protect most securities transactions from avoidance after a party in the chain of

transfers files for bankruptcy.  *See, e.g.*, 11 U.S.C. §§ 546, 555, 556, 559, 560, 561, 562.

Section 546(e), part of these amendments, protected "settlement payments" from

avoidance.  The protection of Section 546(e) was given sweeping scope by most courts to

consider it.  *See, e.g.*, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986-87 (8th

Cir. 2009) (plain language of Section 546(e) controls and prohibits avoidance of

payments to shareholders in leveraged buyout); *In re QSI Holdings, Inc.*, 571 F.3d 545,

550 (6th Cir. 2009) (same); *In re Resorts Int'l, Inc.*, 181 F.3d 505, 516 (3d Cir. 1999)

(same).

However, the "settlement payment" definition in the original legislation caused

some confusion, and in 2006 Congress amended Section 546(e) to provide for broad

protection for *all* payments by a stockbroker or financial institution in connection with a

securities contract.  Section 546(e) of the Bankruptcy Code now provides, in relevant

part:

> "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this
> title, the trustee may not avoid a transfer . . . that is a transfer made by or
> to . . . [a] stockbroker [or] financial institution . . . in connection with a
> securities contract, as defined in section 741(7), . . . that is made before the
> commencement of this case, except under section 548(a)(1)(A) of this
> title."  11 U.S.C. § 546(e).

Under Section 546(e), even were the Trustee to prove that a particular defendant was not a customer who invested for the purpose of buying securities, all of the transfers sought to be avoided in the Complaint fall within the scope of Section 546(e). BLMIS was a "stockbroker." *See* 11 U.S.C. § 101(53A).[36] JPMorgan Chase, the financial institution that made the transfers on behalf of BLMIS, is a "financial institution." *See Id.* § 101(22). "Securities contract" is defined broadly to include "a contract for the purchase, sale or loan of a security . . . or option on any of the foregoing, including an option to purchase or sell any such security." 11 U.S.C. § 741(7)(A)(i). A "securities contract" also includes "any other agreement or transaction that is similar to an agreement or transaction" listed in Section 741(7)(A)(i)-(vi). *Id.* § 741(7)(A)(vii). Congress has limited the avoidance period for such transfers to two years—not thirty.

Nothing on the face of Section 546(e) suggests that it is not applicable in Ponzi schemes. On the contrary, it expressly applies in the case of intentional fraud. *See* 11 U.S.C. § 546(e); *see also Manhattan Inv. Fund*, 397 B.R. at 13 n.8 (recognizing two-year limit in Ponzi scheme); *In re Derivium Capital, LLC*, 437 B.R. 798, 812 (Bankr. D.S.C. 2010) (protecting transfers under Section 546(e) in the context of a Ponzi scheme).

The Trustee has argued that because Madoff did no trading, the rules usually in place to protect customers do not apply, and perhaps BLMIS was not a broker. *See*

---

[36]  The Trustee has argued that BLMIS might not be a broker because Madoff executed no trades, and the Bankruptcy Court has acknowledged this possibility. *See Picard v. Merkin*, 440 B.R. 243, 267 (Bankr. S.D.N.Y. 2010). But only a registered broker qualifies as a candidate for a SIPA proceeding, and the rules of Article 8, the federal securities laws, and SIPA do not depend upon the broker doing the right thing. The rules apply even if he does not adhere to them. *Cf. In re J.P. Jeanneret Assocs., Inc.*, 09 Civ. 3907, 2011 U.S. Dist. LEXIS 9630 (S.D.N.Y. Jan. 31, 2011), discussed *infra*. Moreover, contrary to the Trustee's argument, the market-making arm of BLMIS *did* execute trades.

*Picard v. Merkin*, 440 B.R. 243, 267 (Bankr. S.D.N.Y. 2010) (suggesting that applying

Section 546(e) to a fraudulent situation would not "promote stability and instill investor

confidence").  There is nothing in the statute to support any such conclusion, which, in

any event, evaluates the transactions from the perspective of the fraudster and not the

protected customer.

