USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/27/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
IRVING H. PICARD,                    :
                                     :
          Plaintiff,                 :          11 Civ. 3605 (JSR)
                                     :
                                     :          [Adv. Pro. No. 10-05287]
          -v-                        :
                                     :
SAUL B. KATZ, et al.,                :          OPINION AND ORDER
                                     :
          Defendants.                :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.


          Pending before the Court is the motion of defendants Saul B.

Katz, et al., made pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R.

Civ. P. 12(b)(6), to dismiss the Amended Complaint filed against them

on March 18, 2011, by Irving H. Picard (the "Trustee"), who was

appointed under the Securities Investor Protection Act ("SIPA"), 15

U.S.C. §§ 78aaa et seq., to liquidate the business of Bernard L.

Madoff and Bernard L. Madoff Investment Securities LLC ("Madoff

Securities").[1]  In a "short and plain statement"[2] of 373 pages, the

---

[1] This adversary proceeding was originally filed in Bankruptcy
Court under the docket number 10-05287, assigned to the Hon.
Burton R. Lifland as part of the SIPA Liquidation entitled
Securities Investor Protection Corporation v. Bernard L. Madof
Investment Securities LLC, 08-01789 (BRL).  The reference of this
adversary proceeding to the Bankruptcy Court was subsequently
withdrawn, and the lawsuit, assigned the number 11 Civ. 3605
(JSR), is now before this Court through the conclusion of trial.

[2] See Fed. R. Civ. P. 8(a), made applicable to complaints filed in
bankruptcy adversary proceedings by Fed. R. Bankr. P. 7008.

Amended Complaint seeks to recover over a billion dollars from the defendants on theories of actual fraud, constructive fraud, preferential transfer, and the like, in violation of various provisions of federal bankruptcy law and New York State debtor and creditor law.  For the following reasons, the Court dismisses all claims except those alleging actual fraud and equitable subordination and narrows the standard for recovery under the remaining claims.

Although this lawsuit raises important and in some respects unsettled issues of the interaction of securities law with bankruptcy law, given the public interest in this case it is well to begin with the basics.  A debtor with assets less than its obligations is considered insolvent in the eyes of the law and may apply for, or be forced into, bankruptcy.  See generally, Bankruptcy Code, 11 U.S.C. §§ 101 et seq.  Issues then arise regarding whether prior payments made by the debtor can be, in effect, rescinded – or, in the language of bankruptcy law, "avoided" – and the money returned ("clawed back") to the bankrupt's estate, from where it can be distributed among creditors in accordance with legal and equitable principles of bankruptcy law.

Some of the avoided payments may take the form of "preferences."  If, prior to the bankruptcy filing, the bankrupt transfers some or all of its remaining assets to some of its creditors in preference to the other creditors, this transfer, known as a

2

"preference," may be "avoided" – regardless of the facial validity of the transfer or the intent of the parties to the transfer - if it occurred within 90 days of the filing for bankruptcy. See 11 U.S.C. § 547(b). The idea is that, while an ongoing business may freely decide which of its creditors to pay first, an insolvent business cannot be allowed to deplete its remaining assets in favor of one creditor over another.

Other avoided payments may take the form of "fraudulent transfers." For example, if an insolvent debtor intentionally seeks to defraud his creditors - as when a debtor who has a huge judgment filed against him intentionally seeks to hinder recovery by transferring all of his assets to a friend – the transfer can be avoided as an actually fraudulent transfer. See 11 U.S.C. § 548(a)(1)(A). Still other transfers can be avoided as "constructively fraudulent," i.e., as fraudulent in effect, even if not in intent. Thus, if the insolvent debtor, regardless of intent, transfers his remaining assets to his friend in return for plainly inadequate consideration, that transfer can be avoided as "constructively fraudulent." See 11 U.S.C. § 548(a)(1)(B).

Under the Bankruptcy Code, fraudulent transfers (whether actual or constructive) can be avoided if they occurred within 2 years of the bankruptcy filing. 11 U.S.C. § 548(a)(1). But the Bankruptcy Code also adopts for these purposes the "applicable [state] law," see 11

3

U.S.C. § 544(b) – which means in this case New York Debtor and

Creditor Law, under which fraudulent transfers can be avoided if they

occurred within 6 years of the filing.  See N.Y. C.P.L.R. § 213(8).

In the case of the bankruptcy of Madoff Securities, however,

these basic principles are affected by several special features.

