UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Debtor, | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                    Plaintiff,<br>    v.<br><br>SAUL B. KATZ, et al.,<br><br>                  Defendants. | Adv. Pro. No. 10-05287 (BRL)<br><br>11 Civ. 03605 (JSR) (HBP)<br><br>(Oral Argument Requested) |

**TRUSTEE'S MEMORANDUM OF LAW SUPPORTING THE CALCULATION OF PRINCIPAL AND FICTITIOUS PROFIT UNDER THE NET INVESTMENT METHOD**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

# Table of Contents

|  |  | Page |
|---|---|---|
| Background | | 1 |
| Preliminary Statement | | 2 |
| Legal Discussion | | 4 |
| I. | The Net Investment Method comports with the Trustee's avoidance powers. | 4 |
| II. | The Net Investment Method complies with the netting rule applied in Ponzi cases. | 5 |
| III. | The Net Investment Method ensures equal treatment for all customers. | 8 |
| IV. | The Net Investment Method provides the Trustee with the correct method for determining net profits avoidable and recoverable from Defendants in the two years prior to the Filing Date. | 9 |
| Conclusion | | 12 |

## Table of Authorities

Page(s)

**CASES**

*In re Adler, Coleman Clearing Corp.*,
   263 B.R. 406 (Bankr. S.D.N.Y. 2001) ..................................................................................4

*Armstrong v. Collins*,
   No. 01 Civ. 2437, 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ............................................6

*Bayou Accredited Fund, LLC v. Redwood Growth Partners (In re Bayou Group, LLC)*,
   396 B.R. 810 (Bankr. S.D.N.Y. 2008) ..................................................................................8

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*,
   362 B.R. 624 (Bankr. S.D.N.Y. 2007) ..............................................................................5, 6

*In re Bernard L. Madoff Inv. Sec.*,
   --- F.3d ---, 2011 WL 3568936 (2d Cir. Aug. 16, 2011) ............................................... *passim*

*In re Bernard L. Madoff Inv. Sec. LLC*,
   424 B.R. 122 (Bankr. S.D.N.Y. 2010) ..................................................................................4

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*,
   439 B.R. 284 (S.D.N.Y. 2010) ..............................................................................................6

*Cunningham v. Brown*,
   265 U.S. 1 (1924) ..................................................................................................................8

*Daly v. Radulesco (In re Carrozzella & Richardson)*,
   247 B.R. 595 (B.A.P. 2d Cir. 2000) ......................................................................................8

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir.), *cert. denied*, 129 S. Ct. 640 (2008) ..........................................5, 6, 7

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..................................................................................5

*Jobin v. Youth Benefits Unlimited (In re M&L Business Mach. Co.)*,
   59 F.3d 1078 (10th Cir. 1995) ..............................................................................................8

*In re Lake States Commodities, Inc.*,
   253 B.R. 866 (Bankr. N.D. Ill. 2000) ....................................................................................7

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
   277 B.R. 520 (Bankr. S.D.N.Y. 2002) ..................................................................................8

*In re Moore*,
   39 B.R. 571 (Bankr. M.D. Fla. 1984) ....................................................................................7

# Table of Authorities
(continued)

Page(s)

*Noland v. Morefield (In re Nat'l Liquidators, Inc.)*,
   232 B.R. 915 (Bankr. S.D. Ohio 1998) .................................................................................. 6, 7

*Picard v. Cohmad Sec. Corp.*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011) ........................................................................................ 5

*Picard v. Katz*,
   --- F. Supp. 2d ----, 2011 WL 4448638 (S.D.N.Y. Sept. 27, 2011) ................................. *passim*

*SEC v. Credit Bancorp., Ltd.*,
   No. 99 Civ. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000) ........................................... 8

*Sender v. Buchanan* (*In re Hedged-Investments Assoc., Inc.*),
   84 F.3d 1286 (10th Cir. 1996) ................................................................................................... 7

*Wing v. Dockstader*,
   No. 2:08 Civ. 776, 2010 WL 5020959 (D. Utah Dec. 3, 2010) ................................................. 6

**STATUTES**

11 U.S.C. § 510(c) ............................................................................................................................ 1

11 U.S.C. § 548(a)(1) ....................................................................................................................... 7

11 U.S.C. § 548(a)(1)(A) ........................................................................................................ *passim*

