**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Adv. Pro. No. 08-01789 (BRL) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | SIPA LIQUIDATION |
| Debtor, | (Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05287 (BRL) |
| Plaintiff, v. | 11 Civ. 03605 (JSR) (HBP) |
| SAUL B. KATZ, et al., | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Esq. Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC And Bernard L. Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

I.    BANKING ON MADOFF'S RETURNS AND ACCOUNTS FOR THEIR
      BUSINESS FINANCING, THE STERLING DEFENDANTS BECAME
      DEPENDENT UPON BLMIS .......................................................................................... 4

      A.    The Sterling Partners' Business Plans Became Overly-Dependent Upon
            Their Guaranteed Madoff Returns ...................................................................... 5

      B.    The Sterling Defendants Exploited the "Madoff Vig" in Ingenious Ways ........... 6

      C.    Madoff was the Investment Arm of Sterling's Business and Its Primary
            Source of Liquidity ........................................................................................... 7

      D.    Banking on the BLMIS double ups, the Sterling Defendants
            Overleveraged on Madoff-Related Debt ............................................................ 8

      E.    The Sterling Partners Knew that Even an Investigation of Madoff Could
            Trigger Defaults in their Loans and Personal Guarantees .................................. 9

II.   THE DEFENDANTS WERE COMPLETELY DEPENDENT UPON THEIR
      MADOFF ACCOUNTS AS THE WARNINGS AND RED FLAGS OF FRAUD
      AMASSED .................................................................................................................... 14

      A.    By 2001, the Sterling Partners Had Already Looked Into Potential Fraud
            Insurance for their Madoff Accounts ................................................................ 14

      B.    The Sterling Partners' Investment Fund Partners Warned the Defendants
            not to Continue to Invest with Madoff ............................................................. 15

III.  THE STERLING DEFENDANTS KNEW OF SIGNIFICANT AND
      MOUNTING RED FLAGS OF FRAUD AT BLMIS, YEAR AFTER YEAR ............. 24

IV.   THE STERLING PARTNERS DELIBERATELY CHOSE TO CONTINUE
      INVESTING WITH MADOFF AND TO REFRAIN FROM ANY SCRUTINY
      OF THEIR INVESTMENTS ........................................................................................ 26

      A.    The Sterling Partners Conducted No Due Diligence into their Investments ....... 26

      B.    Even After Having Lost Millions in the Bayou Ponzi Scheme, the Sterling
            Partners Still Conducted No Due Diligence on their Madoff Investments .......... 28

      C.    The Sterling Defendants Were So Willfully Blind They Remained
            Ignorant About What Madoff Charged Them .................................................... 29

      D.    The Sterling Defendants Had A Duty To Perform Due Diligence In
            Connection With Their 401(k) Plan And Admittedly Did Not Do So ................ 29

      E.    Rather Than Scrutinize their Madoff Investments in the Face of Red Flags,
            the Sterling Partners Instead Took Affirmative Steps to Protect Madoff
            from Scrutiny ................................................................................................... 30

# TABLE OF CONTENTS
(continued)

**Page**

V.    THE STERLING PARTNERS CHOSE WILLFUL BLINDNESS TO MADOFF'S FRAUD UNTIL THEY HAD NO CHOICE ................................................ 31

ARGUMENT ............................................................................................................... 32

I.    SUMMARY JUDGMENT STANDARD AND BURDEN OF PROOF ....................... 32

    A.    On This Motion, It is the Defendants' Burden To Prove that they Received Every Transfer From BLMIS For Value and In Good Faith ............................... 32

    B.    Defendants' Lack of Good Faith Is a Factual Question As to Which Summary Judgment is Inappropriate .................................................... 34

    C.    Defendants' Self-Serving Statements As a Matter of Law Are Insufficient to Warrant Summary Judgment ......................................................... 34

II.    DEFENDANTS' MOTION AT BEST RAISES ISSUES OF FACT AND CREDIBILITY THAT CAN ONLY BE DETERMINED BY A JURY ........................ 34

III.    THE RECORD IS REPLETE WITH EVIDENCE FROM WHICH A REASONABLE JUROR COULD CONCLUDE DEFENDANTS WERE WILLFULLY BLIND TO MADOFF'S FRAUD .......................................................... 35

    A.    Willful Blindness Standard ................................................................ 36

    B.    A Reasonable Jury Could Conclude that Defendants were aware of facts suggesting a high probability of fraud at BLMIS ................................. 37

    C.    A Reasonable Jury Could Conclude that Defendants Consciously Avoided Confirming BLMIS's Fraud ............................................................. 40

    D.    The totality of evidence, at a minimum, raises a question for jury ..................... 43

IV.    THE STERLING PARTNERS' WILLFUL BLINDNESS IS IMPUTED AS A MATTER OF LAW TO ALL STERLING DEFENDANTS ......................................... 44

    A.    The Sterling Partners' Bad Faith with Regard to Defendants' BLMIS Investments Is Imputed to All Defendants............................................ 44

    B.    The Sterling Partners' Bad Faith Is Imputed to All Defendants ......................... 46

V.    THE SUBSEQUENT TRANSFER COUNT IS NEITHER RIPE NOR APPROPRIATE FOR  SUMMARY JUDGMENT........................................................ 49

CONCLUSION............................................................................................................ 51

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................32, 35

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F.Supp.2d 372 (S.D.N.Y. 2010)................................................38, 39, 48

*Apollo Fuel Oil v. United States*,
   195 F.3d 74 (2d Cir. 1999)................................................................48

*Art Finance Partners, LLC v. Christie's Inc.*,
   58 A.D.3d 469, 870 N.Y.S.2d 331 (1st Dep't 2009) ..............................47

*In re Baesa Sec. Litig.*,
   969 F.Supp. 238 (S.D.N.Y. 1997) ........................................................40

*Baker v. Latham Sparrowbush Assocs.*,
   72 F.3d 246 (2d Cir. 1995)................................................................48

*In re Bayou Group LLC*,
   439 B.R. 284 (Bankr. S.D.N.Y. 2010) ................................................34

*In re Beacon Assocs. Litig.*,
   745 F. Supp. 2d 386 (S.D.N.Y. 2010) ................................................39

*Benjamin v. Kim*,
   No. 95-9597, 1999 WL 249706 (S.D.N.Y. Apr. 28, 1999) ....................43

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................32

*Croscill Inc. v. Gabriel Capital (In re Merkin and BDO Seidman Sec. Litig.)*,
   No. 08 Civ. 10922, 2011 WL 4435873 (S.D.N.Y. Sept. 23, 2011) ........39

*D'Olimpio v. Crisafi*,
   718 F.Supp.2d 357 (S.D.N.Y. 2010) ....................................................35

*Dingle v. Zon*,
   189 F.App'x. 8 (2d Cir. 2006) ............................................................35

*In re Dreier*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011)................................................37

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)................................................................36

*Farr v. Newman*,
  14 N.Y.2d 183, 250 N.Y.S.2d 272 (1964) ...................................................................48

*First Capital Inv. Holdings v. Wilson Capital Grp*,
  No. 10 Civ. 2948 (JSR) 2011 WL 2119737 (S.D.N.Y. May 23, 2011) ................................34

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
  391 U.S. 253 (1968)...........................................................................................................32

*In re Fischbach Corp. Sec. Litig.*,
  No. 89 Civ. 5826, 1992 WL 8715.............................................................................37, 41, 42

*Gebhart v. SEC*,
  595 F.3d 1034 (9th Cir. 2010).................................................................................................38

*Gilllian v. Starjem Restaurant Corp.*,
  2011 WL 4639842 (S.D.N.Y. 2011) ......................................................................................35

*Global-Tech Appliances, Inc. v. SEB, S.A.*,
  131 S.Ct. 2060 (2011).............................................................................................................37

*Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*,
  No. 10-5447, 2011 WL 6327385 (Bankr. S.D.N.Y. Dec. 19, 2011) ......................36, 40, 41

*Guilder v. Corinth Constr. Corp.*,
  235 A.D.2d 619, 651 N.Y.S.2d 706 (3d Dep't 1997) .............................................................49

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
  413 F.3d 257 (2d Cir. 2005)....................................................................................................40

*In re J.P. Jeanneret Assocs., Inc.*,
  769 F. Supp. 2d 340 (S.D.N.Y. 2011)....................................................................................40

*Kirschner v. Bennett (In re Refco Sec. Litig.)*,
  759 F. Supp. 2d 301 (S.D.N.Y. 2010) ...................................................................................41

*Kirschner v KPMG LLP*,
  15 N.Y.3d 446, 912 N.Y.S.2d 508 (2010) ............................................................................47

*In re Leslie Fay Cos. Inc. Sec. Litig.*,
  835 F.Supp. 167 (S.D.N.Y. 1993).........................................................................................41

*McClellan v. Smith*,
  439 F.3d 137 (2d Cir. 2006)................................................................................................32, 35

*Murray Hill Manor Co. v. Destination Paradise, Inc.*,
  266 A.D.2d 132, 698 N.Y.S.2d 482 (1st Dep't 1999) ...........................................................49

*In re Optimal US Litig.,*
   No. 10 Civ. 4095, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ......................................38, 39

*Pappas v. Middle Earth Condominium Ass'n,*
   963 F.2d 534 (2d Cir 1992)................................................................................................22

*Patrick v. LeFevre,*
   745 F.2d 153 (2d Cir. 1984)..............................................................................................34

*Picard v. Katz,*
   No. 11 Civ. 3605 (JSR), 2011 WL 4448638 (S.D.N.Y. Sept. 27, 2011)........................ passim

*Picard v. Katz,*
   No. 11 Civ. 3605 (JSR), 2012 WL 127397......................................................................33, 34

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC),*
   440 B.R. 243 (Bankr. S.D.N.Y. 2010)..............................................................................14, 34

*Poller v. Columbia Broad. Sys., Inc.,*
   368 U.S. 464 (1962)..........................................................................................................34

*Reznor v. J. Artist Mgmt., Inc.,*
   365 F.Supp.2d 565 (S.D.N.Y. 2005) ................................................................................49

*Saks v. U.S.,*
   964 F.2d 1514 (5th Cir. 1992) ..........................................................................................22

*Sartor v. Arkansas Natural Gas Corp.,*
   321 U.S. 620 (1944)..........................................................................................................34

*SEC v. Cooper,*
   402 F.Supp. 516 (S.D.N.Y. 1975)..............................................................................38, 42, 44

*SEC v. Credit Bancorp,*
   279 F. Supp. 2d (S.D.N.Y. 2003)......................................................................................38

*SEC v. Credit Bancorp, Ltd.,*
   386 F.3d 438 (2d Cir. 2004).........................................................................................37, 42

*SEC v. Elliot,*
   No. 09-7594, 2011 WL 3586454 (S.D.N.Y. Aug. 11, 2011)..............................................42

*SEC v. Infinity Grp. Co.,*
   212 F.3d 180 (3d Cir. 2000).........................................................................................34, 38

*SEC v. Musella,*
   748 F.Supp. 1028 (S.D.N.Y. 1989)...................................................................................40

*SEC v. U.S. Envt.l, Inc.,*
    No. 94 Civ. 6608 (PKL), 2003 WL 21697891 .......................................38

*In re Sharp Int'l Corp.,*
    403 F.3d 43 (2d Cir. 2005).................................................................33

*Sundstrand Corp. v. Sun Chem. Corp.,*
    553 F.2d 1033 (7th Cir. 1977) .........................................................40

*United States v. Adelson,*
    237 F. App'x. 713 (2d Cir. 2007) .....................................................37

*United States v. Ferguson,*
    Nos. 08-6211-cr ................................................................................38

*United States v. Rodriguez,*
    983 F.2d 455 (2d Cir. 1993)..............................................................36

*United States v. White,*
    124 F.2d 181 (2d Cir. 1941)..............................................................44

*Zaken v. Beorer,*
    964 F.2d 1319 (2d Cir. 1992), *cert. denied*, 506 U.S. 975 (1992).........22

**STATUTES**

11 U.S.C. 548......................................................................................33

11 U.S.C. 548(c) ...........................................................................33, 37

11 U.S.C. 550(a)(1)..............................................................................49

New York Uniform Commercial Code ("NYUCC")....................................33

NYUCC...........................................................................................33, 37

NYUCC § 8-105(a)(2), Comment 4 ...........................................38, 40, 42

**OTHER AUTHORITIES**

Federal Rule of Evidence 801(d)(2) .......................................................22

Merkin's "Ascot" .................................................................................16

Restatement (Third) of Agency § 5.03 ....................................................47

Restatement (Third) of Agency, § 5.03 cmt. A (2006)..............................48

Rule 10b-5............................................................................................37

Rule. 56.1 ...................................................................................................................................1

Rule 56.1 ¶ 192 ........................................................................................................................19

Rule 56.1 ¶¶ 194-95, 200 ........................................................................................................19

Super Family" that is Sterling, " .............................................................................................44

Trustee's Statement of Additional Material Facts that are Undisputed or as to which
    There Exists Genuine Issues to Be Tried Pursuant to Local Rule 56.1(b) ..............................5

Wilpon "Super Family." ...........................................................................................................44

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA") 78aaa et seq., by and through his undersigned counsel, respectfully submits this Memorandum of Law in Opposition to the Sterling Defendants'[1] Motion for Summary Judgment ("Motion").   The Trustee respectfully request that the Sterling Defendants' Motion be denied in its entirety.[2]

## PRELIMINARY STATEMENT

The Sterling Defendants assert in their motion that no reasonable jury could conclude that they intentionally chose to blind themselves to the "red flags" that suggested a high probability of fraud at BLMIS.  The gist of their position is that it would be "nonsensical" for them to risk their fortunes and business reputation by investing in a potential fraud merely for moderate investment returns from Madoff "that were dwarfed by the success of their own businesses."

But the record shows that the Sterling Defendants *did* blind themselves to warnings and unmistakable signs of Madoff's fraud, and there is more than enough evidence from which a reasonable jury could conclude that they did so because the success of the Defendants' businesses had become dependent upon Madoff.

After more than fifteen years of investing with BLMIS, the Sterling Partners had by the early 2000s become hooked on Madoff's guaranteed returns.  They were so expectant of those steady, ten to fourteen percent returns, that they began to budget them into their business plans.