   The customers certainly engaged in securities transactions—they provided funds

to BLMIS for the purchase of securities; they received statements reflecting the purchase

of securities; and they received payment when they were advised that securities had been

sold.  They had no way of knowing that BLMIS was not performing as it was legally

required to do.  That is why Article 8 expressly provides that the customer has rights

whether or not the broker buys securities.  *See* NYUCC § 8-501(c).  The effect of the

Trustee's position is to give Madoff a defense to payment that did not exist the day before

the filing.  That would truly give Madoff the ability to determine who wins and loses by

his fraud.

   Courts looking at a similar issue have concluded that the lack of actual

transactions *by the broker* is irrelevant.  They have uniformly ruled that Madoff's

activities were sufficient to demonstrate that a transaction was "in connection with the

purchase and sale of a security" for purposes of liability under Rule 10b-5.  "While it

may seem counterintuitive, Madoff's purported buying and selling of securities is itself

sufficient to satisfy the 'in connection with' requirement."  *In re J.P. Jeanneret Assocs.,*

*Inc.*, 09 Civ. 3907, 2011 U.S. Dist. LEXIS 9630, at *51 (S.D.N.Y. Jan. 31, 2011).

> "And while this is not dispositive, it bears noting that all of my colleagues
> who have encountered this issue in Madoff-related cases have concluded
> that, in the context of his Ponzi scheme, the 'in connection with'

83

requirement is satisfied by his phony purchases and sales. *See, e.g.*, *In re Beacon Assocs. Litig.*, 2010 U.S. Dist. LEXIS 106355, 2010 WL 3895582, at **16-17 (S.D.N.Y. Oct. 5, 2010); *Barron v. Igolnikov*, 2010 U.S. Dist. LEXIS 22267, 2010 WL 882890, at **4-5 (S.D.N.Y. Mar. 10, 2010); *Levinson v. PSCC Servs.*, 2009 U.S. Dist. LEXIS 119957, 2009 WL 5184363, at *7 (D. Conn. Dec. 23, 2009)." *Id.* at *59.

## IV.  THE COMMENCEMENT OF A SIPA CASE PROTECTS, RATHER THAN DESTROYS, CUSTOMER RIGHTS

The rules governing the relationship between a customer and a broker are intended to protect the customer.  None of these rules changes because a SIPA case is commenced.  Rather, the Securities Investor *Protection* Act is a key element of the broker regulatory structure that continues to protect customers when their broker fails.  *See* 15 U.S.C. § 78bbb.

SIPA was intended "to effect two aims.  It will establish immediately a substantial reserve fund which will provide protection to customers of broker-dealers[.]  This will reinforce the confidence that investors have in the U.S securities markets.  In addition, [it] will provide for a strengthening of the financial responsibilities of broker-dealers."[37] H.R. Rep. No. 91-1613, at 3-4 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254, 5257. Consistent with maintaining investor confidence, SIPA does not contemplate that customers who receive payments on account of what their broker owes them can be sued, decades later, for avoidance of those transfers—especially where *the broker defrauded them*.  For avoidance purposes, SIPA specifies that customers are "creditors."  15 U.S.C. § 78fff-2(c)(3).  As to creditors, it is contemplated that the Trustee will exercise "the

---

[37]  *See also In re New Times*, 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[] and upgrade the financial responsibility requirements for registered brokers and dealers.'" (quoting *SIPC v. Barbour*, 421 U.S. 412, 415 (1975))); *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1318 n.5 (2d Cir. 1976) (same).

same rights to avoid *preferences,* as a trustee in a case under title 11."  15 U.S.C. § 78fff-1(a) (emphasis added).

SIPA governs the liquidation of a registered broker, regardless of the cause of its failure.  SIPA contains no "Ponzi scheme" exception.  There is no hint in SIPA, on the SIPC website, or in any other publication of the SEC, FINRA, or any other regulatory body to suggest that, if a broker fails because it had engaged in a thirty-year Ponzi scheme undetected by any of these regulators, then customer statements going back twenty-five years are all retroactively voided, and customers will be liable for monies they had a legal right to withdraw from their brokerage accounts over that period.  Any such result is unthinkable under a statute intended to protect customers and maintain confidence in the financial markets.