First, Madoff Securities was a registered securities brokerage firm, a

fact that directly invokes certain "safe harbor" provisions of the

Bankruptcy Code, permits the appointment of a SIPA Trustee, and

indirectly implicates certain principles of the securities laws.

Second, Madoff and Madoff Securities were, at all times here relevant,

engaged in the special kind of fraud known as a "Ponzi scheme," by

which customers of Madoff Securities, who were led to believe that

their monies were being invested in profitable securities

transactions, were paid their profits from new monies received from

customers, without any actual securities trades taking place.

Because Madoff Securities was a registered stockbrokerage

firm, the liabilities of customers like the defendants here are

subject to the "safe harbor" set forth in section 546(e) of the

Bankruptcy Code.  "By restricting a bankruptcy trustee's power to

recover payments that are otherwise avoidable under the Bankruptcy

Code, the safe harbor stands 'at the intersection of two important

national legislative policies on a collision course – the policies of

bankruptcy and securities law.'"  In re Enron Creditors Recovery

4

Corp., _ F.3d _, 2011 WL 2536101 (2d Cir. June 28, 2011) at *5
(quoting In Re Resorts Int'l, Inc., 181 F.3d 505, 515 (3d Cir. 1999)).
Specifically, section 546(e) of the Bankruptcy Code provides that
"[n]otwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of
this title [i.e., all the sections dealing with preferences and
constructive fraud under the Bankruptcy Code and, by reference, all
applicable sections of New York State law], the trustee may not avoid
a transfer that is a . . . settlement payment, as defined in section
. . . 741 of this title, made by or to (or for the benefit of) a . . .
stockbroker . . . or that is a transfer made by or to (or for the
benefit of) a . . . stockbroker, in connection with a securities
contract, as defined in section 741(7). . . except under section
548(a)(1)(A) of this title [dealing with actual fraud]."  11 U.S.C
§ 546(e) (emphasis supplied).  Section 741(7) defines a "securities
contract" as a "contract for the purchase, sale, or loan of a
security," which is the kind of contract Madoff Securities had with
its customers.  Section 741(8) defines "settlement payment" as "a
preliminary settlement payment, a partial settlement payment, an
interim settlement payment, a settlement payment on account, a final
settlement payment, or any other similar payment commonly used in the
securities trade" – an "extremely broad" definition, see Enron, 2011
WL 2536101 at *5 (collecting cases), which clearly includes all
payments made by Madoff Securities to its customers.  Furthermore, any

 5

payment by Madoff Securities to its customers that somehow does not
qualify as a "settlement payment" qualifies as a "transfer" made "in
connection with a securities contract."  By its literal language,
therefore, the Bankruptcy Code precludes the Trustee from bringing any
action to recover from any of Madoff's customers any of the monies
paid by Madoff Securities to those customers except in the case of
actual fraud.

        Notwithstanding the plain language of section 546(e), the
Trustee argues that it should not be applied here, because doing so
would (supposedly) not accord with the statute's purpose.  Congress
enacted § 546(e) "to minimize the displacement caused in the
commodities and securities markets in the event of a major bankruptcy
affecting those industries."  In re Manhattan Inv. Fund Ltd., 310 B.R.
500, 513 (Bankr. S.D.N.Y. 2002) (quoting H.R. Rep. No. 97-420 (1982),
reprinted in 1982 U.S.C.C.A.N. 583, 583).  Although the Trustee argues
that avoiding Madoff Securities' transfers to customers cannot cause
the "displacement" that § 546(e) aims to prevent, this seems at
variance with his own Amended Complaint, which alleges that the Madoff
fraud involved approximately $68 billion and 4,900 customers.  See
Amended Complaint ¶ 39.  As in Enron, this Court sees "no reason to
think that undoing" such large transfers involving so many customers

6

from so long ago as 2002 "would not also have a substantial and
similarly negative effect on the financial markets." Enron, 2011 WL
2536101 at *9.