11 U.S.C. § 548(c) ............................................................................................................................ 2

15 U.S.C. § 78aaa *et seq*. ................................................................................................................. 1

Irving H. Picard (the "Trustee"), trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff ("Madoff"), respectfully submits this memorandum of law pursuant to this Court's order entered on September 28, 2011 ("September 28 Order") [ECF No. 41], and the Court's Opinion and Order dated September 27, 2011, *Picard v. Katz*, --- F. Supp. 2d ----, 2011 WL 4448638, at *4 n.6 (S.D.N.Y. Sept. 27, 2011) [ECF No. 40], on Defendants' Motion to Dismiss the Amended Complaint or, in the Alternative, for Summary Judgment ("Motion") [ECF Nos. 20-25], supporting the calculation of principal and fictitious profit from the inception of the BLMIS customer accounts.

## Background

The Court's decision in *Katz* sustained the Trustee's Amended Complaint only as to Count One (actual fraud under § 548(a)(1)(A) of the Bankruptcy Code) and Count Eleven (equitable subordination under § 510(c) of the Bankruptcy Code).[1]  Section 548(a)(1)(A) of the Bankruptcy Code permits the Trustee to avoid payments made by BLMIS to its customers within two years of the commencement of BLMIS's SIPA liquidation, which is deemed to have occurred on December 11, 2008 ("Filing Date").  The decision further stated that there is an open question on the Motion as to "whether the Trustee can avoid as profits only what defendants received in excess of their investment during the two year look back period[2] specified by section 548 or instead the excess they received over the course of their investment with Madoff."  *Katz*, 2011 WL 4448638, at *4 n.6.  In

---

[1] Count Eleven is not relevant to the issue raised by the Court that is the subject of this Memorandum.

[2] The term "look back period" used in this Memorandum refers to the time period before the Filing Date specified in applicable statutes during which transfers may be avoided.  Section 548 of the Bankruptcy Code, for example, specifies a two-year look back period in which fraudulent transfers may be avoided, while the New York Debtor and Creditor Law limits the avoidance period to six years.

the September 28 Order, the Court requested briefing to promptly resolve the open question, which was framed as "whether, in determining what portion of that sum should be considered principal and what portion profits, reference should be made only to that [two-year] period or should be made to earlier transfers as well." *See* September 28 Order.[3]

### Preliminary Statement

The issue presented by the Court implicates not only the resolution of this avoidance action but the legal process used to unwind Madoff's colossal Ponzi scheme. After its inevitable collapse, the Trustee was charged with sorting out decades of fraud in an equitable and fair manner according to the governing law. Because it was a Ponzi scheme, BLMIS's customers either lost principal to the scheme or received all of their principal back as well as other people's money. In determining customer claims under SIPA and seeking to recover customer property for equitable distribution, the Trustee has taken a uniform approach that gives all customers the benefit of every principal deposit made during the life of their investment relationship with BLMIS.

The Second Circuit ruled that the "Net Investment Method," which credits for the life of the account the amount of cash a customer deposited into his BLMIS account, less any amounts withdrawn from it, was the only legally sound and fair approach to calculate a customer's "net equity" claim under SIPA. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 239, 2011 WL 3568936, at *5, *12 (2d Cir. 2011) (the "Net Investment Ruling"). As applied to all BLMIS customer accounts, the Net Investment Method distinguishes: (1) the customers that lost principal

---

[3] The Trustee submits that this issue is not appropriate for resolution at the motion to dismiss stage to the extent it forces a determination of the two-year transfers alleged to be avoidable under section 548(a)(1)(A). The underlying facts with respect to the amount of recoverable net profits are alleged in the Trustee's Amended Complaint (*see* Appendix I, Exh. B and Appendix II, Exhs. B and C to the Amended Complaint, Adv. Pro. No. 10-05287, ECF No. 34 (Mar. 18, 2011)), and, together with Defendants' affirmative defenses under section 548(c), cannot be finally determined prior to discovery and the introduction of evidence at trial.

over the course of their investment with BLMIS (often referred to as "net losers"), from (2) the customers that received the return of their principal as well as the principal of other investors in the form of fictitious profits over the course of their investment with BLMIS (often referred to as "net winners"). Under the Net Investment Ruling, only those customers who lost principal are entitled to an allowed customer claim.