---

[1] For purposes of this motion, "Defendants" or the "Sterling Defendants" refers to the partners of Sterling Equities (the "Sterling Partners"), their related trusts, various entities they own, operate and control and their family members.

[2] The Trustee's arguments in opposition to the Defendants' prior motion to dismiss or in the alternative for summary judgment are incorporated herein. *See* Opp. to Mot. To Dismiss the Am. Compl. or in the Alternative for Summ. J. and papers filed in support (Dkt. No. 29 (Mem. of Law); Dkt. No. 30  (Rule. 56.1 Statement); Dkt. No. 31 (Decl. of Fernando A. Bohorquez, Jr.); and Dkt. No. 36 (Supp. Mem. of Law).

They learned to exploit the Madoff returns in ingenious ways, using the returns they could generate from their BLMIS accounts to substitute in the place of disability insurance for their Mets players, and even to make the Madoff "vig" off players' deferred compensation arrangements.  The Sterling Partners had also over time grown dependent upon their Madoff returns as their primary source of liquidity, and income from BLMIS investments accounted for more than half of all of their projected necessary operating cash flow.  There were times when the Sterling Partners could not even make payroll for the Mets if it were not for BLMIS.

At the same time, the Sterling Partners had grown dependent upon using their Madoff accounts as collateral or as a source of liquidity in order to procure hundreds of millions of dollars in bank loans.  By 2001, the Sterling Defendants had $102 million in Madoff-related loans, and by 2007, that number had grown to more than $237 million.  The agreements governing this debt contained default provisions in the event of any threat to the banks' collateral – i.e., the Madoff accounts – or material changes in the Sterling Partners' financial condition.

Over time, their reliance upon their Madoff accounts grew to the point that there wasn't any financing for the Sterling Defendants' business operations that was not dependent in some way upon their BLMIS investments.  And it was against this backdrop that red flags of fraud amassed around those investments.

In 2001, the Sterling Partners circulated among themselves articles in which industry professionals had publicly expressed skepticism about the legitimacy of Madoff's returns and investment advisory strategy.  At about the same time, after discussions with another investor who told them he had obtained insurance to protect his Madoff investments against the potential for fraud.  The Defendants themselves also looked into procuring a similar type of policy that would protect their own Madoff investments against fraud, including coverage for a Ponzi

2

scheme.

Then the Sterling Partners began to receive personal warnings about their Madoff investments from their business partners in their very own investment fund, Sterling Stamos, which they had formed in 2002.  The former Chief Investment Officer of Sterling Stamos told Saul Katz and David Katz in 2003 that Madoff's investment returns were "too good to be true," not correlated to the stock market, and were either a "fiction" or the result of illegal "front-running."

Another partner in Sterling Stamos, Merrill Lynch, advised Sterling Partner Saul Katz that Merrill Lynch's due diligence team rejected investing in Madoff, and that Merrill refused to allow BLMIS investments to be marketed to its clients.  Indeed, Merrill insisted that Sterling Stamos completely divest itself of its own substantial Madoff investments before it would agree to close a deal to acquire a portion of the Sterling Partners' ownership interests in Sterling Stamos.  And not only did Sterling Stamos itself divest itself from its Madoff investments, so too did the family members of Sterling Stamos' Chief Executive Officer – and the investment professionals at Sterling Stamos repeatedly warned the Katz and Wilpon families to do the same.

The Defendants heard the warnings of their business partners and admit that they were aware of the specifics of the accumulating red flags of fraud at BLMIS.  The Sterling Partners knew that Sterling Stamos' and Merrill Lynch's due diligence processes had rejected Madoff; they knew that investment professionals had expressed concern that Madoff self-cleared, self-custodied and self-executed his own investment transactions; they knew that Madoff was rumored to be front-running; they knew that Madoff's returns were positive 99.9% of the time, and that such steady positive returns were inconsistent with his purported investment strategy, which was not supposed to eliminate market volatility; they had been exposed to another Ponzi

scheme Bayou, and were aware that BLMIS possessed similar "red flags" of fraud; and they knew that Madoff not only lacked "transparency" in his investment advisory strategy and business practices, but that he in fact demanded secrecy from his investors.

In the face of these accumulating warnings and red flags of fraud surrounding BLMIS, the Sterling Partners' business partners had chosen to stay away from, or to divest themselves, from their Madoff investments. But the Sterling Partners had substantially all of their liquid investments with Madoff, and had built their business plans around their BLMIS returns. Any confirmation that their BLMIS investments were involved in fraudulent activities could trigger systemic loan default, business-wide liquidity crisis, personal liability on guarantees—in short, could result in their financial undoing.

And so the Sterling Partners made different choices than their business partners. They made a choice <u>not</u> to divest from Madoff, or to conduct any further scrutiny into their investments that might confirm a fraud. Instead, they chose to ignore the warnings and to continue to invest hundreds of millions of dollars with Madoff. Whether they made these choices because of avarice for Madoff's returns, or because they had become completely dependent on their Madoff accounts as their primary source of liquidity and cash flow, or because they had over-leveraged themselves with hundreds of millions of dollars in Madoff-related debt, the evidence of their conduct described herein at the *very least* creates a triable issue of fact as to their willful blindness.

## <u>THE FACTS</u>

**I.     BANKING ON MADOFF'S RETURNS AND ACCOUNTS FOR THEIR BUSINESS FINANCING, THE STERLING DEFENDANTS BECAME DEPENDENT UPON BLMIS**

For almost 25 years, their BLMIS accounts provided the Sterling Defendants with a

virtually guaranteed double-digit return.[3]  And over time, the Sterling Partners literally began to "bank" on them.  By the 2000s, there was not a thread of their business operations that was not entangled with their BLMIS accounts.

### A.    The Sterling Partners' Business Plans Became Overly-Dependent Upon Their Guaranteed Madoff Returns

 Sterling's Madoff investments were presumed to average "10, 11, 12 percent a year." (R. 56.1 ¶ 10.)  That "Madoff Effect," as the Mets controller Len Labita coined it, was budgeted into every Sterling plan. (R. 56.1 ¶¶ 11-12.)

For example, Sterling's financial statements for 2001 reflect that the Sterling Partners projected that, based on a 14% rate of return, they would earn an income of $34 million from their Madoff investments for the following year.  (R. 56.1 ¶¶ 13-14.)  This accounted for 59% of Sterling's entire projected total operating cash flow for the year for all their businesses, and 88% of all income generated from liquid assets. (R. 56.1 ¶¶ 13-16.)  For 2002 through 2007, Sterling projected annual income from its Madoff investments ranging from $32 million to $76 million, with Madoff income ranging from a half to a third of Sterling's total operating cash flow. (R. 56.1 ¶¶ 17-35.)

The Mets in particular demonstrate Sterling's dependency on the steady stream of guaranteed Madoff income.[4]  The Mets relied on Madoff's returns as a predictable source of income for a business—professional baseball—with an otherwise unpredictable revenue stream.

---

[3] In March 2004, the Sterling Defendants made a presentation to lenders, in which they stated that they earned an average annual return from their Madoff investments in excess of 18% over the previous fifteen years, and that the "statistics predict positive annual returns 99.9% of the time." (Trustee's Statement of Additional Material Facts that are Undisputed or as to which There Exists Genuine Issues to Be Tried Pursuant to Local Rule 56.1(b) ("R. 56.1") ¶¶ 4-6, 46-47.)

[4] The Mets' many Madoff accounts were earmarked to fund the team's working capital as well as provide for special purposes such as deferred compensation and even players' disability insurance. (R. 56.1 ¶ 36.)  The Mets put all excess cash in BLMIS. (R. 56.1 ¶¶ 37-39.)

(R. 56.1 ¶ 40.)  The Mets controller Len Labita and CFO Mark Peskin held it as a given that BLMIS' returns would come in at 10-12 percent every year and planned their finances around it. (R. 56.1 ¶ 41.)  When faced with "cash crunches" from week to week, the Mets routinely and confidently relied on future Madoff returns to bridge the gap. (R. 56.1 ¶ 42.).  There were times when the Sterling Partners could not even make payroll for the Mets if it were not for BLMIS. (R. 56.1 ¶ 43.)  In at least 2002, the Mets would not have made a profit but for the Madoff income.  (R. 56.1 ¶ 44.)

Sterling's other businesses followed the Mets' Madoff plan.  The real estate business had several entities for the purpose of generating BLMIS income for particular properties.  (R. 56.1 ¶¶ 48-49.)  It was a regular practice that upon sale of certain real estate assets the profits were invested in BLMIS.  (R. 56.1 ¶ 50.)  The Sterling Partners also used Madoff's guaranteed income to fund capital calls for their other entities.  (R. 56.1 ¶¶ 51-52.)  There was very little that the Sterling Partners did not rely on Madoff's guaranteed returns to cover, including payment of quarterly taxes, living expenses, and loan interest.  (R. 56.1 ¶ 53.)

### B.    The Sterling Defendants Exploited the "Madoff Vig" in Ingenious Ways

Madoff's guaranteed double digit returns also enabled the Sterling Defendants to arbitrage the difference between Madoff's returns and interest rates, which Saul Katz referred to as the Madoff "vig." (R. 56.1 ¶ 54.)  The Mets, for instance, routinely exploited the Madoff "vig" by investing its $10 million line of credit from Chase Bank entirely in BLMIS, literally banking on the fact that Madoff's rate of return would not just be positive, but that it would always exceed the interest rate to be paid on the bank's line of credit. (R. 56.1 ¶ 55.)  Similarly, rather than paying full salaries up front to Mets players like Bobby Bonilla, Darryl Strawberry, Roger Cedeno, and Cliff Floyd, the Mets set up a deferred compensation "fund" with Madoff, wherein they would invest sums equal to the deferred salaries of the players.  (R. 56.1 ¶¶ 56-57.)

According to Labita, "very simply, if you're paying somebody eight percent of interest and you're able to earn ten, you're going to make two percent on the money every year." (R. 56.1 ¶ 58.)

And at one point, instead of taking out key disability insurance on certain Mets players, Saul Katz instead directed the premium money be invested in BLMIS to earn the "Madoff vig." (R. 56.1 ¶ 59.) Saul Katz testified that he directed "the money that [the Mets] would have paid to the insurance company, put it aside in a separate account and we should be using that money only for paying for hurt players." (R. 56.1 ¶ 60.) That account was widely known as "Saul's cookie jar."[5] (R. 56.1 ¶ 61.) Saul Katz used the same methodology to even self-insure his wife's jewelry. (R. 56.1 ¶ 71.)

Sterling's other businesses also exploited the Madoff "vig," including SAP. (R. 56.1 ¶¶ 65-70.) It was also a regular Sterling business practice to refinance real estate property mortgages and invest the excess proceeds in Madoff. (R. 56.1 ¶¶ 63-64.) This practice leveraged the equity of the real estate property to the fullest extent possible, and again, was based upon the Sterling Defendants' assumption that their Madoff returns would always be positive and in fact greater than the interest Sterling had to pay on the mortgage.

**C.   Madoff was the Investment Arm of Sterling's Business and Its Primary Source of Liquidity**

At the same time the Sterling Defendants relied on BLMIS for its returns, they relied on it as their primary source of liquidity for their operations and other expenses. Almost all of the Sterling Partners' assets—real estate, SAP funds, and interests in the New York Mets and SNY—were and continue to be by their very nature illiquid, meaning that among other things,

---

[5] Despite Katz' instruction to use the money only for paying for hurt players, "Saul's cookie jar" was eventually raided. By February 2008, the Mets had used the money for operational expenses when the team was "scrambling for cash." (R. 56.1 ¶ 62.)

they could not and cannot provide cash on demand when needed by the many Sterling businesses. (R. 56.1 ¶ 72.)  The ability to access money quickly was critically important to the Sterling Defendants' decision to invest with BLMIS.  (R. 56.1 ¶ 73.)

Prior to the revelation of Madoff's fraud, BLMIS was the cash/investment arm of the Defendants' business.[6]  (R. 56.1 ¶¶ 74-77.)  Their Madoff investments were the Defendants' primary source of liquidity,[7] and in fact from 2001-2007, more than 59-87% of all of Sterling's liquid assets were with Madoff.[8]  (R. 56.1 ¶¶ 77-84.)  Given the importance of their Madoff accounts to their cash flow, the Sterling Partners monitored the Defendants' BLMIS investments on a daily, bi-weekly, and monthly basis, and reported on Madoff at every bi-weekly management meeting. (R. 56.1 ¶¶ 88-91, 413.)

### D.      Banking on the BLMIS double ups, the Sterling Defendants Overleveraged on Madoff-Related Debt

Nowhere did the Sterling Partners exploit the Madoff "vig" more than in what they dubbed the Madoff "double up" loans from Bank of America (and BofA's predecessor Fleet). Beginning in 2000, the Sterling Partners used more than 28 BLMIS accounts, established for the benefit of the Sterling Partners, their family members, trusts and related entities as collateral for loans used to further investment in BLMIS.  (R. 56.1 ¶¶ 93-94; Defs.' Answer, *Picard v. Katz, et. al.*, No. 11 Civ. 3605 (S.D.N.Y. Oct. 11, 2011) (JSR), ECF No. 48 ("Answer"), ¶ 81.)  The

---

[6] The Sterling Partners opened and administered 483 BLMIS accounts: approximately 300 for themselves and the rest of the Defendants; and the remainder for their closest friends, employees, and business associates. (R. 56.1 ¶ 2; Answer ¶ 4.)

[7] Indeed, until the formation of Sterling Stamos in 2002 Madoff was the Sterling Partners' *only* source of liquidity.  (R. 56.1 ¶ 75, 85.)  But the Sterling Stamos investments were not as liquid as BLMIS and the funds could not be accessed anywhere near as quickly.  (R. 56.1 ¶ 86.)

[8] In 2001, $244,946,178 out of $281,566,544 (or 87%) of Sterling's liquidity was held by Madoff.  (R. 56.1 ¶ 78.)   For the years 2002 through 2007, BLMIS purportedly held $241,598,895 (79%), $258,462,176 (67%), $297,464,619 (66%), $347,478,864 (59%), $429,428,299 (65%) and $432,682,000 (68%) of Sterling's liquid assets respectively. (R. 56.1 ¶¶ 79-84.)