The Trustee, of course, is engaged in exactly that exercise.  To justify broad attacks on customers that appear completely inconsistent with SIPA's objectives, the Trustee argues that SIPA permits him to employ the avoidance powers of the Bankruptcy Code.  But SIPA does not *expand* those powers.  On the contrary, the Trustee's power to seek avoidance is expressly subject to the Bankruptcy Code.  He may recover only transfers "*if and to the extent*" "voidable or void *under the provisions of title 11.*" 15 U.S.C. § 78fff-2(c)(3) (emphasis added).

Nor does labeling a targeted transfer as "fictitious profit" taken by "net winners" with "other people's money" change the law.  None of those terms appears in any statute. Under the law, when a customer deposits funds with a broker to invest in securities, the broker becomes obligated to the customer for the securities reflected on the customer's statement.  In return, the broker is entitled to deploy the customer's funds in its

business—including to pay other customers.  Here, BLMIS ultimately breached its

obligations to its customers to purchase securities—but its payments to customers during

the twenty-five or thirty years before its fraud was revealed were legally mandated and do

not retroactively become invalid.

   The Trustee uses these non-statutory terms to suggest that his campaign to avoid

transfers going back thirty years is equitable—that to permit "net winners"—those who

withdrew more from their accounts than they deposited—to keep more than "net

losers"—those who deposited more than they withdrew—is unfair.[38]  But the Trustee is

wrong.  If SIPA gave him such a right, customers would be far better off had SIPA never

been enacted.  But he has no such right.  SIPA does not prioritize customers as "net

winners" vs. "net losers."  SIPA does not even allow fraudulent transfer claims against

customers, let alone dictate that the Trustee must recover from them at all costs—even to

the point of making false and misleading allegations against customers who are perceived

as being wealthy.[39]

---

[38]  Obviously, the goal of equalizing recoveries among creditors is a preference concept.  Indeed,
the Trustee often cites to the original Ponzi case, *Cunningham v. Brown*, as support for this justification for
clawback.  *Cunningham* was, of course, a preference case.  *See* 265 U.S. 1, 7 (1924).  The preference
provision of the Bankruptcy Code permits avoidance of transfers within 90 days of a filing.  It does not
permit avoidance beyond that timeframe, reflecting Congress's view as to the appropriate balance between
policies supporting equality of distribution and those supporting the need for settled expectations.  *See* H.R.
Rep. No. 95-595, at 177-78 (1977) (discussing the balance between the "short period before bankruptcy"
for preference avoidance and equality of distribution); *see also Union Bank v. Wolas*, 502 U.S. 151, 160
(1991) ("[T]he fact that Congress carefully reexamined and entirely rewrote the preference provision in
1978 supports the conclusion that the text of [Section 547] as enacted reflects the deliberate choice of
Congress.").

[39]  Counsel for the Trustee argued before the Second Circuit that that once a SIPA proceeding is
filed, otherwise applicable rules "go by the board."  (Transcript of Oral Argument at 60:18-62:14, *In re
Bernard L. Madoff Inv. Sec. LLC*, No. 10-2378 (2d Cir. Mar. 3, 2011) (Seshens Decl., Ex. S).)  "It isn't
business as usual, it isn't dealing with your broker on a daily basis. This is a catastrophe and it's only in
that catastrophe that the Trustee can operate the way he does[.]"  (*Id.* at 62:8-11.)  This is the Trustee's
justification for creating priority rules not found in SIPA.  "That's what the statute is all about, is that these
who did not get their money out get the opportunity, through the customer fund, that priority. Once that
priority is satisfied, then all of them are on equal footing and they all have a fraud claim."  (*Id.* at 54:20-

The Trustee may not replace Congress's judgment with his own.  *See, e.g.*, *United States v. Noland*, 517 U.S. 535, 539 (1996) ("[A bankruptcy court] is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable."); *Union Bank v. Wolas*, 502 U.S. 151, 162 (1991) ("Whether Congress has wisely balanced the sometimes conflicting policies underlying § 547 is not a question that we are authorized to decide."); *Thomas v. Whalen*, 962 F.2d 358, 363 (4th Cir. 1992) ("A federal court, whether in law or in equity, has no authority to depart from the clear command of a statute in order to effect a result that it believes to be . . . dictated by general principles of fairness.").