In any event, resort to legislative history is inappropriate
where, as here, the language of the statute is plain and controlling
on its face.  "[C]ourts must presume that a legislature says in a
statute what it means and means in a statute what it says there."
Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).  Indeed, to
deviate from what Congress has clearly and constitutionally decreed is
a power the judiciary does not possess.  See Lamie v. U.S. Trustee,
540 U.S. 526, 534 (2004).  Thus, here, as in Enron, there is neither a
need nor a basis "to address . . . arguments regarding [the]
legislative history [of § 546(e)]."  Enron, 2011 WL 2536101 at *9.[3]

_____

[3] While the Trustee also argues the section 546(e) was designed to
protect only stockbrokers, not customers, this, again, is nowhere
indicated on the face of the statute.  From the standpoint of
Madoff Securities' customers (except for any who were actual
participants in the fraud), the settlement payments made to them
by Madoff Securities were entirely bona fide, and they therefore
are fully entitled to invoke the protections of section 546(e).
Indeed, were it otherwise, the very uncertainty that the Trustee
says the statute was designed to obviate would prevail.  In any
event, there is no reason to ignore the breadth of the statutory
language.  Section 546(e) has been revisited by Congress on
numerous occasions, as recently as 2006, when it was amended to
its present wording.  See Financial Netting Improvements Act of
2006, Pub. L. No. 109-390, § 5, 120 Stat. 2692, 2697-98 (2006)
(inserting "or for the benefit of" and "in connection with a

Accordingly, the Court grants the defendants' motion to dismiss all claims predicated on principles of preference or constructive fraud under the Bankruptcy Code, as well as all claims under New York law, collectively corresponding to Counts 2 through 9 of the Amended Complaint.

This leaves, principally, the Trustee's claim for actual fraud under § 548(a)(1)(A) of the Bankruptcy Code (Count 1 of the Amended Complaint).[4]  Section 548(a)(1)(A) permits the Trustee to avoid any payment made by Madoff Securities to its customers within two years of the filing of the bankruptcy petition if the debtor (Madoff Securities) "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."  Since it is undisputed that Madoff's Ponzi scheme began more than two years before the filing of the bankruptcy petition and continued to almost the very day of filing, it is patent that all of Madoff Securities' transfers during the two-year period were made with

---

securities contract," and thereby broadening the statute's application).  If Congress did not mean it to be taken literally, Congress had ample opportunity to narrow or alter the wording, but Congress chose not to.

[4]  The Trustee's other two claims not barred by section 546(e), for disallowance and subordination of the defendants' own claims (Counts 10 and 11 of the Amended Complaint), are discussed below.

8

actual intent to defraud present and future creditors, i.e., those left holding the bag when the scheme was uncovered.[5]  Nonetheless, subsection (c) of section 548 provides that "a transferee or obligee of such a transfer or obligation that takes for value and in good faith . . . may retain such any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. § 548(c) (emphasis supplied).  It is clear that the principal invested by any of Madoff's customers "gave value to the debtor," and therefore may not be recovered by the Trustee absent bad faith.  As for transfers made by Madoff Securities to its customers in excess of the customers' principal - that is, the customers' profits - these were in excess of the "extent" to which the customers gave value, and hence, if adequately proven, may be recovered regardless of the customers' good faith.

---

[5] On the facts of this case as alleged in the Amended Complaint (which for purposes of this motion must be taken as true), there is therefore no need to invoke any "Ponzi scheme presumption." See, e.g., SEC v. Res. Dev. Int'l, LLC, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); In re Agric. Research & Tech. Grp., 916 F.2d 528, 535 (9th Cir. 1990) ("[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme.").

The defendants attempt to resist this latter conclusion, arguing that, as long as they acted in good faith, their profits, as reflected in Madoff Securities' monthly statements to them purporting to reflect actual securities trades, were legally binding obligations of Madoff Securities, so that any payments of those profits to the customers were simply discharges of antecedent debts. In this regard, the defendants rely heavily on In re Sharp Int'l Corp., which held that a "conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another." 403 F.3d 43, 54 (2d Cir. 2005) (quoting Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 191 A.D.2d 86, 90-91 (1st Dep't 1993)). Sharp, however, did not apply this holding to actually fraudulent transfers. Instead, it found that the attempts to avoid actually fraudulent transfers failed "for the independent reason that Sharp inadequately allege[d] fraud." Id. at 56. Here, the allegations of the Amended Complaint clearly make out a claim that all of the transfers made by Madoff Securities in the two years prior to the filing of the bankruptcy petition were made with the intent on the part of Madoff Securities to "hinder, delay, or defraud" past and future customers, so that a prima facie case of actual fraud under section 548(a)(1)(A) has been

10

adequately pled.  Whether, in these circumstances, defendants can
avail themselves of the affirmative defense of taking for value and in
good faith under section 548(c) is in no way controlled by Sharp.
See, e.g., In re Manhattan Inv. Fund Ltd., 397 B.R. 1, 11 (S.D.N.Y.
2007) ("At most, [Sharp] simply means that courts must be sure that
the transfers sought to be avoided are related to the [Ponzi]
scheme.").