As applied in the litigation context, the Net Investment Method is also the proper way to determine whether a customer has received fraudulent transfers. Case law is uniform that transfers of fictitious profits in a Ponzi scheme are avoidable under federal and state fraudulent conveyance laws. Transfers of principal are also recoverable, but are subject to different standards than transfers of fictitious profits. Thus, in every case, a trustee must determine whether transfers consist of principal and/or fictitious profits in order to avoid and recover those transfers under the relevant statutory framework. To do so, reference must be made to the entire investment relationship to determine at what point a customer's withdrawals exceeded the amount of principal invested. This is consistent with both established precedent and the Net Investment Ruling.

Using any other method for calculating the amount of transfers of principal and fictitious profits that may be avoided would lead to arbitrary and unfair results, as demonstrated by the impact on Defendants' accounts here. The Court has limited the Trustee to avoiding those transfers that occurred in the two-year period preceding the Filing Date.[4] The Trustee's Amended Complaint sets forth the two-year transfers (the "Two Year Transfers"), which, using the Net Investment Method as the basis for calculating the amounts, alleges that Defendants received transfers consisting of

---

[4] The Trustee has moved for leave to appeal the Court's decision in *Katz*; the Amended Complaint sought to avoid and recover transfers under provisions of the Bankruptcy Code and the New York Debtor and Creditor law other than section 548(a)(1)(A) and beyond the two-year period. While that matter is pending, this Memorandum refers to the Two Year Transfers defined above.

$301,027,523 of principal and $83,309,162 of fictitious profits. By contrast, if the Net Equity balances for all of the accounts were reset to zero as of December 11, 2006, the amount of avoidable transfers in the form of fictitious profits received by Defendants would increase to over $215,000,000 because Defendants would not be credited with any principal deposits prior to that date.

Using the Net Investment Method to determine net equity claims and the amount of avoidable transfers gives all customers—both those with allowed claims and those subject to avoidance—the full benefit of the principal deposits they made with BLMIS. This brings the "greatest number of investors closest to their positions prior to Madoff's scheme in an effort to make them whole." *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 142 (Bankr. S.D.N.Y. 2010). Any other method of calculating the amount of principal lost or returned to customers would deprive customers of their principal invested and their right to credit that principal against the transfers received within the two-year period. Such a result would skew the legal basis on which the Trustee seeks to avoid fraudulent transfers made by BLMIS in all of the avoidance actions and arbitrarily shift the net equity position of each customer in violation of the Net Investment Ruling.

## Legal Discussion

**I.    The Net Investment Method comports with the Trustee's avoidance powers.**

Although the Second Circuit noted in its Net Investment Ruling that the Trustee's avoidance powers were not at issue on appeal, it stated its view that "in the context of *this* Ponzi scheme—the Net Investment Method is nonetheless more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud, *see* 11 U.S.C. § 548(a)(1)(A), and 'avoid[s] placing some claims unfairly ahead of others,' *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 463 (Bankr. S.D.N.Y. 2001)." *In re Bernard L. Madoff Inv. Sec.*, 2011 WL 3568936, at *12 n.10 (emphasis in original). Applying the Second Circuit's reasoning in this avoidance

litigation, the Net Investment Method fairly subjects customers having negative "net equity" to potential avoidance liability under section 548(a)(1)(A) for the amount of principal and fictitious profits they received.

## II.     The Net Investment Method complies with the netting rule applied in Ponzi cases.

The Net Investment Method, in conjunction with the applicable statutory look back period, complies with established precedent for determining whether a customer has potential avoidance liability and in what amount.  In the context of a fraudulent investment scheme, virtually every court to address the question has held "unflinchingly," *In re Dreier LLP*, 452 B.R. 391, 440 n.44 (Bankr. S.D.N.Y. 2011), that payments to an investor in excess of the principal amounts invested are voidable as fraudulent transfers because they are not taken for value.  *See, e.g.*, *id.*; *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 333 (Bankr. S.D.N.Y. 2011); *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 636 (Bankr. S.D.N.Y. 2007); *see also Katz*, 2011 WL 4448638, at *4.