Sterling Partners called these loans and related BLMIS accounts "double ups" because they allowed the partners to borrow millions of dollars using their BLMIS accounts as collateral which they then reinvested with Madoff to "double" their Madoff returns. (R. 56.1 ¶ 92; Answer ¶ 830.)

The Sterling Partners also relied on Madoff to secure its credit lines for its internal bank Sterling Equities Funding ("SEF"), which was "a source of cash to the partners and a line of credit for the Sterling entities." (R. 56.1 ¶ 104.) SEF had a total of $90 million in lines of credit with a number of banks. (R. 56.1 ¶ 105.)

By 2001, the Defendants had seven "double up" and other Madoff-related loans with Bank of America totaling $102 million. (R. 56.1 ¶ 111.) By 2003, the Defendants had $117 million in Madoff-related debt, which grew to $237 million by 2007. (R. 56.1 ¶¶ 112-13.)

### E.   The Sterling Partners Knew that Even an Investigation of Madoff Could Trigger Defaults in their Loans and Personal Guarantees

#### 1.   The Madoff-Related Debt Loan Covenants and Guarantees

The "double up" loans and related pledged collateral account control agreements required, among other things, the Sterling Partners to maintain minimum balances in their Madoff Accounts. (R. 56.1 ¶ 96.) Many of the "double up" loans also required the Sterling borrowers to provide personal and unconditional guarantees. (R. 56.1 ¶ 97.) SEF's credit lines required that Sterling maintain certain liquidity to debt ratios in respect of the collateral so that its lenders would be oversecured,[9] and required periodic reports to ensure compliance with the net liquidity covenants. (R. 56.1 ¶¶ 106-07.) The Sterling Partners relied on their Madoff accounts as the primary source of liquidity to meet these covenants.[10]

---

[9] For example, HSBC and Chase each had loan covenants with SEF that required SEF to maintain a ratio of net liquidity divided by unsecured debt above 1.125. (R. 56.1 ¶ 108.)

[10] The Sterling Partners provided their banks certifications on a monthly or quarterly basis,

In addition, the Sterling Partners' "double-up" loans had a pledge and security agreement creating a duty to take appropriate action to protect the only collateral securing the loans—the cash and purported securities in their Madoff accounts—including, in particular, the duty to investigate possible fraud associated with the collateral.[11]   Additionally, the double up loans provided for an event of default in the event that:

> (i) any event has occurred with respect *to Madoff* that could have a Material Adverse Effect or (ii) the investment strategies used *by Madoff* in connection with the Pledged Accounts are no longer consistent with the investment strategies used as of the date hereof.[12]

The non-double up loans also contained a default provision based on the occurrence of a material adverse effect on Sterling's business condition or otherwise.[13]

Under these covenants, any notice that Madoff could be perpetrating a potential fraud in connection with the Sterling Partners BLMIS investments—which as noted above were the Sterling Partners' primary liquid assets and source of between 59-87% of their cash flow from liquid assets[14]—could not only trigger Sterling's duty to take appropriate action to protect the

---

stating that they were in compliance with the liquidity requirement of the loans and provided a liquidity analysis that was directly linked to the monthly HELL sheets Sterling prepared for the partners' Madoff investments. (R. 56.1 ¶¶ 109-10.)

[11] *See, e.g.*, Bohorquez Decl., Ex. 69, Section 4.02 of the Pledge and Security Agreement of Sterling Thirty, SE_T673654 at 656 ("Pledgor shall not … take any other action or permit any other person *(including without limitation, Madoff)* to take any other action, that would create any Lien upon the Collateral.") (emphasis added).  All of the outstanding double up loans had language consistent with Section 4.02 of the Pledge and Security Agreement for Sterling Thirty and a consistent definition of the term lien. (R. 56.1 ¶¶ 114-16.)

[12] *See, e.g.,* Bohorquez Decl., Ex. 46, Section 9(j) of the Sterling 30 Venture LLC Credit Agreement, SE_T673552, at 579.  (R. 56.1 ¶ 118.)

[13] *See, e.g.,* Bohorquez Decl., Ex. 89, Section 7.11 of the Sterling Internal IV Loan Agreement, BASM000003879 at 892. (R. 56.1 ¶ 117.)

[14] Many of the Sterling Partners' loan agreements contained "loan to asset value ratio" provisions that required the Sterling Partners to maintain certain a certain amount of liquid assets. (R. 56.1 ¶ 119.)

collateral securing the loan and constitute an event of default under the "double up" loans, but could also qualify as a materially adverse effect on Sterling's business condition under the other loans.

In turn, defaults of these provisions could have led – and in fact, after the Ponzi scheme collapsed did lead – to cross-default provisions contained in dozens of Sterling's bank loans, and eventually trigger the guarantor provisions which extended to every Sterling Partner.  (R. 56.1 ¶¶ 147-51.)

### 2. The Sterling Partners Knew That An Investigation into Madoff Could Trigger Loan and Guarantee Defaults and Were Willing to Execute False Documents to Avoid a Default

The Sterling Partners were well aware that any threat to their Madoff accounts—even just an investigation into Madoff—could trigger defaults by their lenders.  Arthur Friedman testified that Peter Stamos had warned the Sterling Partners that if Madoff were investigated by regulators and their Madoff accounts frozen, their lenders might default them:

> The only *danger* that [Peter Stamos] put forth was that if anything ever happened … a problem … that Sterling might encounter, would be if accounts were frozen and while any kind of—if [regulators] started to look into Madoff's operation— again not saying that they'd find anything, but just saying, just creating a fear of just an investigation.  *And our accounts were frozen, would we—and at the same time the banks said, well, pay us the money, you're in default, we might have a problem.*

> So that was the only—that was the basis of his *warning*, we'll say, or saying that you should have less money.  Again, not that he could point to and say there's something wrong or an investigation would turn up anything wrong.  *Just that if there were an investigation and if the money was tied up, then we might run into a problem.*

(Bohorquez Decl., Ex. 2, Friedman Tr. 579:5-23 (emphasis added).)  Stamos' warnings about the possibility of an investigation of Madoff and the potential freezing of the Sterling Partners' BLMIS accounts occurred somewhere between 2002 and 2005, and were reported to the Sterling Partners at a partners meeting.  (R. 56.1 ¶¶ 120-24.)  Peter Stamos confirms that he had so

warned Arthur Friedman, Saul Katz and perhaps one or two other Sterling Partners about the potential risks if Madoff were investigated by authorities.  (R. 56.1 ¶ 123.)  Michael Katz's own notes reflect that he was concerned about the effect that a potential Madoff insolvency could have upon his wife's personal guarantee obligations:  "By putting dollars into [Sterling Stamos Partners], I'm not protected from Madoff bankruptcy because DHK is on the guarantee as of now.  I am trying to get her off." (R. 56.1 ¶ 125.).

Indeed, the evidence reveals just how far the Sterling Partners were willing to go to avoid triggering bank loan defaults.   They admittedly joined with Madoff in executing false documentation to disguise a $54 million loan that, if discovered by their lenders, could have triggered those very liquidity default provisions. (R. 56.1 ¶¶ 126-46.)

On or about May 25, 2004, Saul Katz, Fred Wilpon, and Ruth Madoff executed a letter agreement that purported to document a $54 million investment by Ruth Madoff into the Sterling entity that would later become SportsNet New York ("SNY").   (R. 56.1 ¶ 134.)   The letter agreement provided:

> This will confirm the conversations with respect to an investment by you [Ruth Madoff] in the Network.  Over the years you have invested with us in, among other things, real estate funds; and we contemplate extending this relationship to the Network ….  You are simultaneously wiring to Sterling Equities Associates the sum of $54 million which is expected to be the approximate amount of your proposed investment with the Network.

(Bohorquez Decl., Ex. 98.)  The letter was false. Saul Katz and Fred Wilpon admitted under oath that the signed letter agreement did not accurately reflect the transaction that it described.[15]  (R. 56.1 ¶ 136.)  In fact, Ruth Madoff never made any such investment into any Sterling entity.  (R.

---

[15] While Fred Wilpon and Saul Katz deny any knowledge as to why the letter was drafted to misrepresent the transaction, (R. 56.1 ¶ 137), their other partners, Friedman and David Katz, as well as their CFO, Mark Peskin, professed complete surprise as to its contents.  (R. 56.1 ¶ 138.) Marvin Tepper—the purported author—denies any recollection. (R. 56.1 ¶ 139.)

56.1 ¶¶ 140-41.)[16]   The transaction is even described as a loan rather than an investment on Sterling's management meeting minutes.  (R. 56.1 ¶ 133.)

Saul Katz admitted that a possible reason for why the letter agreement was drafted to reflect an investment from Ruth Madoff rather than a loan was due to concerns related to certain financial liquidity covenants with the banks.  (R. 56.1 ¶ 142.)   In addition, in the month preceding the $54 million transaction, Sterling conducted a liquidity analysis using the proposed liquidity covenants from the proposed $54 million loan from the banks.  (R. 56.1 ¶ 144.)  That liquidity analysis indicated that in the worst case scenario, the $54 million loan would clear the debt/ratio by only the "tiniest of margins," and the Sterling Partners' controller admitted that entering into a loan with the proposed liquidity covenants would be "too close to be comfortable."  (R. 56.1 ¶¶ 145-46.)

If the Sterling Partners were willing to take affirmative steps to falsely document a $54 million loan with Madoff to avoid possibly triggering defaults in their loan agreements, a jury could reasonably infer that they consciously avoided conducting any due diligence into their BLMIS investments that could have the same consequences for them, or worse.

---

[16] While $54 million was wired from Madoff to the Sterling Partners on or about May 26, 2004, (Answer ¶ 993), these funds had nothing to do with any transaction involving Ruth Madoff or any investment by Madoff into any Sterling entity. Sterling had requested to redeem $54 million from its Madoff accounts to fund its purchase of the option to broadcast rights for the Mets and the bank financing had not come through and time was running out. (R. 56.1 ¶ 126-27.)  Instead of complying with their redemption request, Madoff responded that such a withdrawal could lower Sterling's returns and offered to loan them the $54 million.  (R. 56.1 ¶ 128.)  Sterling returned the $54 million to Madoff after receiving funds from its lender. (R. 56.1 ¶ 129-30; Answer ¶ 994-95.)

## II.   THE DEFENDANTS WERE COMPLETELY DEPENDENT UPON THEIR MADOFF ACCOUNTS AS THE WARNINGS AND RED FLAGS OF FRAUD AMASSED

### A.   By 2001, the Sterling Partners Had Already Looked Into Potential Fraud Insurance for their Madoff Accounts

As set forth above, over the course of their 25 year relationship with Madoff, the Sterling Partners had grown dependent upon their BLMIS investments.  Madoff money fueled their entire business.  And it was against this backdrop, with the Sterling Partners' financial fate inextricably intertwined with their Madoff accounts and returns, that red flags of fraud accumulated surrounding the Defendants' BLMIS investments.

In 2001, the Sterling Partners distributed among themselves two articles, published within weeks of each other, in which industry experts questioned the legitimacy of Madoff's investment strategy and his returns.  (R. 56.1 ¶¶ 165-70.)  They did not choose to do any due diligence into the questions raised by the articles, nor did they even inquire with their good friend, Madoff.  Instead, the Sterling Partners explored procuring a one-of-a-kind insurance to protect their investments against fraud and, in particular, a Ponzi scheme. (R. 56.1 ¶¶ 152-64.)

Defendants suggest that, based upon statements by another Madoff investor, Charles Klein of American Securities, this fraud insurance was not motivated by any concern about Madoff.  But American Securities' own files show that it internally described this insurance as a "Madoff Policy" that "cover[ed] theft...[i]f *Madoff* runs off with our money" and provided "*primarily protection against a 'ponzi' scheme or some situation where we went to redeem the principal and it wasn't 'there*.'" (R. 56.1 ¶ 160 (emphasis added); *see also* ¶ 161-62.)

The fact that the Sterling Partners even considered spending money on fraud insurance is a manifestation of their awareness of a potential risk of fraud to their investments.  This fact also evidences that they were still willing and desirous of maintaining their relationship with Madoff,

*even knowing* the potential that he was engaging in fraud – they just wanted to "hedge" their Madoff bet with insurance.  The reason they did not get the insurance is that the hedge wouldn't work.  As David Katz testified, the Sterling Partners did not purchase the insurance because it was expensive and would not cover the vast sums they had invested in BLMIS—in other words, the bulk of their Madoff investments was an uninsurable risk.  (R. 56.1 ¶¶ 155, 158.)

**B.    The Sterling Partners' Investment Fund Partners Warned the Defendants not to Continue to Invest with Madoff**

In 2002, the Sterling Partners formed their own investment fund, Sterling Stamos, and partnered with top executives from the hedge fund industry.  (R. 56.1 ¶ 171.)  The Defendants admit that the purpose of creating Sterling Stamos was to diversify away from BLMIS because the Sterling Defendants were too reliant on Madoff and they "did not know what he was doing." (R. 56.1 ¶ 283.)  Their own business partners and investment professional advisors at Sterling Stamos repeatedly and independently warned the Sterling Defendants of indicia of fraud in connection with their BLMIS investments.

**1.    Sterling Stamos' Chief Investment Officer Warned Saul Katz and David Katz in 2003 that Madoff's Investment Returns were Either a "Fiction" or the Result of "Violations of Securities Laws"**

In 2002, Sterling Stamos hired Noreen Harrington, a twenty year hedge fund industry veteran and former executive of Goldman Sachs and Merrill Lynch.  (R. 56.1 ¶¶ 179-80.)  As Sterling Stamos' Chief Investment Officer, she was responsible for selecting fund managers and supervising Sterling Stamos' due diligence processes.  (R. 56.1 ¶ 181.)  In 2003, Ms. Harrington was directed by Saul Katz and Peter Stamos to meet with Ezra Merkin, an investment manager with whom Katz wanted Sterling Stamos to invest.  (R. 56.1 ¶ 182.)