## V.   THE TRUSTEE'S IMPUTATION AND VEIL PIERCING CLAIMS ARE UNSUPPORTED AND UNSUPPORTABLE

The Trustee has grabbed newspaper headlines by demanding huge damages from the Sterling Defendants.  He did so by aggregating so-called "net winner" accounts of all Sterling Defendants, but disregarding "net loser" accounts.  The Sterling Defendants dispute his legal right to aggregate these accounts, none of which was under the control of any "mastermind."

But the Complaint also aggregates the claims because it alleges no facts whatsoever as to almost all of the Sterling Defendants.  The claims against them are premised upon an extreme application of a number of inapplicable imputation theories.  The Complaint essentially argues that a single Sterling Partner was "willfully blind," and every other defendant is therefore liable.  The claim is legally and factually unsound.

---

25.)  But there is no such priority in SIPA, which does not differentiate among customers, and gives no direction to the Trustee to bring unsupportable fraudulent conveyance claims.

First, for the reasons set forth above, the undisputed facts demonstrate that no Sterling Partner was "willfully blind."  Therefore, there are no facts to impute.

Second, the Complaint has no factual support for its sweeping use of imputation, veil-piercing, alter ago, and equitable ownership theories, violating any applicable pleading standard.  (*See generally* Compl. ¶¶ 1080-1091.)  Both agency law and partnership law require that knowledge must be acquired by an agent acting within the scope of his authority as an agent in order for such knowledge to be imputed.  *See Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985); New York P'ship L. ("NYPL") § 23 (knowledge of a partner must be "the knowledge of the partner acting in the particular matter").  If an agent obtains knowledge that is outside the scope of his agency, there can be no imputation.  *See Van Ostrand v. Nat'l Life Assurance Co. of Canada*, 371 N.Y.S.2d 51, 56-57 (N.Y. Sup. Ct. 1975).

But no facts are alleged upon which to make any agency finding, let alone to claim that every Partner acted as an agent for every Defendant.[40]  *See Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 275-76 (2d Cir. 1998) (failure to allege, among other things, "what positions were held by these 'agents, servants and employees' whose words are alleged to bind or be imputed to the company" deemed insufficient under FRCP 9(b));

---

[40]  Unlike the Trustee's complaint in *Chais*, 2011 Bankr. LEXIS 606, at *31-32, the Complaint here does not allege that there was a single "mastermind" of the Sterling-related BLMIS accounts— because there was none.  As discussed *supra*, there were no "Sterling" BLMIS investments and no mastermind.  Each Partner made his own investment decisions.  None was the agent for any other Partner or for the family members of any other Partner.

Stanley Chais is alleged to have acted as settlor and trustee for most of his family trusts and to have personally established the entity defendants for his benefit.  *Id.* at *5, 31.  Here, there are no allegations of fact that the Sterling Partners established the Entity Defendants for their own benefit, or had free access to their assets, including their BLMIS accounts, or "reviewed and notated [the entities' and trusts' BLMIS] statements" or "directed the purchase and sale of securities."  *Id.* at *32.  And most of the Sterling Entity Defendants are *operating businesses*, such as the New York Mets, that are required to, and do, operate with careful regard for corporate requirements.

*see also Meisel v. Grunberg*, 651 F. Supp. 2d 98, 113 (S.D.N.Y. 2009) (dismissing claims when plaintiff "failed to adduce any facts that would support a finding of an agency relationship").