     In other words, while, as to payments received by the
defendants from Madoff Securities equal to a return of their principal
defendants can defeat the Trustee's claim of actual fraud simply by
proving their good faith, as to payments received by the defendants in
excess of their principal defendants can defeat the Trustee's claim of
actual fraud only by showing that they not only were proceeding in
good faith but also that they took for value.[6]

_____

[6] Although, given the difficulty defendants will have in
establishing that they took their net profits for value, the
Trustee might well prevail on summary judgment seeking recovery of
the profits, how to determine which profits the Trustee can
recover remains an open question.  Specifically, the Court does
not resolve on this motion whether the Trustee can avoid as
profits only what defendants received in excess of their
investment during the two year look back period specified by
section 548 or instead the excess they received over the course of
their investment with Madoff.  According to the Amended Complaint,
defendants' profits amounted to $83,309,162 in the two years
preceding the bankruptcy and $295,465,565 over the course of their
investment.  Amended Complaint ¶¶ 1105, 1108.

11

It remains only to define what is meant by lack of "good faith" in this context.  Both sides agree that if the defendants had actual knowledge of Madoff's scheme, it would constitute lack of good faith.  But even the Trustee does not appear to undertake the dubious task of plausibly pleading that the defendants knowingly invested in a Ponzi scheme.  Both sides also agree, however, that if the defendants willfully blinded themselves to the fact that Madoff Securities was involved in some kind of fraud, this too might, depending on the facts, constitute a lack of good faith.[7]  The Amended Complaint plainly advances this theory of willful blindness.  See, e.g., Amended Complaint ¶ 9 ("Given Sterling's dependency on Madoff, it comes as no surprise that the Sterling partners willfully turned a blind eye to every objective indicia of fraud before them.").  But why would defendants willfully blind themselves to the fact that they had invested in a fraudulent enterprise?   The Amended Complaint alleges, in effect, that it was because they felt they could realize substantial short-term profits while protecting themselves against the

_____

[7] For the purposes of this motion, but not necessarily otherwise, the Court finds, based on the allegations of the Amended Complaint at, e.g., ¶¶ 659, 853-864, that the defendants' investment decisions were sufficiently coordinated that the intent of their common vehicle, Sterling Equities, and its principals, can be imputed to  the other defendants.  See Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 255 (2d Cir. 1995); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

12

long-term risk.  Although the defendants vehemently deny these accusations,[8] the Amended Complaint, while less than overwhelming in this regard, pleads sufficient allegations to survive a motion to dismiss so far as this claim of willful blindness is concerned.  See, e.g., Amended Complaint ¶¶ 702-710, 941-948 (defendants seriously considered purchasing fraud insurance with respect to their investments in Madoff Securities and created their own hedge fund in 2002 at least partly to limit their exposure in Madoff Securities).

Perhaps recognizing the problems with this approach, however, the Trustee falls back on arguing that, alternatively, defendants were on "inquiry notice" of the fraud but failed to diligently investigate Madoff Securities and that this also constitutes lack of good faith.  See In re Manhattan Inv. Fund Ltd., 397 B.R. 1, 22-23 (S.D.N.Y. 2007).  Defendants, for their part, strenuously contest that this theory is applicable in the instant setting.

The difference between the inquiry notice approach and the willful blindness approach is essentially the difference between an objective standard and a subjective standard.  Under the former

---

[8] The details of these denials are largely set forth as part of defendants' request that the Court convert their motion to dismiss into a motion for summary judgment.  Finding that the Trustee has made a reasonable argument that he is entitled to further discovery before a motion for summary judgment is fully ripe, the Court declines defendants' invitation to convert.

13

approach, a transferee has inquiry notice when the "information [the transferee] learned would have caused a reasonable [person] in [the transferee's] position 'to investigate the matter further.'" Manhattan, 397 B.R. at 23 (quoting Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 89 Fed. App'x 287, 291 (2d Cir. 2004)). In such circumstances, a failure to further investigate constitutes lack of good faith unless even diligent inquiry would not have unearthed the fraud. See In re Agric. Res. & Tech Grp., 916 F.2d 528, 536 (9th Cir. 1990).