Thus, in cases involving fraudulent schemes where the payments by the debtor are comprised of principal and fictitious profits, courts apply a two-step process to determine the full extent of a transferee's liability and calculate the amount recoverable under the relevant statutory scheme.  The first step is to determine whether the investor is liable through the use of the "netting rule," *Donell v. Kowell*, 533 F.3d 762, 771 (9th Cir.), *cert. denied*, 129 S. Ct. 640 (2008), which is synonymous with the Net Investment Method upheld by the Second Circuit.

In *Donell*, an investor in a Ponzi scheme deposited approximately $23,000 and withdrew $73,000 during the life of his account, resulting in $50,000 of fictitious profits.  The Ninth Circuit found that the receipt of $50,000 in fictitious profits established the investor's potential liability, explaining that the "[a]mounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual.  If the net is positive, the receiver has

5

established liability, and the court then determines the actual amount of liability, which may or may not be equal to the net gain, depending on factors such as whether transfers were made within the limitations period . . . ." *Id.* at 771; *see also Armstrong v. Collins*, No. 01 Civ. 2437, 2010 WL 1141158, at *29 (S.D.N.Y. Mar. 24, 2010); *Noland v. Morefield (In re Nat'l Liquidators, Inc.)*, 232 B.R. 915, 918 n.2 (Bankr. S.D. Ohio 1998). This comports with the Net Investment Ruling, which looks to whether the claimant's transactions with the Ponzi scheme resulted in positive (greater deposits than withdrawals) or negative (greater withdrawals than deposits) net equity. *See In re Bernard L. Madoff Inv. Sec.*, 2011 WL 3568936, at *3, *8.

The second step is to determine the actual amount of liability under the relevant fraudulent conveyance statutes, *i.e.*, the amount of avoidable transfers the trustee may recover. While all transfers of fictitious profits in a Ponzi scheme are avoidable as fraudulent transfers, *see, e.g.*, *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 337-38 (S.D.N.Y. 2010); *In re Bayou Group, LLC*, 362 B.R. at 629-30; *Wing v. Dockstader*, No. 2:08 Civ. 776, 2010 WL 5020959, at *5 (D. Utah Dec. 3, 2010), the applicable statutory look back period restricts the time period in which specific transfers may be avoided. *Donell*, 533 F.3d at 772 ("Only transfers made within the limitations period are avoidable."). Irrespective of the look back period for transfers, however, courts hold that the deposits must be viewed over the life of the account to determine whether transfers in the avoidance period consist of fictitious profits or principal. *See, e.g., id.* at 771; *In re Nat'l Liquidators, Inc.*, 232 B.R. at 918-20.

Thus, in *Donell*, once the district court determined the "good faith" investor's liability for the receipt of avoidable transfers by netting his withdrawals against his investments during the life of the account, the court "properly limited" the recovery to the three transfers of fictitious profits totaling $26,000 that occurred during the applicable four-year statute of limitations period under

California law. 533 F.3d at 773. In *In re Hedged Investments,* the Tenth Circuit applied the netting rule to a "good faith" investor's entire 12-year investment history with the debtor and determined that the investor received a total of $1.25 million of fictitious profits from a Ponzi scheme. *Sender v. Buchanan* (*In re Hedged-Investments Assoc., Inc.*), 84 F.3d 1286, 1288-89 (10th Cir. 1996). The trustee was permitted to recover more than $248,000—everything the investor received during the one-year look back period—because the investor had "invested not one red cent" during the look back period applicable in that case. *Id.* at 1288. In *In re Nat'l Liquidators, Inc.,* the court used the netting analysis to arrive at the amount of fictitious profits that an investor received from a Ponzi scheme recoverable under section 548(a)(1). 232 B.R. at 918 n.2 ("In order to determine the amount of the Defendants' false profits, the total amount invested by the Defendants ($229,600) should be subtracted from the total amount paid by the Debtor to the Defendants ($601,250), resulting in total false profits of $371,650.").

The rule developed in these cases is that the entire investment history is necessary to calculate the principal or profit that an investor received, without regard to the look back period or statutory defense. *See also In re Lake States Commodities, Inc.*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2000) ("To determine the amount recoverable from an investor, payments received from the perpetrators of a scheme are 'netted' against the amounts invested.") (citation omitted); *In re Moore*, 39 B.R. 571, 573 (Bankr. M.D. Fla. 1984) (netting account activity beyond statutory avoidance period and holding investor liable for transfers of fictitious profits during avoidance period). While the law may restrict avoidance and recovery of those transfers that occurred within a certain time period, determining the quantum of fraudulent transfers requires consideration of the entire transactional history.