Before she met with Merkin, Ms. Harrington knew that he had a relationship with Madoff, and that others at Sterling Stamos had expressed concern that Merkin's "Ascot" fund

returns appeared "way too correlated" to Madoff's returns. (R. 56.1 ¶ 183.)  At a meeting she had with Merkin in the summer of 2003, he confirmed that in fact, his fund was indeed a "feeder fund" into Madoff, and Ms. Harrington understood that any investment with him was essentially an investment with Madoff.  (R. 56.1 ¶¶ 187-90.)

At that meeting, Ms. Harrington described to Merkin the due diligence process that Sterling Stamos would have to undertake before they would make any investments in his fund or by extension Madoff's fund.  Merkin flatly refused to permit Ms. Harrington to perform any due diligence, telling her:  "You don't get it do you? This is a privilege.  You don't get to ask questions." (R. 56.1 ¶¶ 188-89.)  By the end of the Merkin meeting, Ms. Harrington also learned that Madoff (and by extension Merkin) went to cash at the end of the month, which she noted was one good way to fly "under the radar" of regulators. (R. 56.1 ¶ 191.)

Ms. Harrington testified that, following the Merkin meeting, her immediate reaction was that Sterling Stamos could not go forward with the investment in Merkin and Madoff because of the number of red flags that had become apparent. (R. 56.1 ¶ 192.)  Aware that Saul Katz enthusiastically wanted this investment because the "Madoff-like" returns would improve Sterling Stamos' performance and make it more attractive to potential investors, Ms. Harrington and her colleague Mr. Chachra performed additional due diligence she knew would be necessary to justify her "negative" recommendation about making this investment, but the results of these analyses merely heightened Ms. Harrington's suspicions.[17] (R. 56.1 ¶¶ 184-198.)

---

[17] Ms. Harrington and her colleague Mr. Chachra performed various due diligence analyses.  (R. 56.1 ¶¶ 194-96.)  With respect to the impact on the market of Madoff's purported "going to cash" at the end of each month, Ms. Harrington did not observe any "footprints" in the marketplace reflecting the month-end cash position that Merkin claimed. (R. 56.1 ¶ 196.)  She also found that Merkin's and Madoff's returns were not correlated to their purported strategy and the stock market, and based upon the lack of volatility of Merkin's and Madoff's funds, neither could have been engaged in the trading strategy they claimed. (R. 56.1 ¶ 197, 203.)

With her analyses in hand, Ms. Harrington met with Saul Katz and David Katz and Sterling Stamos CEO Peter Stamos, and told them that Madoff's returns did not jibe with legitimate trading activity and were either "a fiction" or the result of illegal front-running (R. 56.1 ¶¶ 198-199, 202-04):

> I made an accusation of front-running, which is profitable and non-correlated, but also illegal.  And I said, if it wasn't that, I believed it was fiction.  And to that he said, what do you mean by fiction?  And I said, I don't believe the numbers [the returns] are worth the paper they're written on."  (Bohorquez Decl., Ex. 37, Harrington Tr. 117:4-19.)

Saul Katz refused to accept Ms. Harrington's negative recommendation of Madoff, and became very "angry," demanding specifics from Ms. Harrington (R. 56.1 ¶¶ 202-05):

> When Saul Katz asked me what I thought Madoff was doing with the money, my first response is an illegal act.  You know, it's a violation of securit[ies] law, and it is illegal.  It may be profitable, but it is extremely illegal.  And the second is – a fiction charge is even more heinous. (Bohorquez Decl., Ex. 37, Harrington Tr. 125:22-126:6.)

Ms. Harrington explained to Saul and David Katz that Madoff's returns were too flat, not volatile and implausibly, positively skewed and that she, a hedge fund veteran, could not "understand the math here of how somebody can get these kinds of positive returns."[18]  (R. 56.1 ¶¶ 197- 204.)  She also told Saul and David Katz that Madoff's returns were uncorrelated to the strategy Madoff purported to be engaging in, and to the stock market generally.  (R. 56.1 ¶¶ 197- 204.)  This was the basis of her concern that Madoff's returns might be the result of illegal

---

[18] Another consultant to Sterling Stamos wrote an email to Peter Stamos confirming that he too told Saul Katz around this same time period that he "couldn't make Bernie's math work" and was also met with the same displeasure (R. 56.1 ¶ 212-14):

> I remember the discussions we had about Bernie in the early days of [Sterling Stamos] . . . . In my introductory discussion with Saul, he brought up Bernie and I told him I couldn't make Bernie's math work – something wasn't right …. I don't think Saul was very pleased with the discussion although I tried to be objective . . .

(Bohorquez Decl., Ex.125.)

"front-running," because front-running could create quick returns "that wouldn't have any correlations to the overall return of the market that day." (R. 56.1 ¶¶ 197-204.)

Ms. Harrington told Saul and David Katz that, given Merkin and Madoff's complete lack of transparency, and Merkin's refusal to allow Sterling Stamos to deploy its due diligence processes, she had concluded that Sterling Stamos could not make this investment into Madoff. (R. 56.1 ¶¶ 192, 197-206.)  She also told Saul Katz if she could "sit in front of Bernie Madoff and we could execute our process . . . [if] we could do the due diligence required for the investment, and he—and the answers were good, then I am wrong and we can go forward."  ((R. 56.1 ¶¶ 184-186, 207.)  She never got that meeting with Madoff.  (R. 56.1 ¶ 206.)  She further testified, "it was very clear to me that Saul wanted to do this investment; therefore, Peter wanted to do this investment; and therefore, my answer was the wrong answer."  (R. 56.1 ¶ 207.)  When Peter Stamos told her that Sterling Stamos was going forward with the Merkin/Madoff investment, Ms. Harrington resigned from her position as a direct result of that decision, telling Stamos (R. 56.1 ¶¶ 207-08):

> If we forego the process, then we have lied to our investors and we haven't done the work we were hired to do, and I will not do that.  So whether it is Bernie Madoff or Sue Smith next week or the week after or the month after, I just – I can't make the investment. (Bohorquez Decl., Ex. 37, Harrington Tr. 126:7-127:11.)

Seeking to distance themselves from Ms. Harrington's unequivocal warnings about Madoff, the Sterling Defendants now contend that her testimony is "suspect" and "unsubstantiated."  (Mem. of Law in Support of Defs.' Motion ("Defs.' Br.") at 23.)  To the contrary, the few documents[19] that remain at Sterling Stamos related to Ms. Harrington's due

---

[19]  Sterling Stamos' corporate representative testified that Sterling Stamos kept every document "on all of its funds from day one."  (*See* Declaration of Regina Griffin in Opposition to Defendants' Motion for Summary Judgment, dated February 9, 2012, ¶ 5, and Exhibit C attached thereto.)  Despite repeated demands for the production of Sterling Stamos' Merkin/Madoff files

diligence, as well as history, corroborate Ms. Harrington's testimony.[20]  For example, years after Ms. Harrington's resignation, Sterling Stamos' risk officer made independent findings which confirmed Ms. Harrington analyses, finding that the Merkin fund which invested with Madoff had "blow-up" risk associated with it.  (R. 56.1 ¶ 210.)  And, as set forth more fully below, Sterling Stamos ultimately redeemed out of its Madoff investments for some of the same red flags identified by Ms. Harrington.[21]

### 2.     A Merrill Lynch Executive Advised the Sterling Partners of Concerns about Madoff and Merrill Lynch's Refusal to Market Madoff Investments to Its Clients

Kevin Dunleavy, an executive at Merrill Lynch, one of Sterling Equities' business partners in Sterling Stamos, recently testified that he told the Sterling Partners that because of Merrill Lynch's due diligence concerns about Madoff, Merrill Lynch would not permit Madoff investments to be marketed to their investor-clients.  (R. 56.1 ¶¶ 215-232.)

In 2004, Merrill Lynch partnered with Sterling Stamos and began marketing Sterling Stamos' investment funds to Merrill's client-investors.  (R. 56.1 ¶ 216.)  A few years later, Merrill Lynch negotiated with Sterling Stamos to become a fifty percent owner.  (R. 56.1 ¶ 218.) In the process of acquiring its ownership stake, Merrill Lynch conducted extensive due diligence

---

and the analyses that Ms. Harrington and Mr. Chachra described in their testimony, these materials have not been produced and appear to be missing.  (*Id* at ¶¶ 3, 6, and Exhibits A and D thereto.)

[20] The January 2003 Ascot prospectus corroborates Ms. Harrington's testimony that Merkin  had *carte blanche* discretion to give money to third parties (Rule 56.1 ¶ 192), and so does the testimony of Peter Stamos and Mr. Chachra, who both reference the analyses Ms. Harrington conducted on Merkin's funds and the link between Merkin and Madoff.  (Rule 56.1 ¶¶ 194-95, 200.)  Two emails from Sterling Stamos' former partner to Peter Stamos dated June 2003 and August 2003 similarly corroborate Ms. Harrington's testimony, outlining the concerns she raised about Merkin and Madoff in her meeting with Saul Katz.  (R. 56.1 ¶ 211.)

[21] Just days after the Madoff fraud became public, Ms. Harrington sent an email to Sterling Stamos' Chief Financial Officer stating: "Now maybe, Peter will acknowledge, that in 2003 that I was right and he was wrong regarding the due diligence on Merkin and Madoff."  (R. 56.1 ¶ 209.)

into Sterling Stamos' investments, and discovered that it had hundreds of millions of dollars invested with Madoff.  (R. 56.1 ¶ 219.)  Dunleavy testified that Merrill Lynch's due diligence team was concerned about Madoff because he self-cleared, self-custodied and self-executed his trades.  (R. 56.1 ¶¶ 220-25.)  In fact, Merrill Lynch's due diligence team had *never* before seen an investment manager without the industry "norm" of independent intermediaries responsible for clearing and custodial functions.  (R. 56.1 ¶¶ 222-24.)

Because of those concerns, Merrill Lynch mandated that Sterling Stamos divest itself[22] of its substantial Madoff investments before it would buy into Sterling Stamos.[23]  (R. 56.1 ¶ 227.)  Once Sterling Stamos divested its Madoff investments, Merrill Lynch closed on the Sterling Stamos purchase transaction, paying the Sterling Partners for a "substantial amount."  (R. 56.1 ¶¶ 228-30.)

Mr. Dunleavy further testified that the issue of investing with Madoff was again raised by Saul Katz at a Sterling Stamos board meeting in 2008.  (R 56.1 ¶ 231.)  Saul Katz urged the board to invest Sterling Stamos' assets with Madoff to improve Sterling Stamos' investment returns.  (R. 56.1 ¶ 231.)  Mr. Dunleavy repeated his warnings to Saul Katz that Merrill Lynch's due diligence would not permit Madoff to be marketed to their investors because of Madoff's self-clearing, self-custodying and self-executing of trades, and again, Merrill Lynch refused to approve any Madoff investments.  (R. 56.1 ¶ 232.)

---

[22] Peter Stamos testified that Dunleavy also expressed concern that Defendants Fred Wilpon and Saul Katz had a substantial amount of assets invested with Madoff.  (R. 56.1 ¶ 226.)

[23] Attempting to blunt the fact that Dunleavy told Saul Katz that Merrill would not permit Madoff investments to be marketed to its investors, the Defendants assert that Merrill Lynch itself entered into a joint venture with Madoff.  This venture, however, had nothing to do with Madoff's investment advisory business but was in fact a separate business formed in 1999 to develop a new trading technology platform.  *See* Exhibit G to Declaration of Dana M. Seshens dated January 26, 2012.

###### 3.   Additional Evidence Confirms that Others at Sterling Stamos Warned the Sterling Partners to Redeem their Investments from Madoff

For years, the topic of Madoff came up at regular meetings between Saul Katz, Sterling Stamos' CEO, Peter Stamos, and other Sterling Stamos investment professionals.  (R. 56.1 ¶ 254.)  Peter Stamos and others advised Saul Katz about specific "concerns" he had about Madoff, including Madoff's lack of transparency and rumors of Madoff committing illegal front-running. (R. 56.1 ¶¶ 255-59, 274-76, 282.)  Peter Stamos also testified that Saul Katz was aware that Madoff would not pass Sterling Stamos' own due diligence process.  (R. 56.1 ¶¶ 257-260, 281.)

Moreover, Peter Stamos and his family members also redeemed their own personal investments from Madoff, and repeatedly warned the Sterling Partners to do the same.  (R. 56.1 ¶¶ 234, 240-42.)  In the early 2000s, the Stamos family had personal investments with Madoff, including Sterling Stamos CEO Peter Stamos, his brother and partner Basil Stamos, his father and partner Spiro Stamos, and Peter Stamos' father-in-law.  (R. 56.1 ¶ 234.)  In the fall of 2004, Peter Stamos directed Sterling Equities partner Arthur Friedman—who was their point of contact with Madoff—to close out all four of the Stamos family members' Madoff accounts.  (R. 56.1 ¶¶ 236-41.)  Basil Stamos testified that his brother Peter Stamos was withdrawing his money and counseling his family to close their Madoff accounts because of Madoff's lack of transparency (R. 56.1 ¶ 241):

> I had all my funds in one hedge fund manager that was not transparent, and even though he had the record of tremendous returns and I was making money off of it, as were, you know – supposedly making money off of it, that he exhibited the discipline to say this does not meet my standards and therefore we should all get out.  (Bohorquez Decl., Ex. 130.)

Chris Stamos, another brother of Peter Stamos who was also the former Chief Operating Officer for Sterling Stamos, testified (R. 56.1 ¶¶ 243-44, 246):

I remember my brother [Peter] saying single risk manager and we didn't really know how Bernie was trading and he wasn't comfortable with the fact that for our family to not know what kind of strategy [Madoff] was even using.  *It was a little scary for us.*  (Bohorquez Decl., Ex.137.)

After Madoff was arrested in 2008, Basil Stamos wrote more than ten emails to friends and colleagues about his brother's "call," confirming that Peter Stamos had warned others to stay away from Madoff for years (R. 56.1 ¶¶ 248-49):

I don't know if you've been following the whole Madoff scandal on Wall Street, but it's extremely interesting from our perspective.  My brother knows all the cast of characters.  *Fortunately he's stayed far away from it all and has instructed others to do the same for years*.  I was actually in the fund in 2002 but Peter counseled me out of it. (Bohorquez Decl., Ex. 148.)