Third, imputation theories cannot possibly be stretched as the Trustee proposes to stretch them. There is no legal basis to impute even actual knowledge from one person to hundreds, let alone from one person to ten people to another ninety individuals and entities. *See, e.g.*, *Alaska Trowel Trades Pension Fund v. Lopshire*, 855 F. Supp. 1077, 1085 (D. Alaska 1994) (refusing to impute knowledge multiple times), *rev'd on other grounds*, 103 F.3d 881; *Horan v. Mason*, 141 A.D. 89, 93 (2d Dep't 1910) (deeming as doubtful the existence of authority for imputing multiple times and questioning whether such a theory could have any reasonable basis). Moreover, a number of the Sterling entities are operating businesses with varied and complex ownership structures. For the Trustee's theory to work, he would have to impute knowledge through many links in the ownership chains, which he cannot do as a legal matter and which he has not even alleged.

The Trustee's imputation theory fares even less well under an "inquiry notice" standard. Although the Complaint cites NYPL Section 23 for support (Compl. ¶ 1080), that provision has not been employed to impose broad, personal liability on partners that had no actual notice of any element of a claim against them.[41]  Furthermore, New York

---

[41] Indeed, NYPL Section 23, and most of these imputation concepts, have generally been used in the partnership context to hold a partner bound by knowledge that prevents the partnership from asserting a claim against another party. *See, e.g.*, *Stellar X Prods. v. Int'l Bus. Machs. Corp.*, 03 Civ. 5739 (JSR), 2003 U.S. Dist. LEXIS 22233, at *6 (S.D.N.Y. Dec. 10, 2003) (imputing knowledge to partners under NYPL § 23 and thereby preventing assertion of a fraud claim); *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 144 (S.D.N.Y. 2001) (imputing knowledge to a partner under agency law and thereby preventing assertion of a breach of fiduciary duty claim). These cases provide no support for using this law to vastly increase personal liabilities of the partners.

courts have long recognized that constructive knowledge cannot be imputed to a

principal.  *See, e.g.*, *Wheatland v. Pryor*, 133 N.Y. 97, 102-03 (1892) ("The rule of

constructive notice to a principal can have no operation whatever in a case where the

agent himself has not received actual notice."); *see also Hare & Chase, Inc. v. Nat'l

Surety Co.*, 49 F.2d 447, 458 (S.D.N.Y. 1931) ("Knowledge of an agent, even of a

general agent, to be imputed to his principal, must be actual knowledge.").

> As the Fifth Circuit, applying New York law, explained:
>
> "The principle of imputed knowledge rests upon the duty of the agent to
> disclose to his principal all material facts coming to his knowledge with
> reference to the scope of the agency and upon the presumption that the
> agent has discharged his duty.  It follows, therefore, that there can be no
> presumption that an agent communicated to the principal knowledge
> which it did not have."  *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d
> 320, 325 (5th Cir. 1993) (internal quotation marks, citations, and
> alterations omitted).[42]

Reference to the veil-piercing doctrine is even more unfounded.  A party seeking

to pierce the veil "bear[s] a heavy burden of showing that the corporation was dominated

as to the transaction attacked and that such domination was the instrument of fraud or

otherwise resulted in wrongful or inequitable consequences."  *TNS Holdings, Inc. v. MKI

Sec. Corp.*, 92 N.Y.2d 335, 339 (1998).  The corporate form must have been "used to

commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act" that

---

[42]  *See also Restatement (Second) of Agency* § 277 (1958) ("The principal is not affected by the knowledge which an agent should have acquired in the performance of the agent's duties to the principal or to others, except where the principal or master has a duty to others that care shall be exercised in obtaining information."); *id.* § 277 cmt. a ("The fact that an agent has been negligent . . . either to the principal or to some other person and has thereby failed to acquire relevant information is not, of itself, sufficient to cause the principal to be affected by the knowledge which the agent would have acquired by the proper performance of his duties."); *One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*, 386 F. Supp. 2d 394, 399 (S.D.N.Y. 2005) (recognizing validity of Restatement (Second) of Agency § 277); *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 796 (E.D.N.Y. 1984) (same).

damages the plaintiff. *Am. Cash Card Corp. v. AT&T Corp.*, No. 99-7894, 2000 U.S.

App. LEXIS 6318, at *13 (2d Cir. Apr. 6, 2000).

The Trustee stands in the shoes of BLMIS.  In order to prevail on a veil-piercing

theory, he would have to prove that BLMIS was defrauded by the internal corporate

structures of the Sterling entities, such that he had a defense to payment of his obligations

to them on their securities statements.  The argument fails on its face.