Although this approach is not without some precedent in ordinary bankruptcies, it has much less applicability, the Court concludes, in a context of a SIPA trusteeship, where bankruptcy law is informed by federal securities law. Just as fraud, in the context of federal securities law, demands proof of scienter, so too "good faith" in this context implies a lack of fraudulent intent. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 215 (1976) (holding that scienter requires "proof of more than negligent nonfeasance"). A securities investor has no inherent duty to inquire about his stockbroker, and SIPA creates no such duty. See generally In re New Times Sec. Servs., 371 F.3d 68, 87 (2d Cir. 2004). If an investor, nonetheless, intentionally chooses to blind himself to the "red flags" that suggest a high probability of fraud, his "willful blindness" to the truth is

14

tantamount to a lack of good faith.  See United States v. Rodriguez,

983 F.2d 455, 458 (2d Cir. 1993) ("conscious avoidance," another term

for willful blindness, means "that the defendant was aware of a high

probability of the fact in dispute and consciously avoided confirming

that fact").  But if, simply confronted with suspicious circumstances,

he fails to launch an investigation of his broker's internal practices

- and how could he do so anyway? - his lack of due diligence cannot be

equated with a lack of good faith, at least so far as section 548(c)

is concerned as applied in the context of a SIPA trusteeship.

In short, the Court concludes that, as to the claim of actual

fraud (Count 1), the Trustee can recover defendants' net profits over

the two years prior to bankruptcy simply by showing that the

defendants failed to provide value for those transfers, but the

Trustee can recover the defendants' return of principal during that

same period only by showing an absence of good faith on defendants'

part based on their willful blindness.[9]

Turning to the remaining claims, the Trustee seeks to disallow

the defendants' own claims made on Madoff Securities' estate (Count

10) or at least to equitably subordinate them to other customers'

---

[9]   While the burden of raising the defense of good faith is
initially on the defendants, the question of whether, once the
defendants have made a prima facie showing of good faith, the
burden shifts back to the Trustee to show lack of good faith, is
an issue that need not be decided on this motion.

15

claims (Count 11).  As to disallowance, here again there is a conflict
between the policies of the bankruptcy laws in general and of the
securities laws, in this case expressed through SIPA.  Thus, while
section 502(d) of the Bankruptcy Code would support disallowance of
the claims made against a bankruptcy estate by a party who received
transfers that were void or voidable, this section is overridden in
the context of a SIPA trusteeship by Section 78fff-2 of SIPA, which
provides that securities customers who have received avoidable
transfers may still seek to pursue those transfers as creditors of the
SIPA estate.  15 U.S.C. § 78fff-2(c)(3).  The point, once again, is to
provide stability in the securities markets by imparting a greater
degree of certainty to securities transactions than to other kinds of
transactions.  Accordingly, Count 10 must be dismissed.

It does not follow, however, that because a securities
customer pursuing allegedly voidable claims is not wholly barred from
pursuing them in a SIPA liquidation, the claims still stand on the
same footing as all other claims.  Under § 510(c) of the Bankruptcy
Code, "the court may . . . under principles of equitable
subordination, subordinate for purposes of distribution all or part of
an allowed claim."  Courts equitably subordinate claims when the
claimant has "engaged in some type of inequitable conduct" and the
"misconduct must have resulted in injury to the creditors of the

16

bankrupt or conferred an unfair advantage on the claimant."  In re

Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977).  Inequitable

conduct "encompasses conduct that may be lawful but is nevertheless

contrary to equity and good conscience."  In re Verestar, Inc., 343

B.R. 444, 461 (Bankr. S.D.N.Y. 2006).  Because the Amended Complaint

adequately alleges that the defendants did not receive fraudulent

transfers in good faith, it also adequately alleges that they engaged

in inequitable conduct.  Moreover, this alleged misconduct would have

injured any investors who invested in Madoff Securities based on the

impressive returns others appeared to receive.  Thus, while the

Trustee cannot disallow the defendants' claims against the Madoff

Securities' estate, he can potentially subordinate them by proving

that the defendants invested with Madoff Securities with knowledge, or

in reckless disregard, of its fraud.

     In summary, the Court hereby dismisses all Counts of the

Amended Complaint except Counts 1 and 11.  Under Count 1, the Trustee

may recover defendants' net profits simply by proving that the

defendants did not provide value for the monies received, but the

Trustee may recover the return of the defendants' principal only by

proving that the defendants willfully blinded themselves to Madoff

Securities' fraud.  Finally, the Trustee can subordinate the

defendants' own claims against the estate only by making the same showing required under Count 1 or its equitable equivalent.

The parties are directed to appear in court tomorrow, September 28, 2011 at 3:00 P.M. to set a schedule for all further proceedings relating to the remaining claims.


        SO ORDERED.

                                    _____
                                    JED S. RAKOFF, U.S.D.J.


Dated:  New York, New York
        September 27, 2011

18