7

**III.     The Net Investment Method ensures equal treatment for all customers.**

As stated in the seminal Ponzi scheme case, "equality is equity and this is the spirit of the bankrupt law." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924) (holding that all investors in a Ponzi scheme must be treated equally). Thus, "[i]n a Ponzi scheme, or other scenario where creditors are almost exclusively defrauded parties, there is no distinguishing characteristic which promotes the interests of one over the other. Consequently . . . it is to the detriment of all other similarly situated creditors to favor one defrauded party over another." *Jobin v. Youth Benefits Unlimited (In re M&L Business Mach. Co.)*, 59 F.3d 1078, 1082 (10th Cir. 1995).

Fraudulent transfer laws are not punitive provisions "designed to punish the transferee," but instead "place the transferee in the same position as other similarly situated creditors who do not receive fraudulent [transfers]." *Bayou Accredited Fund, LLC v. Redwood Growth Partners (In re Bayou Group, LLC)*, 396 B.R. 810, 827 (Bankr. S.D.N.Y. 2008). Implementing these principles, the Second Circuit recognized that adherence to the Net Investment Method enables the Trustee to "avoid placing some claims unfairly ahead of others." *In re Bernard L. Madoff Inv. Sec.*, 2011 WL 3568936, at *12 n.10.

To ensure fair results, and to comply with the Net Investment Ruling and longstanding principles of SIPA and other federal and bankruptcy law that mandate treating similarly situated parties equally,[5] the Trustee has consistently applied the Net Investment Method to all customer accounts. Each customer has been given full credit for all deposits that occurred during the life of the account. Transfers to customers were not deemed fictitious profits until the withdrawals from

---

[5] *See, e.g., Cunningham*, 265 U.S. at 13; *Daly v. Radulesco (In re Carrozzella & Richardson)*, 247 B.R. 595, 601-02 (B.A.P. 2d Cir. 2000); *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002); *SEC v. Credit Bancorp., Ltd.*, No. 99 Civ. 11395, 2000 WL 1752979, at *13 (S.D.N.Y. Nov. 29, 2000).

8

each account exceeded the amount of the deposits. Whether applied for the purpose of determining a customer's net equity claim or potential avoidance liability, every customer and the transactions within their accounts were treated the same.

Conversely, by cutting short the period in which deposits are credited, customers' cash positions, *i.e.*, their net equity claims, would inevitably shift, running afoul of the Second Circuit's Net Investment Ruling. For example, some accounts that had negative net equity under the Net Investment Method may have positive net equity if the calculation began at zero on December 11, 2006. Some accounts that had negative net equity would have an even greater amount of negative net equity, even though they had deposits in the preceding years that would actually offset those amounts. And some accounts that had positive net equity may wind up with negative net equity, even though the Net Investment Ruling holds that those accounts have an allowable net equity claim.

Moreover, none of the potential outcomes above would be tied to the actual principal invested and lost—which the Second Circuit held is the only reliable touchstone in this case—and would effectively add another layer to Madoff's "arbitrary machinations." *In re Bernard L. Madoff Inv. Sec.*, 2011 WL 3568936, at *5. Because the Second Circuit has deemed the Net Investment Method binding on the determination of net equity claims, which encompasses a cash in/cash out analysis over the lifetime of the BLMIS accounts, any calculation other than the Net Investment Method would impermissibly undermine the Second Circuit's ruling and "aggravate the injuries caused by Madoff's fraud." *Id.*

**IV.    The Net Investment Method provides the Trustee with the correct method for determining net profits avoidable and recoverable from Defendants in the two years prior to the Filing Date.**

The Court in *Katz* determined that the Trustee may avoid and recover transfers from BLMIS to Defendants under section 548(a)(1)(A) of the Bankruptcy Code during the two-year period from

9

December 11, 2006, to the Filing Date. *Katz*, 2011 WL 4448638, at *3, *5. Consistent with SIPA and in light of the Net Investment Ruling and the above precedents, and relying upon BLMIS's books and records for the cash in/cash out transactions, the Trustee's Amended Complaint describes in detail the Two Year Transfers to Defendants that the Trustee alleges are avoidable.[6]