Basil Stamos' testimony, as well as emails written by Peter Stamos and Ashok Chachra, confirmed that Saul Katz and Fred Wilpon were among those that were warned to stay away from Madoff.  (R. 56.1 ¶¶ 248-53.)  After Madoff's arrest in December 2008, Peter Stamos and Ashok Chachra both wrote a number of emails[24] to Sterling Stamos investors confirming that they had warned the Katz and Wilpon families to divest their investments out of Madoff (R. 56.1 ¶¶ 251-53):

- "[Madoff] wouldn't make it through our risk and ops controls – lack of transparency, no third party administrator, etc.  Unfortunately, our partners – Saul and Fred – against our recommendations invested as individuals and through their real estate firm." (Bohorquez Decl., Ex. 149.)

- "Please let me know if you would like to discuss this further as we are trying to inform all of our investors that our due diligence process rejected Madoff but,

---

[24] As the Sterling Partners were also partners in Sterling Stamos, any and all statements made by the Sterling Stamos partners or by Sterling Stamos employees, which were within the scope and duration of their respective relationship to Sterling Stamos, are admissions by a party-opponent under Federal Rule of Evidence 801(d)(2).  *See Saks v. U.S.*, 964 F.2d 1514 (5th Cir. 1992), *Zaken v. Beorer*, 964 F.2d 1319, 1322-23 (2d Cir. 1992), *cert. denied*, 506 U.S. 975 (1992); *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534 (2d Cir 1992).  The Sterling Partners authorized Peter Stamos to take all actions necessary, on their behalf, with respect to the operational and investment decisions of Sterling Stamos.  (R. 56.1 ¶ 173.)  Thus, any and all statements made by Sterling Stamos partners or employees within the scope and duration of their respective relationships are admissible against the Defendants.

unfortunately, the Katz and Wilpon families maintained their investment independent of our advice." (Bohorquez Decl., Ex.150.)

- "We had recommended to [the Wilpon and Katz families] to redeem [from Madoff] for years but they kept their investment independent of our recommendation." (Bohorquez Decl., Ex.151.)

The Defendants selectively quote portions of Peter Stamos' testimony that his "assumption" was that Madoff was among the most "honest and honorable" of men.[25]  (*See* Defs.' Br. at 14-15.)  But Peter Stamos' credibility on this particular point is suspect for several reasons.  First, this testimony is in direct conflict with all of the evidence set forth above, including Stamos' own documents and his own testimony about the Madoff "concerns" that he and Merrill Lynch shared with Saul Katz and/or other Sterling Partners.  Moreover, this portion of Stamos' testimony is directly contradicted by his own emails to investors, as well as the testimony of his *own brother*, who testified that Peter Stamos called the Madoff fraud years ago, redeemed all of their family investments from Madoff, and warned other investors, including Fred Wilpon and Saul Katz, to do so as well. (R. 56.1 ¶¶ 236-42, 245, 247-253.)  Also, it appears that Peter Stamos has a competing self-interest when it comes to testifying about his opinions and concerns about Madoff.[26]  In any event, questions of credibility are classic issues for the trier

---

[25] Contrary to Peter Stamos' testimony regarding Madoff's renown in the hedge fund industry, Mr. Dunleavy testified that he was "surprised" to see such outstanding performance from a manager he had "never" heard of, and Ms. Harrington testified that she was not familiar with Madoff. (R. 56.1 ¶¶ 262-64.)

[26] After Madoff's fraud was revealed, Sterling Stamos and its CEO Peter Stamos faced scrutiny from their investors, their partner Merrill Lynch, and the New York Attorney General's Office regarding the "revelation" that Sterling Stamos had exposure to Madoff through several of Merkin's funds. (R. 56.1 ¶ 265-69.)  While Peter Stamos assured investors that Sterling Stamos was unaware that it had investments with Madoff through Merkin, there is evidence—including Ms. Harrington's testimony—that he and others at Sterling Stamos knew they had previously held investments with Madoff through Merkin's Ascot Fund.   (R. 56.1 ¶¶ 265, 270-71.)  In November of 2004, Peter Stamos emailed Merkin, "We had a tough conversation with our attorneys on Thursday evening that will have several implications for *our investments with our friend in the Lipstick Building*" (emphasis added)). (R. 56.1 ¶ 271.)

of fact to determine, and are inappropriate for determination on summary judgment.

## III.   THE STERLING DEFENDANTS KNEW OF SIGNIFICANT AND MOUNTING RED FLAGS OF FRAUD AT BLMIS, YEAR AFTER YEAR

Over time, between the express warnings from Sterling Stamos' partners discussed above and a wide variety of other sources, the indicia of fraud that had been brought to the Defendants' attention included, among other things:

- that in 2001, financial professionals were publicly expressing skepticism about Madoff's investment strategy and returns (R. 56.1 ¶¶ 165-70);

- that in 2001, after another Madoff investor had discussed procuring insurance for their Madoff accounts that would cover fraud, including a Ponzi scheme, they investigated obtaining such coverage themselves (R. 56.1 ¶¶ 152-63);

- warnings that Madoff appeared to be either a fraud or a fiction (*see* Section II.B.1);

- warnings that Madoff could be illegally front-running to supplement his returns (*see* Section II.B.1; R. 56.1 ¶¶ 273-80);

- warnings that Madoff was unique in the industry because he self-cleared, self-executed and self-custodied his transactions and for this reason and others would not satisfy Merrill Lynch's due diligence (*see* Section II.B.2; R. 56.1¶¶ 255-56);

- warnings that Madoff investments were rejected by Merrill Lynch's due diligence (*see* Section II.B.2); and

- warnings that Madoff lacked transparency, and therefore would not pass Sterling Stamos' due diligence process (*see* Section II.B.3; R. 56.1 ¶¶ 255-60, 281-85).[27]

In addition, the Sterling Partners were also aware of the following red flags of fraud.

### A.   The Sterling Partners Knew that Madoff's Returns Were Not Correlated to the Market or to his Purported Strategy

The Sterling Partners knew that Madoff's purported "split-strike" strategy was intended to limit the upside and the downside of market volatility. (R. 56.1 ¶ 290.)  As evidenced by

---

[27] Sterling Partner Richard Wilpon was informed by Martin Sass, a prominent investment professional with almost 50 years of experience, that Brooklyn College Foundation's Investment Committee had outright rejected investing any of BCF's funds in BLMIS given their "discomfort" with Madoff's lack of transparency. (R. 56.1 ¶¶ 284-89.)

documents in their own files, the Sterling Partners knew that under this "spilt-strike" strategy, they should still expect losses and will not be immune from market volatility. (R. 56.1 ¶¶ 291-96.)  Yet, throughout a period of close to a quarter-century, the Sterling Partners knew received "99.9% of the time" positive, double-digit returns—typically in "excess of 18%"—and never once suffered an annual loss.  (R. 56.1 ¶ 297-300.)  They even admittedly had no understanding of how Madoff achieved these returns. (R. 56.1 ¶ 301.)  In 2003, Noreen Harrington informed Saul Katz and David Katz that Madoff's positive returns year in and year out was a red flag and, in fact, did not correlate to his purported strategy or even the stock market generally. (R. 56.1 ¶ 199, 202-04.)

### B. The Sterling Partners Were Aware of Madoff's Practice of Going to Cash At Year End and Were Warned that it was a Red Flag

The Sterling Partners and their CFO were well-aware that Madoff, without fail, always went "out of the market" and liquidated all of their holdings to cash at every year end, they never inquired as to why.  (R. 56.1 ¶¶ 312-14.)  As early as 2003, Sterling Stamos' Chief Investment Officer warned Saul Katz and David Katz that this behavior was a red flag because it would enable Madoff to avoid regulatory scrutiny. (R. 56.1 ¶¶ 315-16.)

### C. The Sterling Partners Knew that Madoff's Auditor Was a Red Flag

Michael Katz—a former auditor himself—testified that while he did not know the name of Madoff's auditor, he knew that it was a small accounting firm, which raised a concern for him because it "wasn't a Big Eight firm," which would have been better because "[t]hey never have problems."  (R. 56.1 ¶¶ 317, 320.)  The Sterling Partners certainly knew the advantage of using a large, well-known auditor—they use KPMG for the Mets and Ernst & Young for SAP and Sterling Stamos.  (R. 56.1 ¶¶ 318.)  Further, the Sterling Partners understood from their own business partners the importance of examining a fund manager's auditor.  (R. 56.1 ¶ 319.)

IV. **THE STERLING PARTNERS DELIBERATELY CHOSE TO CONTINUE INVESTING WITH MADOFF AND TO REFRAIN FROM ANY SCRUTINY OF THEIR INVESTMENTS**

The Sterling Partners were not only aware of the warnings of their business partners and the mounting red flags of fraud concerning their investments. They were also aware of the very real risks posed to their hundreds of millions of dollars in BLMIS investments if Madoff were even just to be investigated for wrongdoing. In November 2005, after the Bayou fraud had become public, each Sterling Partner was told at a partners' meeting that they should be analyzing their own "*Madoff exposure*." (R. 56.1 ¶ 347.)

In the face of the accumulating red flags of fraud, their business partners in Sterling Stamos had made the choice to stay away from, or to divest themselves, from Madoff investments. But whether driven by compulsion for Madoff's returns, or whether they were simply in too deep with Madoff, the Sterling Partners made a different choice: they chose to continue investing with Madoff. At the same time, the Sterling Partners also deliberately chose to refrain from conducting any due diligence into mounting the red flags. Again, whether this choice was driven by their knowledge that the price of investing with Madoff was compliance with his demands for secrecy (R. 56.1 ¶¶ 383-84) and that too many questions could lead to the loss of their privilege of investing in Madoff's "private club" (R. 56.1 ¶ 392); or by their concern that diligence into the red flags might possibly lead to potential confirmation of a fraud—and their financial undoing—they are bound by the consequences of their choice to be willfully blind to the fraud.

A. **The Sterling Partners Conducted No Due Diligence into their Investments**

As successful commercial real estate magnates, the Sterling Partners admittedly are aware of and have performed extensive due diligence in connection with the many significant business transactions in which they were involved. (R. 56.1 ¶¶ 321-22.) Indeed, they marketed

Saul Katz, David Katz and Fred Wilpon's due diligence capabilities to the investors they were soliciting to invest in their fund, Sterling Stamos.[28]  (R. 56.1 ¶ 177.)  Given the hundreds of millions of dollars they invested with Madoff, one would expect that they would have brought their due diligence skills to bear to protect their own investments.

But the only purported "due diligence" that the Sterling Defendants even claim to have performed for themselves supposedly took place for only a few months in the *late 1980s*—long before any of the red flags of fraud began to accumulate.  (Def. Mem. at p. 8.)  At that time, Sterling Partner Arthur Friedman apparently "checked" transaction prices and attempted to replicate Madoff's strategy at that time.  (*See* Answer ¶ 764; Defs.' Br. at 8; R. 56.1 ¶ 323.)  He never repeated this process at any later date, not even in response to escalating red flags of fraud.[29]

Given that "price checking" in the late 1980s is the sum total of all due diligence that the Defendants can point to over a 25-year history with Madoff, the Defendants attempt to conjure some due diligence from their arms-length lenders.  But it defies credulity that the Sterling Partners would rely upon their bank's credit officers to conduct diligence into their valuable investments rather than entrusting this critical process to any one of their many investment fund business partners at Sterling Stamos.  In any event, the evidence does not support the Defendants' claim, as the bank's own representatives[30] themselves testified they did not perform

---

[28] In fact, Fred Wilpon served on the Board of Directors at Bear Stearns for close to a decade, as well as its Audit Committee.

[29] Friedman acknowledged, "it was very early on.  Could very well have been in '86 and . . . I never repeated that exercise through the years."  (R. 56.1 ¶¶ 323-24.)  Other than this "checking" process, Friedman wasn't sure whether what he did was "necessarily due diligence." (R. 56.1 ¶ 325.)

[30] Representatives of the Sterling Partners' lenders (Fleet Bank and later Bank of America) testified that the banks' only information about Madoff's investment performance came from Sterling Partner Arthur Friedman (who provided summaries of Sterling's historical returns with

any such due diligence into the Sterling Partners' investments.[31]

**B.      Even After Having Lost Millions in the Bayou Ponzi Scheme, the Sterling Partners Still Conducted No Due Diligence on their Madoff Investments**

The Sterling Partners were exposed to another Ponzi scheme, the Bayou fund, in which they invested through Sterling Stamos.  (R. 56.1 ¶ 339.)  Shortly before that fraudulent scheme collapsed, Sterling Stamos' due diligence process led it to redeem its investments from Bayou.  (R. 56.1 ¶ 340.)  The Sterling Partners knew that Sterling Stamos redeemed from Bayou because of specific red "flags" identified by its due diligence process, many of which were applicable to BLMIS. (R. 56.1 ¶¶ 220-24; 255-56; 259; 281-85; 317; 319; 341-46.)

After having been exposed to a Ponzi scheme, most investors would ensure none of their other investments exhibit similar characteristics to the recently-revealed fraud.  (S. Pomerantz Report, ¶ 112.)  The Sterling Partners' own lender had the same reaction after learning that they had been exposed to the Bayou fraud, and asked Sterling's CFO:

> Are there any other funds you were invested in that when completing your ongoing due diligence, as you did for Bayou, you reached similar conclusions with respect to the funds [sic] ability to manage the asset base given the size of its staff.  If yes, did you exit those funds.  (Bohorquez Decl., Ex. 170.)

Still after having lost millions in the Bayou Ponzi scheme, the Sterling Partners never performed basic, independent due diligence on their significant investments at BLMIS. (R. 56.1 ¶ 350.)

---

Madoff), and that the bank never conducted its own analysis of Madoff's returns.  (R. 56.1 ¶¶ 326, 329-31.)  Bank of America never attempted to verify the existence of the purported securities held in the Madoff accounts as reflected on the statements it received and never requested a third-party audit of Madoff.  (R. 56.1 ¶¶ 327-28.)