The Trustee may, by his extreme use of imputation, be trying to allege that each

subsequent transferee in fact received initial transfers and to contend that each subsequent

transferee was "willfully blind" and therefore must be considered an initial transferee.

Bankruptcy Code Section 550 stands as a bar to any such effort.  Section 550 provides

that a transfer to a subsequent transferee cannot be avoided if that transferee took in good

faith and for value.  *See* 11 U.S.C. § 550(b).  As recently noted:

> "The limited legislative history specifically concerning the phrase 'good
> faith' in § 550(b) also does not indicate that Congress ever intended courts
> to use that phrase as a 'gateway' to more expansive liability.  The phrase
> was 'intended to prevent a transferee from whom the trustee could recover
> from transferring the recoverable property to an innocent transferee, and
> receiving a retransfer from him, that is, 'washing' the transaction through
> an innocent third party.'" *TOUSA*, 2011 U.S. Dist. LEXIS 14019, at
> *176-77 (quoting S. Rep. No. 95-989, at 90 (1978), *reprinted in* 1978
> U.S.C.C.A.N. 5876).

## VI.     THE TRUSTEE'S DISALLOWANCE AND SUBORDINATION CLAIMS MUST BE DISMISSED AS UNSUPPORTED

The Trustee also seeks to disallow and equitably subordinate the claims of the

Sterling Defendants.  These claims are subject to dismissal as a matter of law.

As noted, the Sterling Defendants were customers of a registered broker.  They

were owed the value of the securities on their last statements, and the payments to them

that discharged obligations reflected on prior statements are not avoidable.  The

91

undisputed facts demonstrate that the antecedent debt held by the Sterling Defendants was valid and that they acted in food faith.  Therefore, no fraudulent transfer claim lies.

In addition, Section 546(e) of the Bankruptcy Code prevents avoidance as preferential of any transfer in connection with a securities contract.  Consequently, Section 502(d) of the Bankruptcy Code, which requires disallowance of any claim of an entity that is a transferee of a voidable transfer, is of no application.

Nor is equitable subordination of any claim appropriate.  Customer "net equity" claims are entitled to priority under SIPA.  Such claims may be subordinated only pursuant to 11 U.S.C. § 510(c), which provides in relevant part:

"(c)  [A]fter notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]"

In order to subordinate these customer net equity claims, the Trustee must prove that the creditor has engaged in "some type of inequitable conduct," that the misconduct has "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant," and that the subordination is not "inconsistent with the provisions of the Bankruptcy Act."  *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).  As noted in *U.S. v. Noland*, 517 U.S. 535, 539 (1996), "[t]his last requirement has been read as a 'reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable.'"

Here, the Trustee argues that, because the Sterling Defendants engaged in the conduct alleged in the Complaint, "the customers of BLMIS have been misled as to the

92

true financial condition of the debtor, customers have been induced to invest without knowledge of the actual facts regarding BLMIS' financial condition, and/or customers and creditors are less likely to recover the full amounts due them."  (Compl. ¶ 1400.)

The undisputed facts demonstrate the contrary.  Further, the Sterling Defendants neither had any duty to any other customers nor are alleged to have represented anything to any other customer about BLMIS' financial condition.

## CONCLUSION

For the reasons set forth above, the Sterling Defendants respectfully request that the Court dismiss the Complaint in its entirety under Bankruptcy Rule 7012(b)(6) or, in the alternative, enter summary judgment for the Sterling Defendants under Bankruptcy Rules 7012(d) and 7056.

Dated:  New York, New York
        March 20, 2011

                              DAVIS POLK & WARDWELL LLP

                              By:  s/ Karen E. Wagner
                                   _____
                                   Karen E. Wagner
                                   Dana M. Seshens

Of Counsel:                        450 Lexington Avenue
Robert B. Fiske, Jr.               New York, New York  10017
Robert F. Wise, Jr.                Telephone:  (212) 450-4000
                                   Facsimile:  (212) 701-5800

                                   *Attorneys for the Sterling Defendants*

94