In this case, if the Net Equity balances for all of the accounts were reset to zero dollars as of December 11, 2006, that would have a negative effect on Defendants because the amount of transfers avoidable as fictitious profits would *increase* from the amount set forth in the Amended Complaint. Under the Net Investment Method, the Trustee calculated that Defendants' gross withdrawals from their BLMIS accounts in the two-year period equals $384,336,685. Am. Compl. ¶ 1108. Of that amount, $301,027,523 equals principal and $83,309,162 constitutes fictitious profits. *Id.* If, however, the Court were to calculate the two-year principal and fictitious profits by starting with a balance of zero dollars in Defendants' BLMIS accounts on December 11, 2006, Defendants' gross withdrawals would remain constant at $384,336,685, but the amount of principal withdrawn would drop to $165,847,310, and the amount of fictitious profits would jump to $218,489,375. *See* Am. Compl., Appendix I, Exhibit B.[7] Thus, applying the "reset to zero" methodology almost triples the amount the Trustee would be able to avoid and recover as fictitious profits. *See Katz*, 2011 WL 4448638, at *4 n.6 (". . . the trustee might well prevail on summary judgment seeking recovery of the profits . . .").

---

[6] Attached to the Trustee's Amended Complaint as Appendix I, Exh. B, and Appendix II, Exhs. B and C are schedules that, among other facts, reflect the total amount of Defendants' deposits into their BLMIS accounts during the lifetime of the accounts and transfers from BLMIS to Defendants within the statutory avoidance periods, that is, within two years and six years, respectively. The Two Year Transfers reflect only those transfers to Defendants during the two years prior to the Filing Date.

[7] This calculation is based on the aggregate of the post-December 10, 2006 cash deposits and cash withdrawals in columns 4 and 5 of Appendix I, Ex. B, respectively, for all 185 accounts.

The reason for this disparity is clear. The Net Investment Method employed by the Trustee properly allocates an investor's principal deposits over the life of his account, reducing his fictitious profits at the moment of each new deposit. To start all accounts at a zero balance as of December 11, 2006 would cancel out all of these past credits, counting only the cash in/cash out over that limited time period. This would unfairly punish those investors who made deposits outside of the two years in favor of those who invested and took their profits near the end of the scheme.

This dynamic is illustrated by the transactions in one of Defendants' accounts at issue here, 1KW435. *See* Am. Compl., Appendix I, Exhibit B-227. The account opened with a deposit via wire transfer in the amount of $67,937,120 on July 27, 2006, four and one-half months prior to the start of the two-year look back period. *Id.*, column 4. Following this initial deposit, all successive transactions took place during that two-year period. During that time, specifically between December 26, 2006 and July 9, 2008, the account had eight redemptions, in the total amount of $51,102,500, *id.,* column 5, and only one additional deposit on November 14, 2007, in the amount of $1,200,000. *Id.,* column 4. As a result of these actual cash transactions, the "net cash activity" during the two-year look back period for this account demonstrates that the account holder withdrew $49,902,500 more than it deposited over the same period.

The Net Investment Method would consider these withdrawals the return of principal because it takes into account the opening deposit, which occurred outside the look back period. And, according to the Court, avoidance of principal requires a higher level of culpability than fictitious profits. *See Katz*, 2011 WL 4448638, at *4-*5. However, assuming the clock were reset to zero dollars as of December 11, 2006, the amount of cash withdrawn during the two-year look back period would exceed the amount deposited during that time by a total of $49.9 million, which sum would then constitute fictitious profits subject to avoidance, essentially as a matter of law.

11

This result would deprive Defendants of the proper credit for the principal they invested outside of the two-year period.  As this example demonstrates, using any method other than the Net Investment Method to calculate which portion of the Two Year Transfers constitutes principal or profit would upset the uniform application of established precedent to customers' deposits and withdrawals in contravention of the Second Circuit Ruling.

## Conclusion

For the foregoing reasons, the Trustee respectfully requests that the Court rule that the Net Investment Method applies for purposes of calculating which portion of the Two Year Transfers constitute principal or profit.

Date:   October 24, 2011
        New York, New York

By: */s/ David J. Sheehan*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com
Marc F. Skapof
Email: mskapof@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*