[31] Also unsupported by the evidence is the Sterling Defendants' notion that they relied upon Travelers Insurance Company, J.P. Morgan, and Fitch to conduct diligence into the Madoff investments.  (Defs.' Br. at 11-13.)  Not a single Sterling Partner recalls receiving the Travelers Insurance Company memorandum prepared by Barry Gonder, and Saul Katz had no recollection of J.P. Morgan's analysis of one of his Madoff accounts.  (R. 56.1 ¶¶ 332-34.)  Fitch did not conduct any independent due diligence, but rather issued a rating based entirely on "documents and information provided by" Sterling, as well as the then-decade old memorandum from Traveler's. (R. 56.1 ¶¶ 335-38.)

Indeed, on the heels of the Bayou fraud, Madoff offered the Sterling Partners a "special investment" opportunity in November 2005 that would purportedly generate 50% greater returns than usual through an entirely "new" strategy. (R. 56.1 ¶ 351.) Admittedly having absolutely no understanding of what this "new" strategy entailed, the Sterling Partners once again chose to invest with Madoff, without conducting any diligence. (R. 56.1 ¶¶ 352-54.)

### C.   The Sterling Defendants Were So Willfully Blind They Remained Ignorant About What Madoff Charged Them

The Sterling Partners were so willfully blind about Madoff, they were content to remain ignorant about a basic fact concerning their investments with BLMIS—how much they were actually paying Madoff to manage substantially all of their liquid assets. They admittedly had "no clue" over what fees they were paying Madoff for more than 25 years to manage hundreds of millions of their investments—and never even bothered to ask. (R. 56.1 ¶¶ 355-57.) Such ignorance of the fees they were paying Madoff is by itself evidence of the Sterling Partners' willful blindness, especially since they knew that in their own investment fund, they enjoyed standard management fees of 1% and performance fees of 10% of assets under management. (R. 56.1 ¶ 358.)

### D.   The Sterling Defendants Had A Duty To Perform Due Diligence In Connection With Their 401(k) Plan And Admittedly Did Not Do So

The Sterling Defendants failed to conduct any due diligence at all, even though they offered Madoff as an investment option for their 401(k) plan on behalf of their employees, two of the Partners served as plan trustees, and Sterling Equities Associates was the plan sponsor.[32] (R. 56.1 ¶ 359-60.) Even though Michael Katz, one of the plan trustees, testified he understood

---

[32] Both Friedman and Michael Katz admitted however, they conducted no diligence on BLMIS in connection with creating the 401(k) plan or at any time thereafter. (R. 56.1 ¶ 367.) Michael Katz acknowledged that the Sterling Defendants treated the 401(k) account with Madoff just like any other account they had with Madoff. (R. 56.1 ¶ 366.)

that as a trustee he "was to make sure that their monies were protected… in a manner that as if it was my money, or better," (R. 56.1 ¶ 365), as plan fiduciaries, the Sterling Partners departed from industry standards by, among other things, failing to conduct further due diligence into Madoff in the face of all of the warnings signs of which they were aware, by compromising their independence and failing to make appropriate disclosure of Madoff's fees. (*See* Expert Report of Harrison J. Goldin at 4-5, 13-16 ("Goldin Report"); (R. 56.1 ¶ 382.)

The Defendants' conscious disregard of their duties to 401(k) plan participants is exacerbated by the fact that the Sterling Partners considered and rejected adding BLMIS as an option for the New York Mets Employee Savings Plan after the Mets Plan Trustees "determined that they were not able to get adequate information from Madoff to provide to the plan participants." (R. 56.1 ¶¶ 368-81.) An independent advisor also warned that BLMIS was an unsuitable option for a Mets 401(k) plan for myriad reasons. (R. 56.1 ¶¶ 370-78.) Yet the Sterling Partners took no action to safeguard the interests of Sterling employees already in the Madoff option in the Sterling plan. (R. 56.1 ¶ 381.) A jury could reasonably conclude that the Sterling Partners' disregard of their fiduciary obligations to their employees is evidence of their conscious avoidance of any investigation into BLMIS.

**E.      Rather Than Scrutinize their Madoff Investments in the Face of Red Flags, the Sterling Partners Instead Took Affirmative Steps to Protect Madoff from Scrutiny**

As noted above, the Sterling Partners were well aware that Madoff demanded confidentiality from his investors. (R. 56.1 ¶¶ 383-84.) So when Madoff expressed concerns about disclosures Sterling Stamos would have to make in connection with its registration as an investment advisor with the Securities and Exchange Commission,[33] the Sterling Partners

---

[33] Peter Stamos' testimony directly contradicts the Defendants' argument that the restructuring of Sterling Stamos was due to the Sterling Partners' own privacy concerns (Defs.' Br. at 26): "I

became extremely troubled that they might no longer be permitted to continue investing with Madoff.[34]  The Sterling Partners devoted great time and expense—from retaining legal counsel to advise on the issues, to office moves, to the complete restructuring of their own investment fund—so as to avoid having to make the disclosures that had so disquieted Madoff.  (R. 56.1 ¶ 394-99.)

In short, while the Sterling Partners would go to great lengths to protect Madoff *from* scrutiny, in stark contrast, they did not spend any time or money on any due diligence that would in fact place Madoff under scrutiny.

## V.    THE STERLING PARTNERS CHOSE WILLFUL BLINDNESS TO MADOFF'S FRAUD UNTIL THEY HAD NO CHOICE

As discussed above, the Sterling Partners were faced and again with the same choice. Every day they remained invested with Madoff, and every time a new warning or red flag of fraud presented itself, they had a decision to make.  Their choices were to: 1) divest themselves from their Madoff investments, like their business partners had done; 2) conduct due diligence into the relevant red flags, and accept the risk of financial undoing if the fraud were confirmed; or 3) turn a blind eye, and continue to invest.

History has shown what the Sterling Partners chose every time:  not only did they choose to continue to invest, they continued to "double-up," work the Madoff "vig," and to increase their leveraged exposure to Madoff.  When it came to Madoff, they chose "in for a penny, in for a pound."

By the time Madoff turned himself in to the authorities in December 2008, the Sterling

---

came to understand [Saul Katz's] concern to be that *Mr. Madoff* had expressed his concern to Mr. Katz."  (R. 56.1 ¶ 386; *see also* ¶¶ 397-89.)

[34]  Peter Stamos testified that Saul Katz was "concerned" that Sterling Stamos' registration "could possibly hurt his relationship with Bernie Madoff" such that "he would no longer be able to continue being an ongoing investor with Mr. Madoff."  (R. 56.1 ¶¶ 387-89.)

Partners had exposure to Madoff-related loans totaling approximately half a billion dollars.  (R. 56.1 ¶¶ 147-49.)  With Madoff's steady income stream dried up instantly, Sterling had only $10 million in cash, and no other accessible sources of liquidity.  (R. 56.1 ¶ 150.)  Their liquidity crisis and their defaults and cross-defaults across all of their loans, credit facilities, pledge agreements and guarantees eventually required a complete restructuring of all their outstanding indebtedness.  (R. 56.1 ¶ 151.)  Without Madoff's fictitious returns, public news accounts report that the Sterling Partners' financial crisis continues three years later.

## ARGUMENT

## I.  SUMMARY JUDGMENT STANDARD AND BURDEN OF PROOF

"In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).  Summary judgment is appropriate only if the court determines that there is no genuine issue of material fact to be tried.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A genuine factual issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 288-89 (1968). There is more than ample evidence from which a jury could find that the Defendants were willfully blind to Madoff's fraud.

### A.  On This Motion, It is the Defendants' Burden To Prove that they Received Every Transfer From BLMIS For Value and In Good Faith

Because it is undisputed that BLMIS made transfers to the Sterling Defendants with actual intent to defraud, the Trustee is entitled to recover *all* transfers alleged in the Amended Complaint unless the defendants can prove that they received those transfers "for value and in

good faith" pursuant to 11 U.S.C. 548. *Picard v. Katz*, No. 11 Civ. 3605 (JSR), 2011 WL 4448638, at *3 (S.D.N.Y. Sept. 27, 2011) ("*Katz I*").[35]  Therefore the only relevant inquiry on this motion is whether the Defendants can satisfy the affirmative defense under section 548(c) of the Bankruptcy Code. *Picard v. Katz*, No. 11 Civ. 3605 (JSR), 2012 WL 127397, at *3S.D.N.Y. Jan. 17, 2012) ("*Katz II*"); *Katz I,* 2011 WL 4448638, at *5.

Among the transfers the Trustee seeks to recover are amounts that are equivalent to the Defendants' principal investments with Madoff. As to these transfers,[36] the Court has ruled that the relevant standard for determining the Defendants' lack of good faith is whether they "willfully blinded themselves to Madoff Securities' fraud." *Katz I*, 2011 WL 4448638, at *6.  In its decision, the Court noted that the initial burden of raising a good faith defense is on the Defendants, but expressly declined to reach "the question of whether, once the defendants have made a prima facie showing of good faith, the burden shifts back to the Trustee to show lack of good faith." *Katz I*, 2011 WL 4448638 at *7 n.9.

The law is clear that the burden of proving *both* elements of the affirmative defense that transfers were received "for value and in good faith" under 548(c) of the Bankruptcy Code rests with the Defendants. *In re Bayou Group LLC*, 439 B.R. 284, 308-09 (Bankr. S.D.N.Y. 2010)

---

[35] The Defendants argue that the Trustee bears the burden of demonstrating that "the transfers were not made to valid creditors and did not discharge valid antecedent debt because, at the time Defendants invested, they had knowledge of or were willfully blind to BLMIS'[s] fraud." (Defs.' Br. at  16-17) (relying on the New York Uniform Commercial Code ("NYUCC") and *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005).)  The Defendants already made the argument that their customer statements from BLMIS represented a "valid antecedent debt" based on the NYUCC and *Sharp,* an argument that this Court rejected. *Katz I,* 2011 WL 4448638, at *4.  This Court found that the transfers BLMIS made to the Defendants were made with actual intent to hinder, delay or defraud creditors*. Id.*

[36] As to fictitious profits, the Trustee need only show (and has shown) that the Defendants "did not provide value for the monies received."  Katz I, 2011 WL 4448638 at *6.   The Trustee accordingly has moved for partial summary judgment on transfers of approximately $83 million of fictitious profits that undisputedly were received by the Defendants.

33

(quoting 11 U.S.C. § 548(c)) (2010)); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243, 256 (Bankr. S.D.N.Y. 2010) and cases cited therein. Accordingly, the Trustee submits that it is the Defendants' burden here to establish "that they did not know of, or willfully blind themselves to, Madoff Securities' fraud." *Katz II*, 2012 WL 127397, at *1.

### B.     Defendants' Lack of Good Faith Is a Factual Question As to Which Summary Judgment is Inappropriate

Regardless of which party bears the burden of proof or whether or how it shifts, the question of the Defendants' state of mind is a factual issue that must be determined by a jury. "Summary judgment is generally inappropriate where questions of intent and state of mind are implicated." *First Capital Inv. Holdings v. Wilson Capital Grp*, No. 10 Civ. 2948 (JSR) 2011 WL 2119737, at *4 (S.D.N.Y. May 23, 2011) (Rakoff, J.); *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473, (1962); *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984).

### C.     Defendants' Self-Serving Statements As a Matter of Law Are Insufficient to Warrant Summary Judgment

As a matter of law, the self-serving statements of an interested party cannot warrant summary judgment. "The mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact." *Sartor v. Arkansas Natural Gas Corp*., 321 U.S. 620, 628 (1944) (quotations omitted); *see also SEC v. Infinity Grp. Co*., 212 F.3d 180, 192-93 (3d Cir. 2000) (defendants' declarations of "'good faith,'" without more, [do] not necessarily preclude a finding of recklessness. . . A good faith belief is not a 'get out of jail free card.'").

## II.     DEFENDANTS' MOTION AT BEST RAISES ISSUES OF FACT AND CREDIBILITY THAT CAN ONLY BE DETERMINED BY A JURY

Although Defendants style their motion as one seeking summary judgment, they do not attempt to show that there are no material issues of disputed fact from which a jury could find in the Trustee's favor. Instead, they ignore much of the evidence that goes against them, challenge

credibility, or argue about the inferences to be drawn from the evidence.  But the face of their own motion alone demonstrates issues of material fact or credibility that are inappropriate for summary judgment.

For example, Defendants concede in their motion that the former Chief Investment Officer of Sterling Stamos, Noreen Harrington, warned Defendants Saul and David Katz in 2003 that Madoff was either engaged in illegal front-running or a fiction. (Defs.' Br. at 24.)  Although the Defendants spend two pages challenging Ms. Harrington's credibility (Defs.' Br. at 23), such determinations are classic jury questions and cannot be determined on summary judgment. *Anderson*, 477 U.S. at 255; *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006); *Dingle v. Zon*, 189 F.App'x. 8, 11 (2d Cir. 2006).

Similarly, Defendants quote extensively from Peter Stamos' testimony as to Madoff's "legendary" reputation, while largely ignoring the litany of damaging testimony concerning his warnings to Defendants described above. *See,* Section II.B.3, *supra*.  None of these previews of the arguments Defendants may make to the jury in any way support a motion for summary judgment in their favor.  *Gillian v. Starjem Restaurant Corp.*, 2011 WL 4639842, 3 (S.D.N.Y. 2011) (Rakoff, J.); *D'Olimpio v. Crisafi*, 718 F.Supp.2d 357, 366 (S.D.N.Y. 2010) (Rakoff, J.).

## III.  THE RECORD IS REPLETE WITH EVIDENCE FROM WHICH A REASONABLE JUROR COULD CONCLUDE DEFENDANTS WERE WILLFULLY BLIND TO MADOFF'S FRAUD

The Defendants argue that there is no plausible reason they would risk, as they put it, their financial fortune and business reputation by "investing in what they suspected [was] a Ponzi scheme" for modest investment returns.  (Defs.' Br. at 21.)  But in addition to misconstruing the facts, as set forth above, the Defendants' motion misconstrues the law.

### A.  Willful Blindness Standard

This Court held that Defendants' absence of good faith cannot be shown based on inquiry

notice but rather must be "based on their willful blindness."  *Katz I*, 2011 WL 4448638, at *5.[37]

The Court defined the difference between these approaches as "essentially the difference

between an objective standard and a subjective standard."  *Id*.  Specifically, the Court found that

while an investor has no inherent duty to inquire about his stockbroker, "[i]f an investor,

nonetheless, intentionally chooses to blind himself to the 'red flags' that suggest a high

probability of fraud, his 'willful blindness' to the truth is tantamount to a lack of good faith."  *Id*.

To reach its conclusion, the Court drew upon cases involving scienter in the securities context,

see *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 215 (1976) and conscious avoidance in the

criminal context, see *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993).

Although courts in and outside this Circuit generally apply an objective "inquiry notice"

standard to a good faith defense under 548(c), a bankruptcy court in this District recently adopted

a willful blindness standard for assessing lack of good faith under the New York Debtor Creditor

Law.  In *Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP) ("Drier II")*, No. 10-5447,

2011 WL 6327385, at *11 (Bankr. S.D.N.Y. Dec. 19, 2011), the bankruptcy court analogized

willful blindness to scienter and conscious avoidance, and framed the relevant question as:  "did

the grantee make a choice between not knowing and finding out the truth; or were the

circumstances such that he was not faced with that choice?" *Id*.  And Bankruptcy Judge Glenn,

without deciding whether an inquiry notice or "conscious avoidance" standard should apply to a

good faith defense under 548(c), noted that under whatever standard, "if it is proved that the

defendants 'consciously avoided' facts that would suggest that the transfers were made with a

lack of good faith, the [d]efendants may not retain the otherwise avoidable transfers based on the

---

[37] In a Motion to Direct Entry of Final Judgment under F.R.C.P. 54(b) and for Certification under 28 U.S.C. §1929(b) for Leave to Appeal, the Trustee indicated his intent to appeal this determination.  Although the Court denied this motion, the Trustee notes his continued objection to the Court's determination.

Section 548(c) defense." *In re Dreier ("Dreier I")*, 452 B.R. 391, 450 (Bankr. S.D.N.Y. 2011). "As put by the Supreme Court, the grantee must take the consequences if he 'chooses to remain ignorant of what the necessities of the case require him to know.'" *Id. (quoting* 1 Gerard Glenn, Fraudulent Conveyances and Preferences 304, at 532) (1940).

The concept of willful blindness has, across other areas of law, generally been distilled to two elements:  (1) the defendant was aware of facts that suggest a high probability of fraud (or whatever the subject of the dispute) and (2) the defendant intentionally blinded himself to those facts or consciously avoided confirming the truth.  *Katz I*, 2011 WL 4448638, at *5; s*ee e.g., Global-Tech Appliances, Inc. v. SEB, S.A.*, 131 S.Ct. 2060, 2070 (2011); *United States v. Adelson,* 237 F. App'x. 713, 715 (2d Cir. 2007) (conspiracy); *SEC v. Credit Bancorp, Ltd.,* 386 F.3d 438, 448 (2d Cir. 2004) (notice of an adverse claim under the NYUCC*); In re Fischbach Corp. Sec. Litig.*, No. 89 Civ. 5826, 1992 WL 8715 (S.D.N.Y. Jan. 15, 1992 (fraudulent misrepresentations under Rule 10b-5).

**B.  A Reasonable Jury Could Conclude that Defendants were aware of facts suggesting a high probability of fraud at BLMIS.**

**1.  The test is whether Defendants were aware of facts that would suggest a high probability of fraud to investors like them, not whether they actually suspected that Madoff was running a Ponzi scheme.**

As this Court framed it, the first question is whether the Defendants were aware of "the 'red flags' that suggest a high probability of fraud."  *Katz I*, 2011 WL 4448638, at *5.  The test is ultimately a subjective one, meaning that it turns on the facts actually known to the defendant. The defendant's awareness that a fact he knows constitutes a "red flag" can be inferred based on whether that fact likely would alarm a similarly-situated defendant:  in this case, a sophisticated group of investors with vast financial resources, including ownership of diverse companies.  *See, e.g., Gebhart v. SEC*, 595 F.3d 1034, 1042 n.11 (9th Cir. 2010) ("the objective unreasonableness

of the defendant's actions may raise an inference of scienter"); *SEC v. Cooper*, 402 F.Supp. 516, 521 (S.D.N.Y. 1975) ("As a sophisticated, experienced and knowledgeable broker, [defendant] would have had to have been blind not to see what was going on[.]"); NYUCC § 8-105(a)(2), Comment 4 (the "awareness aspect *turns on facts about the world and the conclusions that would be drawn from those facts, taking account of the experience and position of the person in question.*") *Id.* (internal citations omitted) (emphasis added).

But a subjective standard does not mean that a defendant can defeat a claim of willful blindness merely by denying a subjective understanding of the significance of the facts that were laid out before him. "[T]he individual need only have actual awareness of the facts giving rise to suspicion. Actual suspicion is not necessary." *SEC v. Credit Bancorp*, 279 F. Supp. 2d, 247, 264 (S.D.N.Y. 2003) (emphasis removed); *see, e.g., SEC v. Infinity Grp. Co.,* 212 F.3d 180, 193 (3d Cir. 2000) ("A good faith belief is not a 'get out of jail free card' [and] will not insulate the defendants from liability if it is the result of reckless conduct."); *SEC v. U.S. Envt.l, Inc.,* No. 94 Civ. 6608 (PKL), 2003 WL 21697891, at* 24 (S.D.N.Y. July 21, 2003) (internal quotation omitted) (holding that defendants' assertion that objective factors did not and would not have raised any red flags "flies in the face of reality."). To the contrary, "[r]ed flags … can be used to show both actual knowledge and conscious avoidance." *United States v. Ferguson,* Nos. 08-6211-cr, et seq., 2011 WL 6351862, at *10 (2d Cir. Dec. 19, 2011); *In re Optimal US Litig.,* No. 10 Civ. 4095, 2011 WL 4908745, at *8 (S.D.N.Y. Oct. 14, 2011) (allegations of red flags at BLMIS can support inference that party was willfully blind); *Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 372, 411 (S.D.N.Y. 2010) ("Here, Plaintiffs allege that the Fraud Defendants ignored not only what was handed to them but that what they were given was readily suspicious to any reasonable person exercising ordinary prudence.").

Moreover the legal standard is not, as suggested by Defendants, whether they had reason to suspect that BLMIS was specifically operating a Ponzi scheme as opposed to any other kind of fraudulent enterprise.  *See, Katz I*, 2011 WL 4448638, at *5 ("high probability of fraud"), *6 ("willfully blinded themselves to Madoff Securities' fraud"); *4 (asking why defendants would willfully blind themselves to a "fraudulent enterprise"); * 4 ("Both sides also agree, however, that if the defendants willfully blinded themselves to the fact that Madoff Securities was involved in *some kind of fraud*, this too might, depending on the facts, constitute a lack of good faith.") (emphasis added); *see also, In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 407 n.8 (S.D.N.Y. 2010) (while it did not appear defendants firmly believed Madoff was operating a Ponzi scheme, their  "more generalized, albeit grave, doubts" were sufficient to plead scienter).

### 2.     The facts known to the Defendants suggested a high probability of fraud.

The Chief Investment Officer of Defendants' own fund of funds flatly stated that she believed BLMIS to be either front-running or a fiction, based on only some of the facts known to the Sterling Defendants.  As set forth above in Fact Sections II and III, the Sterling Partners had been warned by their business partners and they were aware of numerous indicia of fraud.  This is not as Defendants suggest a case in which the fraud was only visible with hindsight.  *See, e.g., Croscill Inc. v. Gabriel Capital* (I*n re Merkin and BDO Seidman Sec. Litig.)*, No. 08 Civ. 10922, 2011 WL 4435873, at *8 (S.D.N.Y. Sept. 23, 2011).  Where, as here, defendants received direct warnings and/or had access to suspicious information about BLMIS beyond which was commonly available, courts have found a basis for scienter.  *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 412 (S.D.N.Y. 2010)*; In re Optimal U.S. Litig.*, No. 10 Civ. 4095 (SAS), 2011 WL 4908745, at *7-8 (S.D.N.Y. Oct. 14, 2011); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 357 (S.D.N.Y. 2011).

### C. A Reasonable Jury Could Conclude that Defendants Consciously Avoided Confirming BLMIS's Fraud.

The next step in the willful blindness inquiry is whether defendants intentionally blinded themselves to the facts in order to avoid confirming the fraud. With respect to this second part of the willful blindness analysis, *the test is the character of the person's response to the information the person has.* NYUCC § 8-105(a)(2), Comment 4 (emphasis added). As the *Drier* court put it, the relevant question here is "did the grantee make a choice between not knowing and finding out the truth; or were the circumstances such that he was not faced with that choice?" *Drier II,* 2011 WL 6327385, at *11.

This Court and others have held that a party deliberately or consciously disregards the truth if it was consciously reckless when it comes to confirming its suspicions of fraud. *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 241 (S.D.N.Y. 1997) (Rakoff, J.) (*citing Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir. 1978); *SEC v. Musella,* 748 F.Supp. 1028, 1039 and n.5 (S.D.N.Y. 1989) (recklessness in trading on misappropriated non-public information sufficed to establish liability for insider trading, since conscious avoidance of the source of information did not defeat scienter); *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1039 (7th Cir. 1977) ("[R]ecklessness is sometimes considered a form of intentional conduct"). This Court has described such recklessness as "a conscious and purposeful disregard of the truth about a known risk." *In re Baesa Sec. Litig.,* 969 F.Supp. at 241.[38]

In determining whether a defendant consciously avoided learning the truth about a fraud, courts have looked to numerous factors, including factors such as whether the defendant had a

---

[38] Similarly, in the intellectual property context, courts have found willful violations of property rights based on a finding of reckless disregard for the truth. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 263 (2d Cir. 2005) (stating that willful blindness means the defendant recklessly disregarded the possibility that its conduct represented infringement).

motive for ignoring signs of fraud and whether the defendant's sophistication was such that its failure to respond to signs of fraud was likely something more than negligence.

### 1.    Defendants had several compelling motives to ignore the fraud.

"[I]n most cases of 'reckless disregard of the truth,' defendants have had a motive for deliberately remaining ignorant of the facts in question, rendering their characterization as willfully blind more plausible." *In re Fischbach Corp. Sec. Lit.,* No. 89 Civ. 5826, 1992 WL 8715, at *6 (S.D.N.Y. Jan. 15, 1992). Such a motive is typically present when "the defendant enjoys a profitable financial association with another who is willfully committing a fraud" and therefore "[t]he defendant is motivated not to 'open his eyes; to the underlying facts, since this would place him in a position of terminating his profitable situation and exposing his associate or continuing to participate in the fraudulent activities but now without his cherished modicum of deniability." *Id.* "The combination of this motivation and an otherwise unlikely degree of mere carelessness gives rise to an inference of deliberate disregard for the facts." *Id.*

Accordingly, in assessing whether a defendant was willfully blind to a fraud, courts will explore whether a defendant had a motive for choosing to ignore tell-tale signs. *See Katz I,* 2011 WL 4448638, at *4; *In re Leslie Fay Cos. Inc. Sec. Litig.,* 835 F.Supp. 167, 174 (S.D.N.Y. 1993) (defendant's "long and profitable history of providing Leslie Fay with auditing and other accounting services [was] a possible motive for [defendant] turning a blind eye to the Company's fraudulent accounting"); *Dreier II,* 2011 WL 6327385, at *14 (defendants "blindly invested in the Note Fraud in the hopes of turning a huge profit at the expense of later investors"); *Kirschner v. Bennett (In re Refco Sec. Litig.),* 759 F. Supp. 2d 301, 335 (S.D.N.Y. 2010) (Rakoff, J.) (law firm motivated to remain willfully blind because of "millions of dollars of fees . . . and the consequent interest in seeing Refco stay afloat.").

Here, as detailed above, the Defendant had every motive to ignore Madoff's fraud. *See*

Part I, *supra.* The Sterling Partners had become utterly dependent on Madoff's investment returns, which over time had grown to become the very cornerstone of their business plans and personal finances.  Moreover, they had become over-dependent upon their BLMIS accounts to secure hundreds of millions of dollars in bank loans—loans as to which, as they admit, could be in default upon just an investigation into BLMIS.

### 2. Defendants' sophistication makes their mere negligence doubtful.

In determining whether a defendant's conduct rises to the level of willful blindness, a factfinder must consider whether the experience and sophistication of the defendant makes other, more innocent explanations, less plausible.  *See, e.g., SEC v. Elliot,* No. 09-7594, 2011 WL 3586454, at *15 (S.D.N.Y. Aug. 11, 2011); *SEC v. Cooper*, 402 F. Supp. 516, 521 (S.D.N.Y. 1975).  When combined with motive, an "otherwise unlikely degree of mere carelessness gives rise to an inference of deliberate disregard for the facts." *Fishbach,* 1992 WL 8715, at *6; *see also SEC v. Credit Bancorp Ltd.*, 386 F.3d 438, 450-53 (2d Cir. 2004) (based on broker's sophistication and experience, his purported reliance on assurances by interested party about potential adverse clam instead of consulting relevant documents constituted conscious avoidance).; *see also* NYUCC § 8-105(a)(2) Comment 4.

Any notion that Defendants' failure to scrutinize their BLMIS investments despite these indicia of fraud was the result of mere negligence is simply not credible.  Defendants are successful real estate investors who own, among other things, a baseball team, an investment fund, and a cable television station.  In connection with investments and complex transactions, the Sterling Partners routinely perform diligence, such as:

> We do market studies, we do business plans, we do investor books, we do legal due diligence, financial due diligence, and we obtain outside consultants for banks, which would be the appraisals, engineers, environmentals. Identify markets, business plans, investors, legal, financial, outside with finance.  And we

get a joint venture partner to run the property.  Okay, that's basically it.  *We do that for each one of our assets.*

(Bohorquez Decl., Ex. 5, M. Katz Tr. 42:9-43:1; 44:16-45:13 (emphasis added.))   Yet as to hundreds of millions of dollars of BLMIS investments, the Sterling Partners point to absolutely no diligence they performed since the late 1980s, even as the indicia of fraud continued to accumulate throughout the 2000s up until the scheme collapsed in 2008.

In marketing materials soliciting potential investors for the Sterling Stamos investment fund, Sterling Partners Saul Katz, David Katz and Fred Wilpon were held out as investment professionals.  (R. 56.1 ¶ 177.)  But these same individuals claim in this case they did not even know the most basic facts of their investment relationship with Madoff, including what he had been charging them for managing their hundreds of millions of dollars.  A jury could conclude based on these facts alone that the only plausible explanation for the Defendants' utter failure to scrutinize Madoff is conscious avoidance.

### D. The totality of evidence, at a minimum, raises a question for jury.

The fundamental question is whether Defendants were willfully blind to facts of which they were aware that indicated a high probability of fraud.  The answer to that question based on the record here is yes.  At a minimum, the totality of evidence creates an issue of fact that can be resolved only by a jury.  *See*, *e.g., Benjamin v. Kim*, No. 95-9597, 1999 WL 249706, at *8-9 (S.D.N.Y. Apr. 28, 1999) (holding that "the combination of [the] facts should have made [defendant] aware of, or at least suspicious about, possible fraudulent practices or accounting irregularities . . ., and that any failure to discover such facts amounted to willful blindness on his part."   As Judge Learned Hand put it in a similar context, "the sum is often greater than the aggregate of the parts, and the cumulation of instances, each explicable only by extreme credulity or professional inexpertness, may have probative force immensely greater than any one

of them alone." *United States v. White*, 124 F.2d 181, 185 (2d Cir. 1941); *see also SEC v. Cooper*, 402 F. Supp. 516, 523-24 (S.D.N.Y. 1975)("[i]n light of all the objective facts, [defendant's] protestations of innocence and unawareness of D'Onofrio's manipulative conduct flies in the face of reality").

## IV.   THE STERLING PARTNERS' WILLFUL BLINDNESS IS IMPUTED AS A MATTER OF LAW TO ALL STERLING DEFENDANTS

### A.   The Sterling Partners' Bad Faith with Regard to Defendants' BLMIS Investments Is Imputed to All Defendants

Perched atop Sterling Equities, Saul Katz and the other Sterling Partners dominate and control every material aspect of the Sterling enterprise with a view towards maximizing the personal wealth of themselves and their family.  (R. 56.1 ¶ 401-03.)  Put simply, the Sterling enterprise is a single "Super Family,"[39] comprised of the Sterling Partners, their family members, their trusts, and Sterling-related entities—indeed, all of the Defendants.[40]

Within the "Super Family" that is Sterling, "[a]ll decisions are made by all the partners." (R. 56.1 ¶ 404.)  The Sterling Partners' own management meeting agendas and minutes reflect that they collectively discussed and made decisions with respect to all aspects of their business— be it SAP, the Mets, Sterling Stamos, or "Madoff."[41]  (R. 56.1 ¶¶ 87, 405-06.)

As acknowledged by Saul Katz, and well known internally and to the outside world, Mr. Katz was the "overseer" of the cash/liquidity arm of the business and manager of Sterling's financial strategy and investments. (R. 56.1 ¶¶ 409-10.)  Arthur Friedman—with the Sterling

---

[39] Bank of America referred to the various Sterling-related entities, trusts, and individuals as all part of the same Katz / Wilpon "Super Family."  (R. 56.1 ¶ 400.)

[40] The Sterling Partners held Sterling Equities out to their lenders as a "group of like-minded individual investors, their families, trusts and related entities."  (R. 56.1 ¶ 401.)

[41] The Sterling Partners collectively discussed the "Madoff" arm of their business at every bi-weekly management meeting and received reports on the projected and actual rates of return across all Defendants' BLMIS accounts.  (R. 56.1 ¶¶ 88-91.)

Partners' express authorization—served as the liaison between the all Defendants and BLMIS whereby he would: coordinate all transactional activity across the Defendants' hundreds of accounts (R. 56.1 ¶ 411-12, 415-18), communicate daily with BLMIS on behalf of all Defendants about their accounts and documentation (R. 56.1 ¶ 416), receive and review all Defendants' account documentation (R. 56.1 ¶ 413), and calculate Defendants' average monthly and annual rates of return (R. 56.1 ¶ 414-15).

The Sterling Partners collectively decided not only which entities would invest in Madoff and how much, but also which entities would be created for the express purpose of investing in Madoff, including the double-up entities.  (R. 56.1 ¶¶ 93, 406, 424-25.)  In addition to their control over the double-up BLMIS accounts, the Sterling Partners also dictated the flow of and freely transferred funds between and among the BLMIS accounts in which their family members held interests.[42] (R. 56.1 ¶ 426.)

The financial statements which were sent to lenders reflected *all* of the Sterling Defendants' assets, including all BLMIS investments.  (R. 56.1 ¶ 427.)  Bank of America considered all of its hundreds of millions of dollars in loans to various Sterling Defendants as falling "under the Sterling umbrella," because it recognized that the Sterling Partners owned, managed and controlled the Defendants. (R. 56.1 ¶¶ 428-29.)

The Sterling Defendants' conduct after revelation of Madoff's fraud—when they were forced to restructure their collective $525 million in defaulted loans—only confirms that the Sterling Partners operate the Sterling enterprise as one unit and that they control all of the Sterling Defendants' investments.   Throughout the restructuring negotiations, the Sterling

---

[42] The Sterling Partners not only controlled the investments of their own children and trusts in the double-up accounts, they retained benefits from loans taken in their family members' names. (R. 56.1 ¶¶ 419-23.)

Partners held themselves and the Defendants out as a single enterprise.  (R. 56.1 ¶ 433.)  Saul Katz repeatedly represented to lenders throughout the restructuring negotiations that "Sterling" would repay all the money Defendants had borrowed, regardless of which entity, trust or individual borrowed or guaranteed a particular loan.  (R. 56.1 ¶¶ 434-35.)  The lenders understood that "Sterling Equities" "represent[ed] the collective interests of the Wilpon and Katz families." (R. 56.1 ¶ 437.)

Both the Sterling Partners and their lenders recognized that the ownership interests in the myriad of Sterling entities and trusts were too interrelated to restructure Defendants' debts on a discrete loan by loan basis. (R. 56.1 ¶¶ 431-32.)  Thus, the success of restructuring the Defendants' collective debt hinged on the Sterling Partners' ability to pool together all of "Sterling's" collective assets to provide their lenders with sufficient new collateral. (R. 56.1 ¶ 438.)  As a result of the restructuring, various Defendant entities which had been largely unaffected by the Ponzi scheme owned many of the assets that were now pledged to lenders as new collateral.  (R. 56.1 ¶¶ 439-41.)  In the course of restructuring, the Sterling Partners even pledged the assets of the Defendant Trust Entities Trust—which were purportedly established for the benefit of Saul Katz's and Fred Wilpon's children and grandchildren, respectively—as replacement collateral, and then burdened them with a total of $113 million dollars of new debt for the benefit of the entire Sterling Defendants' enterprise.  (R. 56.1 ¶¶ 442-47.)

**B.      The Sterling Partners' Bad Faith Is Imputed to All Defendants.**

The undisputed facts show that at all relevant times, Defendants' BLMIS accounts were all jointly managed, controlled and administered by the Sterling Partners, including Saul Katz and Arthur Friedman.  The Sterling Partners used the BLMIS accounts as the cash/investment arm for the Sterling Defendants' collective businesses, for the benefit of all of the Defendants, including themselves.  The Defendants' argument, therefore, that the willful blindness of the

Sterling Partners cannot be imputed to the remaining Defendants is nonsense.

At a minimum, the Sterling Partners were the agents for all Defendants, on whose behalf they acted. *See Art Finance Partners, LLC v. Christie's Inc*., 58 A.D.3d 469, 471, 870 N.Y.S.2d 331, 333 (1st Dep't 2009) ("A principal-agent relationship may be established by evidence of the consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act even where the agent is acting as a volunteer).  As discussed above, one of the primary benefits to the Defendants of the BLMIS relationship was the Sterling Partners' ability to access cash and purported income from *all* of the Defendants' BLMIS accounts, which they used as the primary source of liquidity and cash flow across the Defendants' operations.  Under fundamental principles of agency law, the Sterling Partners' knowledge and scienter are imputed to all Defendants, who delegated the responsibility over their accounts to them.  *See Kirschner v KPMG LLP*, 15 N.Y.3d 446, 465, 912 N.Y.S.2d 508, 518 (2010); *see also* Restatement (Third) of Agency § 5.03, rep. notes a (2006) ("Imputation reduces incentives that agents and principals may otherwise have to ignore or turn a blind-eye to facts that the principal would prefer not to know.").

Indeed, by accepting and retaining the benefits of their fraudulent BLMIS investments, the Sterling Defendants are estopped as a matter of law from denying that the Partners' willful blindness should be imputed to them.  *See Marine Midland*, 50 N.Y.2d 31, 44, 427 N.Y.S.2d 961, 968 (1980).  Having received transfers of almost $300 million in fictitious profits, together with additional profits from the leveraging of and liquidity created by the BLMIS accounts, Defendants now cannot disclaim the consequences arising from the Partners' knowledge and willful blindness relating to those accounts.  *See id*., *see also Apollo Fuel Oil v. United States*,

195 F.3d 74, 77 (2d Cir. 1999).[43]

But more than mere agents, the Partners dominated and controlled the Defendants' accounts to such an extent that the law recognizes the Partners as the equitable or *de facto* owners of Defendants' accounts.  Defendants throw up the "Sterling Equities partnership" as a shield, arguing that there is "no evidence that the Sterling Equities *partnership*…made *any* investment decisions for anyone."  (Defs.' Br. at 33) (emphasis in original.)  But the relevant evidence here is the vast and undisputed evidence that the individual Sterling Partners controlled and dominated Defendants' BLMIS accounts on behalf of all Defendants.   As a technical matter, the individual Partners were also members, partners and/or officers of the limited liability companies, partnerships, and corporations through which they invested with BLMIS, meaning that most if not all of the Sterling Defendants already are directly liable for the Partners' knowledge, without implicating concepts of agency or equitable ownership.  *See, e.g., Anwar*, 728 F.Supp.2d at 409 (scienter "can be easily imputed" from corporate principals and officers to corporate defendants).  But such granularity is not necessary here because the evidence shows that both before and after BLMIS collapsed, the Partners treated the various Defendant entities as empty shells through which they could pool and shuffle their collective personal and business assets at will.  Such lack of corporate formality is a textbook example of, at a minimum, *de facto* or equitable ownership.  *See Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995); *Guilder v. Corinth Constr. Corp.*, 235 A.D.2d 619, 620, 651 N.Y.S.2d 706 (3d Dep't

---

[43] To the extent Defendants attempt to revive the argument that "willful blindness cannot be imputed to the same extent as actual notice, they remain fundamentally mistaken.  See Tr. Br. at 105-110, incorporated by reference; *Farr v. Newman*, 14 N.Y.2d 183, 187, 250 N.Y.S.2d 272, 275 (1964) ("It is well-settled that the principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency."); Restatement (Third) of Agency, § 5.03 cmt. A (2006) (stating "a principal is charged with notice of facts that an agent knows or has reason to know.").

1997).[44]

While the Trustee submits that imputation is established as a matter of law, at a minimum the Trustee is entitled to present the issue to a jury for its determination. *See Murray Hill Manor Co. v. Destination Paradise, Inc.*, 266 A.D.2d 132, 698 N.Y.S.2d 482 (1st Dep't 1999) (affirming a denial of summary judgment after finding that issues of fact existed as to whether defendants exercised domination and control); *Reznor v. J. Artist Mgmt., Inc.*, 365 F.Supp.2d 565, 575 (S.D.N.Y. 2005) (Rakoff, J.) (denying summary judgment because "[n]umerous disputed questions remain as to the nature and scope of their agency that must be resolved before one can determine the effect of such imputed knowledge").

## V.   THE SUBSEQUENT TRANSFER COUNT IS NEITHER RIPE NOR APPROPRIATE FOR  SUMMARY JUDGMENT

In its decision and order denying Trustee's Motion to Appeal, the Court reinstated Count Nine of the Amended Complaint, which seeks recovery of avoided transfers from subsequent transferees. Because this count was just reinstated, discovery on this issue is ongoing and resolution on summary judgment is premature. In addition, it is undisputed that some of the Defendants here are initial transferees of fictitious profits and/or principal from BLMIS and subsequently transferred those amounts to other Defendants. For reasons already stated by this Court, no value can ever be given for receiving transfers of fictitious profits. Accordingly, all subsequent transferees of fictitious profits never gave value for such transfers and thus must disgorge the transfers or the value thereof to the Trustee pursuant to section 550(a)(1) of the

---

[44] As discussed in the Trustee's Brief in Opposition to Motion to Dismiss, the Trustee will be able to pierce the corporate veil and establish alter ego liability at trial. However, in opposing the Defendants' motion for summary judgment the Sterling Partners' domination and control is detailed not for these purposes but to demonstrate that the Partners so disregarded the separate legal existence of the Defendant entities that they are one and the same for purposes of imputing bad faith.

Bankruptcy Code.  Finally, the subsequent transferees of principal either were willfully blind or are imputed with the willful blindness of their initial transferees such that they did receive their transfers in good faith.  At a minimum, this is a question of material fact and not appropriate for resolution on summary judgment.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Trustee respectfully requests that the Sterling Defendants' motion be denied in its entirety.

Dated: New York, New York
       February 9, 2012

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By: /s/  *David J. Sheehan*
    Baker & Hostetler LLP
    45 Rockefeller Plaza
    New York, New York 10111
    Telephone: (212) 589-4200
    Facsimile: (212) 589-4201
    David J. Sheehan
    Fernando A. Bohorquez, Jr.
    Regina L. Griffin
    Tracy L. Cole

    *Attorneys for Irving H. Picard, Esq. Trustee*
    *for the Substantively Consolidated SIPA*
    *Liquidation of Bernard L. Madoff Investment*
    *Securities LLC And Bernard L. Madoff*